# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.* STF, LLC, <br><br>      *Plaintiff,* <br><br>     v. <br><br> CHRISTOPHER GROTTENTHALER, SUSAN HERTZBERG, JEFFREY "BOOMER" CORNWELL, STEPHEN KASH, MATTHEW THEILER, WILLIAM TODD HICKMAN, COURTNEY LOVE, LAURA HOWARD, CHRISTOPHER GONZALES, JEFFREY MADISON, PEGGY BORGFELD, STANLEY JONES, JEFFREY PARNELL, THOMAS GRAY HARDAWAY, RUBEN MARIONI, JORDAN PERKINS, GINNY JACOBS, SCOTT JACOBS, ASCEND PROFESSIONAL MANAGEMENT, INC., ASCEND PROFESSIONAL CONSULTING, INC., BENEFITPRO CONSULTING LLC, NEXT LEVEL HEALTHCARE CONSULTANTS LLC, LGRB MANAGEMENT SERVICES LLC, S&G STAFFING, LLC, and JACOBS MARKETING, INC., <br><br>      *Defendants.* | Civil Action No. 4:16-CV-547 <br><br> **UNITED STATES' COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> <u>**FILED UNDER SEAL**</u> |

The United States of America, for its complaint, states:

## NATURE OF ACTION

1.    This is an action against laboratory and hospital executives, employees, and recruiters to recover treble damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729–33, and to recover money for common law or equitable causes of action for payment by mistake and unjust enrichment.

2.    From at least 2010 to 2014, various laboratories encouraged healthcare providers to order blood tests by directly paying providers kickbacks disguised as processing and handling (P&H) fees. Laboratories competed to offer the highest P&H fees to providers, topped by Health

Diagnostics Laboratory, Inc. (HDL) paying $20 per referral. Various FCA suits against laboratories and individual defendants were filed regarding these kickbacks to referring providers, including FCA suits against HDL and Boston Heart Diagnostics Corporation (BHD). In June 2014, the Office of the Inspector General for the Department of Health and Human Services (HHS-OIG) issued a special fraud alert warning about kickbacks for laboratory referrals. In April 2015, the Department of Justice (DOJ) intervened in an FCA suit alleging that HDL and three executives had offered and paid kickbacks for laboratory referrals. HDL settled for $47 million and each of the three executives were found liable for over $111 million in a judgment affirmed in all respects by the Fourth Circuit, with certiorari denied by the Supreme Court. Similarly, BHD paid over $26 million to settle allegations of paying P&H fees and other kickbacks.

3.      Despite HHS-OIG's published warning and DOJ's enforcement action, a new laboratory kickback scheme began in or about August 2014, just two months after HHS-OIG's special fraud alert. The kickback scheme involved payments to healthcare providers through purported management services organizations (MSOs) to induce the providers' laboratory referrals. The MSO kickback scheme began by executives Jeffrey Madison and Peggy Borgfeld at Rockdale Hospital d/b/a Little River Healthcare (LRH), a small critical access hospital system based in Rockdale, Texas. While the MSO kickback scheme initially concerned toxicology testing, it expanded to include diagnostic blood testing in or about May 2015, just one month after DOJ's enforcement action against HDL and three executives.

4.      Through the MSO kickback scheme, many of those previously involved in the laboratory P&H fee kickback scheme continued to use kickbacks to induce laboratory referrals. Both BHD and HDL's successor, True Health Diagnostics, LLC (THD), joined and participated in the MSO kickback scheme. So did their executives, including THD's Chief Executive Officer

(CEO) Christopher Grottenthaler, Vice President (VP) of Sales Boomer Cornwell, Director of Strategic Accounts Stephen Kash, and Account Executive Courtney Love, and BHD's CEO Susan Hertzberg, VP of Sales Matthew Theiler, and Area Sales Manager Laura Howard. Cornwell, Kash, Love, and Howard each had worked as employees or contractors for HDL and had offered P&H fee kickbacks to providers in Texas. With their new kickback schemes, they targeted many of the same providers who had received P&H fee kickbacks.

5.     In the MSO kickback scheme, BHD and THD conspired with small Texas hospitals to submit false claims to Medicare, Medicaid, and TRICARE. Pursuant to the kickback scheme, the hospitals paid recruiters to arrange for and recommend referrals, and the recruiters kicked back a portion of the hospital payments to the referring providers who ordered BHD or THD laboratory tests from the hospitals or from BHD or THD themselves. BHD and THD, though competitors, worked with the same hospitals and recruiters to pay kickbacks to providers. Their executives and sales force leveraged the MSO kickbacks to gain and increase provider referrals and, in turn, to increase their own pay. To increase reimbursement, one of the hospitals, LRH, falsely billed the laboratory tests as hospital outpatient services. Moreover, as part of the scheme, providers were encouraged by the laboratories, hospitals, and recruiters to routinely order large panels of laboratory tests for patients, even when not reasonable and necessary.

6.     In addition to the MSO kickback scheme, numerous defendants participated in additional schemes to pay kickbacks in the form of (a) P&H fees to draw site companies that were purportedly independent of referring providers, but in fact were conduits to pay P&H fees to providers and their employees to induce referrals for laboratory testing; (b) monthly fees to a high-referring provider, disguising the payments as consulting fees for participating in THD's advisory board, even though no such board actually existed at THD; and (c) waiving patient copayments

and deductibles. These kickbacks were paid to induce referrals to federal healthcare programs for laboratory testing.

7.    Further, numerous defendants knowingly submitted and/or caused LRH and THD to submit to Medicare claims for laboratory testing that were improperly referred by physicians with a financial relationship with LRH and THD, respectively, in violation of the physician self-referral law (commonly referred to as the Stark Law). The laboratory testing referrals were improper because the physicians had financial relationships with LRH or THD that did not satisfy any applicable Stark Law exception.

8.    Lastly, defendants arranged for and recommended that healthcare providers routinely order laboratory testing from THD, BHD, and LRH without regard to specific patient needs, and encouraged providers to order laboratory tests that were not reasonable and necessary for the diagnosis or treatment of any illness or injury of the patient or to improve the functioning of any malformed body member of the patient.

## JURISDICTION AND VENUE

9.    This action arises under the FCA and the common law.

10.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1345 because the United States is the plaintiff. The Court also has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367(a).

11.    The Court may exercise personal jurisdiction over the defendants under 31 U.S.C. § 3732(a) because acts proscribed by the FCA, 31 U.S.C. § 3729, occurred in this District, and one or more defendants can be found, reside, or transact business in this District.

12.     Venue is proper in the Eastern District of Texas under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District, and one or more defendants can be found, reside, or transact business in this District.

## PARTIES

13.     Plaintiff, the United States of America, acting through the Department of Health and Human Services (HHS), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (SSA), 42 U.S.C. §§ 1395 *et seq.* (Medicare), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 et seq. (Medicaid). The United States, acting through the Defense Health Agency (DHA), administers the TRICARE program (formerly CHAMPUS). Relator STF, LLC has filed this case under the FCA's *qui tam* provisions, and the United States has intervened in part, declined in part, and added additional claims pursuant to 31 U.S.C. § 3731(c).

14.     Relator STF, LLC is a limited liability company, whose members are Felice Gersh, M.D. and Chris Riedel.

15.     Defendant Christopher Grottenthaler was the founder and CEO of THD, Outreach Management Solutions LLC d/b/a True Health Outreach (THD-Outreach), and Health Core Financial LLC d/b/a True Health Financial (THD-Financial). During the relevant period, he resided in Frisco, Texas, and the headquarters for THD, THD-Outreach, and THD-Financial were in Frisco, Texas.

16.     Defendant Susan Hertzberg was BHD's Chief Executive Officer. She oversaw BHD's business in Texas, including its relationship with LRH. Hertzberg transacts business in Texas and is CEO and director of BrainScope Company, Inc., a company registered to do business in Texas.

17.     Defendant Jeffrey "Boomer" Cornwell resides in McKinney, Texas, in this District, and was hired by and reported to Grottenthaler as THD's VP of Sales for the Southwestern Region, which included the State of Texas.

18.     Defendant Stephen Kash resides in Beaumont, Texas and was hired by and reported to Grottenthaler as THD's Director of Strategic Accounts. Kash also was a recruiter for MSOs that paid kickbacks to providers in Texas, including in this District.

19.     Defendant Matthew Theiler was BHD's VP of Sales. In that role, he supervised BHD employees responsible for sales in Texas, including in this District.

20.     Defendant William Todd Hickman resides in Lumberton, Texas and owned and operated defendants Ascend Professional Management, Inc. (APM) and Ascend Professional Consulting, Inc. (APC), each of which was a corporation incorporated in Texas with its principal place of business in Texas. Hickman also owned and operated defendant BenefitPro Consulting LLC (BenefitPro), a company formed in Texas with its principal place of business in Texas.

21.     Defendant Courtney Love resides in Dallas, Texas. She was a THD Account Executive in Texas, and her sales territory included this District.

22.     Defendant Laura Howard resides in Allen, Texas. She was a BHD Area Sales Manager, whose sales territory included this District. She also was a recruiter for MSOs that paid kickbacks to providers in Texas, including in this District.

23.     Defendant Christopher Gonzales resides in McKinney, Texas. He was a recruiter for MSOs that paid kickbacks to providers in Texas, including in this District.

24.     Defendant Jeffrey Madison resides in Georgetown, Texas and was the CEO of LRH, which was headquartered in Rockdale, Texas.

25.     Defendant Peggy Borgfeld resides in Lexington, Texas and at various points during the relevant period was LRH's Chief Financial Officer (CFO) and Chief Operations Officer (COO).

26.     Defendant Stanley Jones resides in San Antonio, Texas, defendant Jeffrey Parnell resides in Dallas, Texas, and defendant Thomas Gray Hardaway resides in San Antonio, Texas. Jones, Parnell, and Hardaway owned and operated defendant LGRB Management Services LLC (LGRB), which was formed in Texas with its principal place of business in Texas.

27.     Defendant Ruben Marioni resides in Spring, Texas, and defendant Jordan Perkins resides in Conroe, Texas. Marioni and Perkins owned and operated defendant Next Level Healthcare Consultants LLC (Next Level), which was formed in Texas with its principal place of business in Texas.

28.     Defendants Ginny Jacobs and Scott Jacobs reside in Magnolia, Texas. They owned and operated defendant S&G Staffing, LLC (S&G), a company formed in Texas with its principal place of business in Texas, and defendant Jacobs Marketing, Inc. (Jacobs Marketing), a corporation incorporated in Texas with its principal place of business in Texas.

## LEGAL AND REGULATORY BACKGROUND

### I.     THE FALSE CLAIMS ACT

29.     The FCA provides, in pertinent part, that any person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]
>
> (a)(1)(C) conspires to commit a violation of subparagraph (A) [or] (B) . . .

is liable to the United States for three times the amount of damages which the United States sustains, plus a civil penalty per violation. 31 U.S.C. § 3729(a)(1).

30.     FCA penalties are regularly adjusted for inflation, pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015. *See* 28 U.S.C. § 2461 note. For violations occurring between September 28, 1999 and November 2, 2015, the civil penalty amounts range from a minimum of $5,500 to a maximum of $11,000. *See* 28 C.F.R. § 85.3; 64 Fed. Reg. 47099, 47103 (1999). For violations occurring after November 2, 2015, the civil penalty amounts currently range from a minimum of $11,803 to a maximum of $23,607. 28 C.F.R. § 85.5.

31.     For purposes of the FCA, the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information—

        (i) has actual knowledge of the information;

        (ii) acts in deliberate ignorance of the truth or falsity of the information; or

        (iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

32.     Under the FCA, a "claim" includes direct requests to the United States for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs. 31 U.S.C. § 3729(b)(2)(A).

33.     The FCA defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

## II.     THE MEDICARE PROGRAM

34.     In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, known as the Medicare program, to pay for the costs of certain healthcare services. 42 U.S.C. § 1395 *et seq.* Entitlement to Medicare benefits is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426 to 426-1.

35.     HHS is responsible for administration and supervision of the Medicare program. The Centers for Medicare & Medicaid Services (CMS), an agency within HHS, is directly responsible for administering the Medicare program.

36.     To participate in the Medicare program, a healthcare provider must file an agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The agreement requires compliance with the requirements that the Secretary deems necessary for participation in the Medicare program in order to receive reimbursement from Medicare.

37.     To enroll in the Medicare program, suppliers of laboratory services must submit a Medicare Enrollment Application, Form CMS-855B. These providers also must complete Form CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

38.     Form CMS-855B requires, among other things, signatories to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 2A1 of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions . . . .
>
> *     *     *
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855b.pdf.

39.     An authorized official must sign the "Certification Statement" in Section 15 of Form CMS-855B, which "legally and financially binds this supplier to the laws, regulations, and program instructions of the Medicare program." *Id.*

40.     To enroll in the Medicare program, institutional providers such as hospitals must submit a Medicare Enrollment Application, Form CMS-855A. These providers also must complete Form CMS-855A to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

41.     Form CMS 855A requires, among other things, signatories to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.
>
> *       *       *
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855a.pdf.

42.     An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855A, which "legally and financially binds [the] provider to the laws, regulations, and program instructions of the Medicare program." *Id.*

43.     In addition, within five months of the end of the cost reporting period, hospitals are required to submit to CMS annual reports known as "cost reports" on Form CMS-2552, *see* 42 C.F.R. §§ 413.20(b), 413.24(f)(2). The top of Form CMS-2552 states:

> This report is required by law (42 USC 1395g; 42 CFR 413.20(b)). Failure to report can result in all interim payments made since the beginning of the cost reporting period being deemed overpayments (42 USC 1395g).

https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R3P240f.pdf.

44.     Part II of Form CMS-2552 and 42 C.F.R. § 413.24(f)(4)(iv)(B) require a mandatory

certification, which includes the following certification statement:

> MISREPRESENTATION OR FALSIFICATION OF ANY
> INFORMATION CONTAINED IN THIS COST REPORT MAY
> BE PUNISHABLE BY CRIMINAL, CIVIL AND
> ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT
> UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES
> IDENTIFIED IN THIS REPORT WERE PROVIDED OR
> PROCURED THROUGH THE PAYMENT DIRECTLY OR
> INDIRECTLY OF A KICKBACK OR WERE OTHERWISE
> ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE
> ACTION, FINES AND OR IMPRISONMENT MAY RESULT.

*Id.*

45.     Form CMS-2552 and 42 C.F.R. § 413.24(f)(4)(iv)(B) require a chief financial

officer or administrator of the hospital to certify that "I have read the above certification statement

and that I have examined the accompanying electronically filed or manually submitted cost report

and the Balance Sheet and Statement of Revenue and Expenses prepared by [Provider Name(s)

and Number(s)] for the cost reporting period beginning [date] and ending [date] and to the best of

my knowledge and belief, this report and statement are true, correct, complete and prepared from

the books and records of the provider in accordance with applicable instructions, except as noted."

*Id.*

46.     Form CMS-2552 and 42 C.F.R. § 413.24(f)(4)(iv)(B) also require a chief financial

officer or administrator of the hospital to certify that "I am familiar with the laws and regulations

regarding the provision of health care services, and that the services identified in this cost report

were provided in compliance with such laws and regulations." *Id.*

47.     To enroll in the Medicare program, physicians must submit a Medicare Enrollment

Application, Form CMS-855I. These providers also must complete Form CMS-855I to change

information or to reactivate, revalidate, and/or terminate Medicare enrollment.

48.     Form CMS-855I requires, among other things, signatories to certify:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in section 4A of this application. The Medicare laws, regulations, and program instructions are available through the Medicare Administrative Contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of the Social Security Act) and the Physician Self-Referral Law (Stark Law), 42 U.S.C. section 1395nn (section 1877 of the Social Security Act)).

> \*      \*      \*

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf.

49.     The provider must sign the "Certification Section" in Section 15 of Form CMS-855I, and in doing so, is "attesting to meeting and maintaining the Medicare requirements" excerpted above, among others. *Id.*

50.     Medicare reimburses only those services furnished to beneficiaries that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member . . . ." 42 U.S.C. § 1395y(a)(l)(A).

51.     The Secretary of HHS (Secretary) is responsible for specifying services covered under the "reasonable and necessary" standard and has wide discretion in selecting the means for doing so. *See* 42 U.S.C. § 1395ff(a). The Secretary acts through formal regulations, and periodically CMS and HHS-OIG issue industry guidance.

52.     The Secretary provides guidance to eligible providers pursuant to a series of Manuals, published by CMS, which are available to the public on the Internet. *See generally* CMS

Internet-Only Manuals, *available at* https://www.cms.gov/regulations-and-guidance/guidance/manuals/internet-only-manuals-ioms.html.

53.     At all times relevant to this Complaint, CMS contracted with private contractors, known as Medicare Administrative Contractors (MACs), to perform various administrative functions on its behalf, including reviewing and paying claims submitted by healthcare providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104. MACs generally act on behalf of CMS to process and pay Medicare claims and perform administrative functions on a regional level. MACs may issue Local Coverage Determinations regarding whether or not a particular item or service is covered. 42 U.S.C. § 1395ff(f)(2).

54.     Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1). In submitting claims for payment to Medicare, providers must certify that the information on the claim form accurately describes the services rendered and that the services were reasonable and medically necessary for the patient.

55.     To obtain Medicare reimbursement, healthcare providers (including suppliers) submit claims using paper forms or their electronic equivalents. Providers identify by code on the appropriate form, among other things, the principal diagnosis of the patient and the procedures and services rendered.

A.     **Medicare Part A**

56.     Under Medicare Part A, hospitals agree with Medicare to provide covered healthcare items and services to treat Medicare patients. The hospital, also called a "provider," is authorized to bill Medicare for that treatment. During the relevant time period, CMS reimbursed hospitals for inpatient Part A services through MACs (formerly known as fiscal intermediaries).

57.     Since 2007, in order to get paid, a hospital must complete and submit to the MAC a claim for payment on a Form UB-04 (also known as CMS-1450) or its electronic equivalent. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare program relies on the accuracy and truthfulness of the UB-04 Forms to determine whether the service is payable and the amounts, if any, the hospital is owed or has been overpaid.

58.     In addition, as noted previously, hospitals are required to submit to the MAC an annual report known as a Medicare "cost report" on Form CMS-2552, which identifies any outstanding costs that the hospital is claiming for reimbursement for that year. The cost report serves as the final claim for payment that is submitted to Medicare. Failure to submit a cost report can result in all interim payments made since the beginning of the cost reporting period being deemed overpayments. The Medicare program relies on the accuracy and truthfulness of the cost report to determine the amounts, if any, the hospital is owed or has been overpaid during the year.

## B.     Medicare Part B

59.     Part B of the Medicare program is a federally subsidized, voluntary insurance program that pays for various medical and other health services and supplies, including laboratory testing, hospital outpatient services, physician services, and physical, occupational, and speech therapy services. *See* 42 U.S.C. §§ 1395j to 1395w-5.

60.     Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury. Eligible individuals who are 65 or older or disabled may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums. Payments under Medicare Part B typically are made directly under assignment

to service providers and practitioners, such as physicians, rather than to the patient/beneficiary. In that case, the physician bills the Medicare program directly.

61.     CMS provides reimbursement for Medicare Part B claims from the Medicare Trust Fund. To assist in the administration of Medicare Part B, CMS contracts with MACs (formerly known as carriers). 42 U.S.C. § 1395u. MACs perform various administrative functions for CMS, including processing the payment of Medicare Part B claims to providers.

62.     To obtain Medicare reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form or its electronic equivalent, known as the 837P format. When a CMS-1500 claim is submitted, the provider certifies that he or she is knowledgeable of Medicare's requirements and that the services for which payment is sought were "medically indicated and necessary for the health of the patient."

63.     Providers wishing to submit an electronic or hard-copy CMS-1500 claim must first seek to enroll in the Medicare program by submitting a provider enrollment form. During the Medicare enrollment process, providers must certify that the claims they submit will be "accurate, complete, and truthful."

64.     For a claim to be paid by Medicare Part B, it must identify each service rendered to the patient by the provider. The service is identified by a code in an American Medical Association (AMA) publication called the Current Procedural Terminology (CPT) Manual. The CPT Manual is a systematic list of codes for procedures and services performed by or at the direction of a provider. Each procedure or service is identified by a five-digit CPT code.

65.     In addition to the CPT Manual, the AMA publishes the International Classification of Diseases (ICD) Manual, which assigns a unique numeric identifier to each medical condition. To be payable by Medicare, the claim must identify both the CPT code that the provider is billing

for and the corresponding ICD code(s) for the patient's medical condition that supports the medical necessity of the provider's service.

66. When submitting claims on the CMS-1500 to Medicare, providers certify, among other things, that: (a) the services rendered are medically indicated and necessary for the health of the patient; (b) the information in the claim is "true, accurate, and complete"; and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws." After a February 2012 revision to the CMS-1500, providers further certify that their claims comply "with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)." CMS-1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

67. When enrolling to submit claims electronically, providers certify that they will submit claims that are "accurate, complete, and truthful." When a provider submits an electronic claim, the provider's identification number and password serve as the provider's signature, just as if the provider physically signed the claim form.

68. Healthcare providers are prohibited from knowingly presenting or causing to be presented claims for items or services that the person knew or should have known were not medically necessary, or knew or should have known were false or fraudulent. *E.g.*, 42 U.S.C.

§ 1395y(a)(1)(A); 42 U.S.C. § 1320a-7(b)(7) (providers may be excluded for fraud, kickbacks, and other prohibited activities).

69.    A provider has a duty to familiarize itself with the statutes, regulations, and guidelines regarding coverage for the Medicare services it provides. *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984).

70.    Because it is not feasible for the Medicare program or its contractors to review medical records corresponding to each of the millions of claims for payment it receives from providers, the program relies on providers to comply with Medicare requirements and relies on providers to submit truthful and accurate certifications and claims.

71.    Generally, once a provider submits a CMS-1500 or the electronic equivalent to the Medicare program, the claim is paid directly to the provider, in reliance on the foregoing certifications, without any review of supporting documentation, including medical records.

## III.    TEXAS MEDICAID PROGRAM

72.    State Medicaid programs are authorized by the Social Security Act, Title XIX. 42 U.S.C. §§ 1396 *et seq.* Medicaid is a joint federal-state program that provides healthcare benefits for certain groups including the poor and disabled. Each state Medicaid program must implement a "State Plan" containing specified minimum criteria for coverage and payment of claims to qualify for federal funds for Medicaid expenditures. 42 U.S.C. § 1396a.

73.    The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage (FMAP), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). During the relevant time period, the federal portion of Medicaid payments for Texas is set forth below:

| Time Period | Texas FMAP |
|---|---|
| 10/1/14 - 9/30/15 | 58.05% |

| Time Period | Texas FMAP |
|---|---|
| 10/1/15 - 9/30/16 | 57.13% |
| 10/1/16 - 9/30/17 | 56.18% |
| 10/1/17 - 9/30/18 | 56.88% |
| 10/1/18 - 9/30/19 | 58.19% |

79 Fed. Reg. 3385, 3387 (Jan. 21, 2014) (FY 2015); 79 Fed. Reg. 71,426, 71,428 (Dec. 2, 2014) (FY 2016); 80 Fed. Reg. 73,779, 73,781–82 (Nov. 25, 2015) (FY 2017); 81 Fed. Reg. 80,078, 80,080 (Nov. 15, 2016) (FY 2018); 82 Fed. Reg. 55,383, 55,385 (Nov. 21, 2017) (FY 2019).

74.    The Texas Health and Human Services Commission (HHSC) is responsible for administering the Medicaid program in the State of Texas. HHSC contracts with the Texas Medicaid and Healthcare Partnership (TMHP) to receive applications from prospective Medicaid providers, assign Medicaid provider numbers, educate providers as to Medicaid policies and regulations, and process and pay Medicaid claims. TMHP has issued Texas Medicaid Provider Manuals for the purpose of furnishing Medicaid providers with the policies and procedures needed to receive reimbursement for covered services provided to eligible Texas Medicaid recipients. Throughout the relevant time period, the Texas Medicaid Provider Manuals were available for review at the State office and in each local and district office, as well as online at https://www.tmhp.com/resources/provider-manuals/tmppm.

75.    To participate in the Texas Medicaid program, providers such as physicians and hospitals must certify in their Medicaid provider agreement that they will "agree[] to abide by all Medicaid regulations, program instructions, and Title XIX of the Social Security Act" and "comply with all of the requirements of the [Texas Medicaid] Provider Manual, as well as all state and federal laws governing or regulating Medicaid."

76.    Providers participating in the Texas Medicaid program must certify that they "understand[] that payment of a claim by Medicaid is conditioned upon the claim and the

underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicaid."

77.     To receive payments from the Texas Medicaid program, providers must agree that "information submitted regarding claims or encounter data will be true, accurate, and complete, and that the Provider's records and documents are both accessible and validate the services and the need for services billed and represented as provided." Likewise, such providers must acknowledge that they have "an affirmative duty to verify that claims and encounters submitted for payment are true and correct" and that "payments received are for actual services rendered and medically necessary."

78.     Pursuant to Texas regulations, the Texas Medicaid program covers medical services, including laboratory testing, only if the services are "medically necessary for diagnosis or treatment, or both, of illness or injury" or "appropriately authorized for prevention of the occurrence of a medical condition, and is prescribed by a physician or other qualified practitioner, as appropriate to the particular benefit, in accordance with federal or state law or policy and the [Texas Medicaid] utilization review provisions of this chapter." 1 Texas Admin. C. § 354.1131(a).

79.     A laboratory enrolled as a Texas Medicaid provider must submit claims on a CMS-1500 claim form or its electronic equivalent, which contains the certifications in Section II above.

80.     A hospital enrolled as a Texas Medicaid provider must submit claims on a UB-04 claim form, CMS-2552 form, or its electronic equivalent, which contain the certifications in Section II above.

81.     Because it is not feasible for the Texas Medicaid program or its contractors to review medical records corresponding to each of the claims for payment it receives from providers,

the program relies on providers to comply with Medicaid requirements and relies on providers to submit truthful and accurate certifications and claims.

## IV.    THE TRICARE PROGRAM

82.    DHA administers TRICARE (formerly CHAMPUS), a medical benefits program established by federal law. 10 U.S.C. §§ 1071–1110b. TRICARE covers eligible beneficiaries, including active duty members of the Uniformed Services and their dependents as well as retired members of the Uniformed Services and their dependents. The federal government reimburses a portion of the cost of covered healthcare services and prescription medications provided to TRICARE beneficiaries.

83.    TRICARE covers only medically necessary care; specifically, services or supplies provided by a hospital, physician, and/or other provider for the prevention, diagnosis, and treatment of an illness, when those services or supplies are determined to be consistent with the condition, illness, or injury; are provided in accordance with approved and generally accepted medical or surgical practice; are not primarily for the convenience of the patient, the physician, or other providers; and do not exceed (in duration or intensity) the level of care which is needed to provide safe, adequate, and appropriate diagnosis and treatments. *See* 32 C.F.R. § 199.4(a)(1)(i) and applicable definitions at 32 C.F.R. § 199.2.

84.    Federal regulations provide that TRICARE may deny payment in "abuse situations." 32 C.F.R. § 199.9(b). To avoid abuse situations, providers are obligated to provide services and supplies under TRICARE that are: "Furnished at the appropriate level and only when and to the extent medically necessary . . .; of a quality that meets professionally recognized standards of health care; and, supported by adequate medical documentation as may reasonably be

required under this part . . . to evidence the medical necessity and quality of services furnished, as well as the appropriateness of the level of care." *Id.*

85.     TRICARE regulations, in turn, define "appropriate" medical care as that which is, among other things, "[f]urnished economically"—i.e., "in the least expensive level of care or medical environment adequate to provide the required medical care." 32 C.F.R. § 199.2.

86.     As with Medicare, providers submit claims to TRICARE using the CMS-1500 or an electronic equivalent. Providers therefore make the same certifications in submitting claims to TRICARE as they do when submitting claims to Medicare.

87.     Because it is not feasible for the TRICARE program or its contractors to review medical records corresponding to each of the claims for payment it receives from providers, the program relies on providers to comply with TRICARE requirements and submit truthful and accurate certifications and claims.

## V.     THE ANTI-KICKBACK STATUTE

88.     The Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concerns involving physicians' conflicts of interest and overutilization of medical services and items. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, § 242(b), (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93. The AKS prohibits kickback payments to protect the integrity of federal healthcare programs such as Medicare, Medicaid, and TRICARE.

89.     The AKS prohibits any person from knowingly and willfully offering, paying, soliciting, or receiving any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to induce or reward a person for, *inter alia*, purchasing, ordering, arranging for, or recommending the purchase or ordering of any goods or services for which payment may be made, in whole or in part, under a federal healthcare program.

90.     In pertinent part, the AKS provides:

> b. Illegal remunerations
>
> (1) Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than ten years, or both.
>
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person
>
> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than ten years, or both.

42 U.S.C. § 1320a-7b(b). "[A] person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." *Id.* § 1320a-7b(h).

91.    Pursuant to the AKS, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g); *see also, e.g.*, *Guilfoile v. Shields*, 913 F.3d 178, 190–91 (1st Cir. 2019) ("§ 1320a-7b(g)'s obviation of the 'materiality' inquiry essentially codifies the long-standing view that AKS violations are 'material' in the FCA context.").

A.    **AKS "Safe Harbors"**

92.    The HHS Office of Inspector General (OIG) has promulgated "safe harbor" regulations that define practices that are not subject to the AKS because such practices are unlikely to result in fraud or abuse. 42 C.F.R. § 1001.952. The safe harbors set forth specific conditions that, if met, assure persons involved of not being sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor protection is an affirmative defense that is afforded to only those arrangements that meet all requirements of the safe harbor.

93.    Under the investment interests safe harbor, a payment to an investor that is a return on an investment is not remuneration for purposes of the AKS only if all eight of the safe harbor's requirements are satisfied. *See* 42 C.F.R. § 1001.952(a).

94.    The safe harbor for investment interests is narrowly tailored to prevent improper economic inducements from being disguised as ordinary investments. Among other things, the safe harbor for investment interests requires:

- The terms on which an investment interest is offered to an investor who is in a position to . . . generate business for the entity must not be related to the previous or expected volume of referrals . . . or the amount of business otherwise generated from that investor to the entity;

- No more than 40 percent of the entity's gross revenue related to the furnishing of health care items and services in the previous fiscal year or previous 12 month period may come from referrals or business otherwise generated from investors;

- No more than 40 percent of the value of the investment interests . . . may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to . . . or otherwise generate business for the entity; [and]

- The amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.

42 C.F.R. § 1001.952(a)(2)(i), (iii), (vi), (viii).

95.     The direct and indirect payments alleged herein did not satisfy the requirements of this or any other AKS safe harbor, and at all relevant times defendants were aware that their conduct was unlawful.

**B.     OIG Special Fraud Alerts and Related Guidance**

96.     To alert the public to "trends of health care fraud and certain practices of an industry-wide character," OIG issues special fraud alerts, which are published online and in the Federal Register. 59 Fed. Reg. 65,372, 65,373 (Dec. 19, 1994). The fraud alerts "provide general guidance to the health care industry" and assist others "in identifying health care fraud schemes." *Id.*

97.     In 1989, OIG issued a Special Fraud Alert on Joint Venture Arrangements. OIG warned that physician joint venture arrangements may violate the AKS where the arrangement was "intended not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for those referrals." OIG, Special Fraud Alert: Joint Venture Arrangements, *reprinted in* 59 Fed. Reg. 65,372, 65,374 (Dec. 19, 1994).

98.     In 1994, OIG issued a Special Fraud Alert on transfers of value from laboratories to referral sources. OIG, Special Fraud Alert:  Arrangements for the Provision of Clinical Laboratory Services, *reprinted in* 59 Fed. Reg. 65,372, 65,377 (Dec. 19, 1994). OIG warned of

"inducements offered by clinical laboratories which may implicate the [AKS]," such as providing items, services, and financial benefits. *Id.* OIG warned that "[w]hen one purpose of these arrangements is to induce the referral of program-reimbursed laboratory testing, both the clinical laboratory and the health care provider may be liable under the [AKS] and may be subject to criminal prosecution and exclusion from participation in the Medicare and Medicaid programs." *Id.* at 65,377–78.

99.     OIG reiterated its concerns in a special bulletin in 2003 about the "proliferation of arrangements between those in a position to refer business, such as physicians, and those providing items or services for which Medicare or Medicaid pays." OIG, Special Advisory Bulletin: Contractual Joint Ventures, *reprinted in* 68 Fed. Reg. 23,148, 23,148 (Apr. 30, 2003) (warning that such "questionable contractual arrangements" may violate the AKS).

100.     In March 2013, OIG issued another Special Fraud Alert about physician-owned entities, including entities "referred to as physician-owned distributorships, or 'PODs.'" OIG Special Fraud Alert: Physician-Owned Entities (Mar. 26, 2013), *reprinted in* 78 Fed. Reg. 19,271, 19,272 (Mar. 29, 2013). OIG noted that it had previously warned that physician-owned entities create "the strong potential for improper inducements" to physician-investors and "should be closely scrutinized under the fraud and abuse laws," including the AKS. *Id.* at 19,272 (quoting Letter from Vicki Robinson, "Response to Request for Guidance Regarding Certain Physician Investments in the Medical Device Industries" (Oct. 6, 2006)).

101.     The 2013 fraud alert reiterated longstanding AKS concerns regarding physician-owned entities, including:     (1) the corruption of medical judgment, (2) overutilization, (3) increased costs to federal healthcare programs, and (4) unfair competition. *Id.* at 19,272.

102.    The 2013 fraud alert warned that PODs are "inherently suspect" under the AKS, and it reiterated OIG's prior guidance that providing a referring physician the opportunity to earn a profit, including through an investment return from an entity for which the physician generates business, could constitute illegal remuneration under the AKS. *Id.*

103.    OIG identified the following five features, among others, that may render PODs particularly suspect under the AKS: (1) the POD "exclusively serves its physician-owners' patient base," rather than selling "on the basis of referrals from nonowner physicians"; (2) the POD "generate[s] disproportionately high rates of return for physician-owners"; (3) the POD "enable[s] the physician-owners to profit from their ability to dictate the [items] to be purchased for their patients"; (4) the physician-owner(s) "are few in number, such that the volume or value of a particular physician-owner's recommendations or referrals closely correlates to that physician-owner's return on investment"; and (5) the physician-owner(s) "alter their medical practice after or shortly before investing in the POD." *Id.* at 19,273.

104.    In June 2014, OIG issued a Special Fraud Alert regarding laboratory payments to referring physicians. OIG Special Fraud Alert: Laboratory Payments to Referring Physicians (June 25, 2014), *reprinted in* 79 Fed. Reg. 40,115 (July 11, 2014). OIG noted that "[a]rrangements between referring physicians and laboratories historically have been subject to abuse and were the topic of one of the OIG's earliest Special Fraud Alerts." *Id.* at 40,116 (citing 1994 Special Fraud Alert).

105.    As OIG recognized, "the choice of laboratory, as well as the decision to order laboratory tests, typically is made or strongly influenced by the physician, with little or no input from patients." *Id.* at 40,116. Transfers of value to physicians "may induce physicians to order tests from a laboratory that provides them with remuneration, rather than the laboratory that

provides the best, most clinically appropriate service." *Id.* Such transfers "also may induce physicians to order more laboratory tests than are medically necessary, particularly when the transfers of value are tied to, or take into account, the volume or value of business generated by the physician." *Id.*

106. With respect to P&H fees paid to physicians and physician practices in connection with orders for laboratory tests, OIG warned that such payment arrangements "are suspect under the [AKS]." *Id.* at 40,116. OIG noted that the AKS prohibits the knowing and willful payment of remuneration "if even one purpose of the payment is to induce or reward referrals of Federal health care program business." *Id.* at 40,117. Payments to physicians are particularly suspect, OIG indicated, when the physician is paid for services the laboratory does not actually need or for which the physician is otherwise compensated, or when the payment is for more than fair market value for the physician's services or takes into account the volume or value of business generated by the referring physician. *Id.* at 40,116–17.

107. Further, OIG warned of payment arrangements with physicians that purport to "carve out" federal healthcare program beneficiaries or business. *Id.* at 40,117. Specifically, OIG stated that its concerns with such payment arrangements "are not abated when those arrangements apply only to specimens collected from non-Federal health care program patients." *Id.* Rather, "[a]rrangements that 'carve out' Federal health care program beneficiaries or business from otherwise questionable arrangements implicate the anti-kickback statute and may violate it by disguising remuneration for Federal health care program business through the payment of amounts purportedly related to non-Federal health care program business." *Id.* OIG noted that "physicians typically wish to minimize the number of laboratories to which they refer for reasons of convenience and administrative efficiency," so payment arrangements "that carve out Federal

health care program business may nevertheless be intended to influence physicians' referrals of Federal health care program business to the offering laboratories." *Id.*

108.    OIG also warned that physicians who receive payments in connection with their laboratory test orders "may be at risk under the [AKS]" because liability attaches to "parties on both sides of an impermissible 'kickback' arrangement." *Id.* at 40,117.

109.    Each defendant was on notice of the foregoing Special Fraud Alerts and Bulletins published in the Federal Register. Moreover, each defendant knew that paying kickbacks to physicians to induce referrals of federal healthcare program business was illegal.

110.    In or about June 2014, defendants Grottenthaler, Cornwell, Kash, Love, Hertzberg, Theiler, and Howard had actual knowledge of HHS-OIG's June 2014 Special Fraud Alert.

## VI.    THE STARK LAW

111.    The Stark Law prohibits an entity from submitting claims to Medicare for certain categories of "designated health services" (DHS), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not satisfy the requirements of an applicable statutory or regulatory exception. 42 U.S.C. § 1395nn(a)(1). The Stark Law further prohibits Medicare from paying any claims for DHS referred in violation of the law. 42 U.S.C. § 1395nn(g)(1). The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to overutilization of DHS, patient steering, and the corruption of physicians' medical judgment by improper financial incentives.

112.    As initially enacted in 1989, the Stark Law applied to referrals of Medicare patients for clinical laboratory services by a physician to a laboratory with which the physician had a financial relationship unless the requirements of an applicable statutory or regulatory exception

were satisfied. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6204, 103 Stat. 2106, 2236-43. In 1993, Congress extended the Stark Law's application to referrals for ten additional DHS. *See* Omnibus Reconciliation Act of 1993, Pub. L. No. 103-66, § 13562, 107 Stat. 312, 596-605; Social Security Act Amendments of 1994, Pub. L. No. 103-432, § 152, 108 Stat. 4398, 4436-37.

113.    Compliance with the Stark Law is a condition of payment by the Medicare program. Medicare is prohibited from paying for any DHS provided in violation of the Stark Law. *See* 42 U.S.C. §§ 1395nn(a)(1), (g)(1). Moreover, "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis[.]" 42 U.S.C. § 411.353(d).

114.    In pertinent part, the Stark Law provides:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b), if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

115.    As noted above, DHS includes clinical laboratory services. 42 U.S.C. § 1395nn(h)(6) and 42 C.F.R. § 411.351 (2014).[1]

---

[1]    The physician self-referral law regulations were amended effective on or after January 19, 2021, 85 Fed. Reg. 77,492 (Dec. 2, 2020), and on January 1, 2022, 86 Fed. Reg. 64,996 (Nov. 19, 2021). Those amendments did not apply during the relevant period in this case.

116.     Under the Stark Law, an "entity is considered to be furnishing DHS if it . . . [i]s the person or entity that has performed services that are billed as DHS or . . . that has presented a claim to Medicare for the DHS, including the person or entity to which the right to payment for the DHS has been reassigned. . . ." 42 C.F.R. § 411.351 (2014).

117.     A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. 42 U.S.C. §§ 1395nn(h)(1)(A), (h)(1)(B); 42 C.F.R. § 411.351 (2014).

118.     A direct compensation arrangement exists "if remuneration passes between the referring physician . . . and the entity furnishing DHS without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1)(i) (2014).

119.     An indirect compensation arrangement exists if (i) there is an unbroken chain of persons or entities that have financial relationships between the referring physician and the entity furnishing DHS; (ii) the referring physician receives from the person or entity with whom the physician has a direct financial relationship aggregate compensation that varies with, or otherwise takes into account, the volume or value of the physicians' referrals to, or other business generated by the referring physician for, the entity furnishing the DHS; and (iii) the entity furnishing the DHS has knowledge of the fact that the referring physician (or immediate family member) receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS. *See* 42 C.F.R. § 411.354(c)(2) (2014).

120.     For purposes of the Stark Law, a "referral" includes any request by a physician for, or ordering of, or the certifying or recertifying of the need for, any DHS for which Medicare

payment may be made, including a request for a consultation with another physician and any test or procedure ordered by or to be performed by (or under the supervision of) that other physician, but does not include any DHS personally performed by the referring physician. 42 U.S.C. § 1395nn(h)(5); 42 C.F.R. § 411.351 (2014).

121.   "Other business generated" means "any other business generated by the referring physician, including other Federal and private pay business." 66 Fed. Reg. 856, 877 (Jan. 4, 2001).

122.   Compensation is "deemed not to take into account 'other business generated between the parties,' provided that the compensation is fair market value for items and services actually provided and does not vary during the course of the compensation arrangement in any manner that takes into account referrals or other business generated by the referring physician, including private pay healthcare business. . . ." 42 C.F.R. § 411.354(d)(3) (2014).

123.   The Stark Law and its companion regulations set forth exceptions for certain financial relationships that meet specific enumerated requirements. The Stark Law's exceptions operate as affirmative defenses to alleged violations of the statute. Once it has been shown that a party submitting Medicare claims has a financial relationship with a referring physician, the defendant bears the burden of demonstrating that the relationship meets all of the requirements of an applicable statutory or regulatory exception. *See, e.g.*, *United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 405 (4th Cir. 2012).

124.   The Stark Law and its implementing regulations contain exceptions for certain compensation arrangements, including "personal service arrangements" and "indirect compensation arrangements."

125.   To qualify for the Stark Law's exception for personal service arrangements, a compensation arrangement must meet, *inter alia*, the following statutory requirements: the

compensation (A) is set in advance, (B) does not exceed fair market value, and (C) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties, except for compensation received pursuant to a "physician incentive plan" as defined by the Stark Law. *See* 42 U.S.C. § 1395nn(e)(3)(A); *see also* 42 C.F.R. § 411.357(d) (2014). A "physician incentive plan" under § 1395nn(e)(3) is narrowly defined and only applies to personal service arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. § 1395nn(e)(3)(B)(ii).

126.    To qualify for the Stark Law's exception for indirect compensation arrangements, the following requirements, *inter alia*, must be satisfied: (A) the compensation received by the referring physician is fair market value for items and services actually provided by the physician, (B) the physician's compensation is not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the DHS entity, (C) the compensation is for identifiable services, and the arrangement is commercially reasonable even in the absence of referrals to the entity, and (D) the arrangement does not violate the AKS. *See* 42 C.F.R. § 411.357(p) (2014).

127.    The Stark Law is a strict liability statute, with no scienter element. Those who knowingly submit or cause to be submitted claims to Medicare in violation of the Stark Law also violate the FCA. A knowing violation of the Stark Law also may result in exclusion from federal healthcare programs. 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

**VII.    LABORATORY TESTING OVERVIEW**

128.    Clinical laboratory services involve the "examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical

condition." Medicare Benefit Policy Manual (MBPM), Pub. 100-02, Ch. 15, § 80.1, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf.

129. Pursuant to Medicare regulations, (1) laboratory tests must be ordered by the physician treating the patient for the treatment of a specific illness or injury; (2) laboratory test orders that are not individualized to patient need, or for which the need is not documented in the medical record, are not covered services; and (3) claims for laboratory services that do not meet these requirements are ineligible for payment. *See* 42 C.F.R. § 410.32.

130. All diagnostic laboratory tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a).

131. A laboratory test order is "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary." MBPM, Ch. 15, § 80.6.1. Medicare requires that an ordering physician "must clearly document, in the medical record, his or her intent that the test be performed." *Id.*

132. Clinical laboratory services must be used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a). *See* MBPM, Ch. 15, § 80.1.

133. Medicare requires proper and complete documentation of laboratory services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation) . . . .").

134.    A laboratory's claim for a service is ineligible for payment if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(3).

135.    Medicare regulations allow laboratories to request documentation from physicians regarding medical necessity:

> Medical necessity. The entity submitting the claim may request additional diagnostic and other medical information from the ordering physician or nonphysician practitioner to document that the services it bills are reasonable and necessary.

42 C.F.R. § 410.32(d)(3)(iii).

136.    Likewise, under the Texas Medicaid program, services must be individualized to the medical needs of each patient; providers must maintain appropriate documentation for each beneficiary, substantiating the need for services, including all findings and information supporting medical necessity, and detailing all treatment provided. For laboratory services or tests to be covered by Texas Medicaid, those services must be ordered by a professional practitioner within the scope of his or her practice.

137.    Similarly, TRICARE covers laboratory tests only if the tests are "medically or psychologically necessary" and "required in the diagnosis and treatment of illness or injury." 32 CFR § 199.4(a)(1). TRICARE will not cover tests that are "not related to a specific illness or injury or a definitive set of symptoms." *Id.* at § 199.4(g)(2).

138.    As noted above, TRICARE regulations provide that TRICARE may deny payment in "abuse situations." 32 C.F.R. § 199.9(b). The regulations expressly include as examples of

"abuse or possible abuse situations" the following: (i) "a battery of diagnostic tests are given when, based on the diagnosis, fewer tests were needed," and (ii) "[f]ailure to maintain adequate medical or financial records." *Id.*

## LABORATORY FRAUD SCHEMES

139.    Laboratory executives and employees in Texas conspired with hospital executives and employees, recruiters, and healthcare providers (HCPs), among others, to pay kickbacks to HCPs to induce their referrals of laboratory testing, even when medically unnecessary. As part of the conspiracy, LRH falsely represented to federal healthcare programs that the beneficiaries were hospital outpatients, in order to fraudulently secure higher reimbursements.

## I.    LITTLE RIVER HOSPITAL FRAUD SCHEMES

### A.    LRH Submitted False Outpatient Claims to Receive Higher Reimbursement

#### 1.    Reimbursement to CAHs

140.    To ensure that Medicare beneficiaries in rural communities can access necessary hospital care, Congress authorized favorable Medicare reimbursements for hospitals certified by CMS as critical access hospitals (CAHs). Balanced Budget Act of 1997, P.L. No. 105-33 § 4201.

141.    To be certified as a CAH, hospitals participating in Medicare generally must, among other things, have 25 or fewer inpatient beds, provide emergency services 24 hours per day, and be located in underserved rural areas some distance from other hospitals or CAHs. 42 C.F.R. §§ 485.610, 485.618, 485.620.

142.    A hospital certified as a CAH is eligible to receive favorable Medicare reimbursements, generally being paid 101 percent of reasonable costs for most inpatient and outpatient services provided to Medicare beneficiaries. 42 U.S.C. § 1395m(g). The cost-based payments to CAHs generally are much higher than the predetermined rates that Medicare pays acute care hospitals (non-CAHs) and laboratories for the same services.

143.     Because Medicare's favorable reimbursement to CAHs is meant to ensure access to care by those in rural communities, a CAH is not eligible for cost-based reimbursement for services provided to individuals who are neither inpatients nor outpatients of the CAH, *i.e.*, non-patients of the hospital. *See* 42 C.F.R. § 413.70 (2015).

144.     As relevant here, for outpatient clinical diagnostic laboratory services, Medicare will pay 101 percent of reasonable costs to a CAH "only if [1] the individual is an outpatient of the CAH" and [2] either "[t]he individual is receiving outpatient services in the CAH on the same day the specimen is collected" or "[t]he specimen is collected by an employee of the CAH." 42 C.F.R. § 413.70(b)(7)(iv) (2015). Although an individual Medicare beneficiary need not be "physically present in the CAH at the time the specimen is collected," the individual must be "an outpatient of the CAH." *Id.*

145.     The CAH can bill for outpatient services only if the individual beneficiary [1] "has not been admitted as an inpatient," [2] "is registered on the hospital or CAH records as an outpatient and [3] receives services (rather than supplies alone) directly from the hospital or CAH." 42 C.F.R. § 410.2.

146.     If a Medicare beneficiary is neither an inpatient nor an outpatient of the CAH, then reimbursement for the non-patient's clinical diagnostic laboratory tests is based on the Medicare clinical laboratory fee schedule (CLFS). 42 C.F.R. § 413.70(b)(7)(vi) (2015).

### 2.     LRH Submitted False Outpatient Claims for Non-Patients of LRH

147.     LRH was a CAH headquartered in Rockdale, Texas (population under 6,000).

148.     LRH received cost-plus payments when it submitted hospital outpatient claims to Medicare for laboratory testing. Such cost-plus payments significantly exceeded the payments available under the CLFS for claims to Medicare for laboratory testing on non-patients of LRH.

149.    For example, the chart below includes laboratory tests in a panel that Elizabeth Seymour, M.D., of Denton, Texas, ordered from LRH on or about August 1, 2016 for a Medicare beneficiary in return for MSO kickbacks. LRH submitted claims for the tests to Medicare, falsely representing that the services were provided to LRH outpatients. The chart lists the amounts that Medicare paid to LRH for purported outpatient services. In comparison, the chart lists the corresponding Medicare payment amount in 2016 in Texas under the CLFS.

| CPT Code | CPT Description | LRH Payment | CLFS Payment |
|---|---|---|---|
| 80053 | Blood test, comprehensive group of blood chemicals | $99.06 | $14.39 |
| 80061 | Blood test, lipids (cholesterol and triglycerides) | $112.84 | $18.24 |
| 82172 | Apolipoprotein level | $94.59 | $21.11 |
| 82306 | Vitamin D-3 level | $125.13 | $37.02 |
| 82533 | Cortisol (hormone) measurement, total | $54.00 | $22.21 |
| 82542 | Chemical analysis using chromatography technique | $91.53 | $24.60 |
| 82542 | Chemical analysis using chromatography technique | $45.77 | $24.60 |
| 82607 | Cyanocobalamin (vitamin B-12) level | $70.76 | $20.54 |
| 82610 | Cystatin C (enzyme inhibitor) level | $41.34 | $18.52 |
| 82627 | Dehydroepiandrosterone (DHEA-S) hormone level | $67.78 | $30.29 |
| 82664 | Electrophoresis, laboratory testing technique | $79.32 | $35.62 |
| 82670 | Measurement of total estradiol (hormone) | $94.22 | $38.06 |
| 82725 | Fatty acids measurement | $40.59 | $18.13 |
| 82747 | Folic acid level, RBC | $125.50 | $23.55 |
| 82777 | Galectin-3 level | $67.03 | $29.96 |
| 83001 | Gonadotropin, follicle stimulating (reproductive hormone) level | $58.09 | $25.31 |
| 83002 | Gonadotropin, luteinizing (reproductive hormone) level | $66.29 | $25.22 |
| 83090 | Homocysteine (amino acid) level | $109.11 | $22.98 |
| 83525 | Insulin measurement, total | $46.92 | $15.57 |
| 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $103.15 | $46.24 |
| 83704 | Lipoprotein level, quantitation of lipoprotein particle number(s) | $197.37 | $42.98 |
| 83789 | Mass spectrometry (laboratory testing method) | $24.58 | $24.60 |
| 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $103.15 | $46.24 |
| 83880 | Natriuretic peptide (heart and blood vessel protein) level | $103.15 | $46.24 |
| 83921 | Organic acid level | $121.40 | $22.41 |
| 84140 | Pregnenolone (reproductive hormone) level | $36.70 | $28.16 |
| 84144 | Progesterone (reproductive hormone) level | $63.31 | $28.42 |
| 84206 | Proinsulin (pancreatic hormone) level | $54.00 | $24.26 |
| 84311 | Chemical analysis using spectrophotometry (light) | $10.80 | $9.52 |
| 84378 | Carbohydrate analysis, single quantitative | $84.16 | $3.92 |
| 84403 | Testosterone (hormone) level, total | $101.67 | $35.17 |
| 84443 | Blood test, thyroid stimulating hormone (TSH) | $128.85 | $22.89 |
| 84481 | Thyroid hormone, T3 measurement, free | $61.07 | $23.07 |
| 84482 | Thyroid hormone, T3 measurement, reverse | $23.46 | $10.48 |
| 84550 | Uric acid level, blood | $54.00 | $6.16 |
| 84681 | C-peptide (protein) level | $27.56 | $28.35 |

| CPT Code | CPT Description | LRH Payment | CLFS Payment |
|---|---|---|---|
| 85025 | Complete blood cell count (red cells, white blood cell, platelets), automated test and automated differential white blood cell count | $45.81 | $10.59 |
| 85385 | Fibrinogen (factor 1) antigen detection | $25.70 | $11.57 |
| 86141 | Measurement C-reactive protein for detection of infection or inflammation, high sensitivity | $102.41 | $17.63 |
| 86341 | Islet cell (pancreas) antibody measurement | $52.51 | $23.57 |
| 86376 | Microsomal antibodies (autoantibody) measurement | $61.82 | $19.82 |
| 86800 | Thyroglobulin (thyroid protein) antibody measurement | $40.59 | $21.67 |
| | **Total:** | **$3,117.09** | **$1,019.88** |

150.    By billing LRH's laboratory claims for non-patient tests (under the CLFS) as if they were outpatient tests (cost-plus reimbursement), LRH inflated its laboratory claims for this patient by over $2,000 to receive more than triple the CLFS amount.

151.    CAHs also receive higher reimbursement when they submit claims for other diagnostic services, such as sleep studies or electroencephalogram (EEG) tests, performed on hospital outpatients.

152.    The higher reimbursement Medicare pays to CAHs like LRH is meant to ensure that patients in rural communities, such as in Rockdale, Texas, can access necessary hospital care.

153.    Rather than focus on providing necessary hospital care to the community, LRH CEO Madison, LRH CFO Borgfeld, and their co-conspirators agreed to and implemented a plan to defraud federal healthcare programs by funneling claims for diagnostic services, including laboratory tests, for hospital non-patients through LRH for higher reimbursement.

154.    Madison and Borgfeld agreed with two laboratories, BHD and THD, and their executives to bill federal healthcare programs for laboratory testing performed by BHD and THD. Madison and Borgfeld agreed to pay numerous recruiters to recommend and arrange for providers throughout Texas to order laboratory testing through LRH for beneficiaries who were neither LRH inpatients nor LRH outpatients.

155.     To further the fraud scheme, Madison and Borgfeld agreed to pay phlebotomists or medical staff located in the offices of primary care providers (PCPs) throughout Texas to draw the beneficiaries' blood. Often, these phlebotomists had previously worked for the PCP's office, BHD, or THD. As examples, LRH paid Lacrimioara Hurgoiu, who was already working in Dr. Annie Varughese's office as a registered nurse, $18 per hour for 30-40 hours a week to draw blood for laboratory tests that Varughese referred to LRH. LRH paid Tracy Tompkins, who was already working in Dr. Elizabeth Seymour's office as a phlebotomist, $19 per hour for 30-40 hours a week to draw blood for laboratory tests that Seymour referred to LRH. Borgfeld often signed the "Clinical Specialist Services" Agreements on LRH's behalf for the LRH-paid phlebotomists.

156.     Pursuant to the scheme agreed to by Madison and Borgfeld, LRH employees and recruiters directed the phlebotomists located in PCPs' offices to create false hospital registration records identifying the PCPs' patients as LRH outpatients for purposes of billing laboratory tests performed by BHD or THD.

157.     LRH's claims to federal healthcare programs for laboratory testing falsely represented, among other things, that the tests were for LRH outpatients, when in fact the beneficiaries were non-patients of LRH.

158.     Many of the beneficiaries were more than 100 miles away from LRH and had never even heard of the hospital, much less ever been a patient there.

159.     Nearly all of the providers who ordered BHD or THD laboratory testing through LRH had no admitting privileges at LRH, had never practiced at LRH, had never referred to LRH before participating in the MSO kickback scheme, and had never even visited LRH's Rockdale hospital.

160.    To induce providers' referrals for diagnostic services reimbursed by federal healthcare programs, including laboratory tests, Madison, Borgfeld, and their co-conspirators agreed to a scheme to pay thousands of dollars to providers who referred to LRH, while disguising the payments as purported MSO investment distributions.

**B.    LRH's MSO Kickback Scheme**

161.    In or about 2014, Madison and Borgfeld developed a "growth plan" to take advantage of LRH's "higher reimbursement levels and government subsidies." Aware that as a CAH, LRH received "cost based reimbursement which enhances financial performance for rural hospitals," Madison and Borgfeld developed a plan for "immediate near term significant growth."

162.    To further their plan, Madison and Borgfeld sought to increase referrals for toxicology laboratory testing. Their goal was to "engage as many toxicology practices as reasonably possible" to refer to LRH. Madison and Borgfeld sought to secure physician referrals for toxicology testing by offering to "incentivize physicians to become part of [LRH's] business model." Madison and Borgfeld understood that LRH would have the financial wherewithal to offer incentives for physicians to refer toxicology testing to LRH because LRH "receives better payment rates than private practices" would receive if they billed insurers.

163.    In 2014, Madison and Borgfeld began implementing their plan to incentivize HCPs to refer toxicology testing to LRH. At their direction, LRH began entering into contracts to pay commissions to recruiters, who in turn would pay financial incentives to HCPs to induce their referrals. On or about August 1, 2014, LRH agreed to pay independent contractor S&G, a company owned and operated by Scott and Ginny Jacobs.

164.    Pursuant to the toxicology scheme developed by Madison and Borgfeld, urine specimens were collected in the referring HCP's office, a toxicology laboratory ran the tests (for a fee paid by LRH), and LRH or a contracted billing company submitted the claims to insurers on

LRH's behalf. As part of their scheme, LRH paid S&G to recruit HCPs to order toxicology tests from LRH, and S&G paid kickbacks to the referring HCPs to order toxicology tests from LRH. Parties to the toxicology scheme understood that the payments to HCPs were kickbacks, merely disguised as investment distributions.

165.     In 2015, Madison and Borgfeld expanded the fraud scheme to include blood testing. Madison and Borgfeld, on behalf of LRH, agreed to pay per-test fees to BHD and later THD to run blood tests for LRH. To gain referrals, LRH paid recruiters to arrange for and recommend HCPs' referrals for blood testing, and the recruiters kicked back some of those payments to the referring HCPs, while disguising the payments to HCPs as investment distributions from an MSO. The MSO-incentivized HCPs ordered BHD and/or THD testing from LRH.

166.     In the toxicology and blood laboratory testing schemes, LRH billed the tests to federal healthcare programs as outpatient services, falsely representing that (a) the claims did not result from AKS or Stark Law violations; (b) the tests were for LRH outpatients, when in fact the tests were for persons who were not patients at LRH at all; and (c) the claims were for reasonable and necessary services.

### C.     LRH Funded the MSO Kickbacks to HCPs

167.     LRH funded the MSO kickbacks to HCPs, with the knowledge and approval of Madison and Borgfeld. LRH paid recruiters to generate commercial and federal laboratory testing referrals; the recruiters transferred a portion of the funds to the recruiters' MSO entities; the MSOs paid the referring HCPs to induce their referrals to LRH; and LRH submitted the resulting claims to Medicare, Medicaid, and TRICARE.

168.     With Madison and Borgfeld's knowledge and approval, LRH agreed to fund the MSO kickbacks by paying volume-based commissions to six sets of recruiters to arrange for and recommend referrals to LRH for toxicology and/or blood testing:  (a) S&G; (b) Jacobs Marketing,

a corporation owned and operated by Scott and Ginny Jacobs; (c) Next Level, a company owned and operated by Ruben Marioni and Jordan Perkins; (d) LGRB, a company owned and operated by Stanley Jones, Jeffrey Parnell, and Thomas Gray Hardaway; (e) Exit Therapy LLC (Exit Therapy), a company Robert O'Neal established in his wife's name; and (f) APC, a company owned and operated by Todd Hickman and O'Neal.

169.    To fund the MSO kickbacks to HCPs, as Madison and Borgfeld knew and approved, LRH paid over $18.5 million to recruiters during the MSO kickback scheme, as follows:

  a.  Over $1.95 million to S&G (since in or about August 2014);

  b.  Over $3.4 million to Jacobs Marketing (since in or about March 2015);

  c.  Over $5.9 million to Next Level (since in or about March 2015);

  d.  Over $3.1 million to LGRB (since in or about May 2015);

  e.  Over $280,000 to Exit Therapy (since in or about May 2015); and

  f.  Over $4.1 million to APC (since in or about July 2015).

**D.    LRH's Recruiters Paid the MSO Kickbacks to HCPs**

170.    Madison and Borgfeld understood that few HCPs would order toxicology or blood tests from a CAH headquartered in Rockdale, Texas without a financial incentive to do so.

171.    In their discussions with recruiters, Madison and Borgfeld understood that the recruiters would offer and pay money to HCPs to induce them to order laboratory testing from LRH. Madison and Borgfeld understood that the recruiters would attempt to disguise the kickback payments to referring HCPs as purported fees from an MSO. Madison and Borgfeld met and corresponded with the recruiters and agreed to the MSO kickback scheme.

172.    LRH paid millions of dollars to S&G and Jacobs Marketing to arrange for and recommend that HCPs refer to LRH for toxicology and blood testing, respectively, and to fund the MSO kickbacks to HCPs.

173.    To induce the HCP referrals to LRH, Scott and Ginny Jacobs paid referring HCPs through two MSOs they owned and operated, North Houston MSO Group, Inc. (North Houston MSO) and Tomball Medical Management, Inc. (Tomball MSO) (collectively, Jacobs' MSOs).

174.    Scott and Ginny Jacobs transferred funds that S&G and Jacobs Marketing received from LRH to the Jacobs' MSOs by means of direct and indirect transfers to the Jacobs' MSOs through other corporate entities owned and operated by Scott and Ginny Jacobs, including Strategic Medical Solutions, Inc. and Texas Premier Management Group LLC.

175.    The Jacobs' MSOs paid over $1.1 million to the following HCPs to induce their referrals to LRH:

| HCP | MSO | MSO Payments |
|---|---|---|
| Alan Tran | North Houston | $14,253 |
| Amrit Thandi | North Houston | $20,500 |
| Angela Mosley-Nunnery (Physician A) | North Houston; Tomball | $83,250 |
| Annie Varughese | North Houston | $8,000 |
| Asif Ali | North Houston | $2,000 |
| Butch Martin | North Houston | $17,650 |
| Candice DeMattia | North Houston; Tomball | $103,503 |
| David Le | North Houston; Tomball | $54,536 |
| E.P. Descant | North Houston; Tomball | $128,233 |
| Earl F. Martin | North Houston | $17,650 |
| Earl "Butch" Martin | North Houston | $17,650 |
| George Murillo | North Houston; Tomball | $81,633 |
| Jason DeMattia | North Houston; Tomball | $158,071 |
| Mark Le | North Houston; Tomball | $28,950 |

| HCP | MSO | MSO Payments |
|---|---|---|
| Michael Casagrande | North Houston; Tomball | $99,533 |
| Michael Diteresa | North Houston | $4,179 |
| Michael Whiteley | North Houston; Tomball | $77,883 |
| Michelle Legall | North Houston; Tomball | $20,000 |
| Randall Walker | North Houston; Tomball | $30,449 |
| Richard Le | North Houston; Tomball | $20,500 |
| Steven Chon | North Houston | $27,600 |
| Tamar Brionez | Tomball | $93,024 |

176.     Scott Jacobs and recruiter and referring HCP Jason DeMattia pitched the Jacobs' MSOs to HCPs, including groups of HCPs. Only HCPs who referred to LRH were allowed to participate and remain in the Jacobs' MSOs, and the only source of revenue for the Jacobs' MSOs came from the referrals or other business generated by the HCPs in the MSOs. In their sales pitches to HCPs, Scott Jacobs and DeMattia described the Jacobs' MSOs as an opportunity for HCPs to share in the profits generated by the HCPs' referrals of toxicology and blood testing to LRH.

177.     To disguise the kickbacks, Scott and Ginny Jacobs used purported "investment" documentation for the Jacobs' MSOs. While HCPs purported to invest in the Jacobs' MSOs, the MSOs' payments to HCPs were not based on the returns from any genuine investment. Instead, the Jacobs' MSOs' payments to HCPs were simply profits shared with HCPs based on the HCPs' referrals to LRH. After agreeing to participate in a Jacobs' MSO and referring laboratory testing to LRH, the Jacobs' MSOs often paid the HCP more in the first month of MSO distributions than the HCP had invested. That is, HCPs in the Jacobs' MSOs often received one or more MSO payments before Scott or Ginny Jacobs deposited the purported investment check.

178.     For example, in or about April 2016, Physician A, of Kingwood, Texas, agreed to participate in the Tomball MSO, provided Scott Jacobs with a purported $2,000 investment check, and began referring to LRH for laboratory testing.

179.    Physician A had no admitting privileges at LRH, had never practiced at LRH, had never referred to LRH before joining the Tomball MSO kickback scheme in or about April 2016, and had never even visited LRH's Rockdale hospital.

180.    Scott and Ginny Jacobs did not deposit Physician A's check until on or about July 21, 2016. By that date, Physician A had made dozens of referrals to LRH for laboratory testing. In addition, Tomball MSO already had paid Physician A two checks of $2,000 each on or about July 5, 2016, totaling twice the amount purportedly invested weeks later. On or about July 22, 2016, the day after her purported investment check was deposited, Tomball MSO paid Physician A another $2,000.

181.    From in or about July 2016 to July 2017, Tomball MSO paid Physician A $37,500 in MSO payments, for a 17,000% return on investment.

182.    As the Tomball MSO was winding down in early 2017, Scott Jacobs and DeMattia convinced Physician A to join the North Houston MSO in or about January 2017. Physician A agreed to participate in the North Houston MSO and provided Scott Jacobs with a purported investment check for $4,000.

183.    Again, Scott and Ginny Jacobs waited to deposit Physician A's check until their MSO had already paid Physician A more than the purported investment. North Houston MSO deposited Physician A's check on or about March 21, 2017. By that date, North Houston MSO already had paid Physician A $8,000—double the purported investment amount—on or about February 13, 2017.

184.    From in or about February 2017 to February 2018, North Houston MSO paid Physician A $51,750 in MSO payments, for an 11,937% return on investment.

185.    From in or about April 2016 to December 2017, during the Tomball MSO and North Houston MSO kickback schemes, Physician A referred to LRH hundreds of tests payable by federal healthcare programs. LRH submitted those claims to federal healthcare programs as purported outpatient services, and Medicare paid over $360,000 to LRH. Examples of those claims are included in Exhibit A hereto.

Marioni and Perkins

186.    LRH paid millions of dollars to Next Level to arrange for and recommend that HCPs refer to LRH for toxicology and blood testing and to fund the MSO kickbacks to HCPs.

187.    Marioni and Perkins transferred the funds that Next Level received from LRH to numerous MSOs that they owned and operated, including SYNRG Partners LLC (SYNRG) and Permian Partners LLC (Permian) (collectively, "Next Level MSOs").

188.    Through the Next Level MSOs, Marioni and Perkins paid referring HCPs to induce their referrals to LRH. The below chart summarizes Next Level MSOs' payments of over $685,000 to the following HCPs to induce their referrals to LRH:

| HCP | MSO | MSO Payments |
|---|---|---|
| Ambreen Sharaf | SYNRG | $22,528 |
| Annie Varughese | SYNRG | $70,664 |
| Ashley Chin | SYNRG | $22,528 |
| Cuong Trinh | SYNRG | $22,528 |
| Jaspaul Bhangoo | Permian | $13,000 |
| Kozhaya Sokhon | SYNRG | $47,056 |
| Murtaza Mussaji | SYNRG; Permian | $52,056 |
| Nina Pham | SYNRG | $22,528 |
| Parul Shah | SYNRG | $47,056 |
| Rakesh Patel | SYNRG | $117,640 |
| Saira Hirani | SYNRG | $22,528 |
| Shane Simpson | SYNRG | $11,764 |
| Thien Nguyen | SYNRG | $22,528 |

| HCP | MSO | MSO Payments |
|-----|-----|--------------|
| Tommy Pham | SYNRG; Permian | $52,056 |
| Trang Trinh | SYNRG | $117,640 |
| Victoria Do | SYNRG | $22,528 |

189.    To disguise the kickbacks, Marioni and Perkins used purported "investment" documentation for the Next Level MSOs. Only HCPs who referred to LRH were allowed to participate and remain in the Next Level MSOs, and the only source of revenue for the Next Level MSOs came from the referrals or other business generated by the HCPs in the MSOs. While HCPs purported to invest in the Next Level MSOs, the MSOs' payments to HCPs were not based on the returns from any genuine investment. Instead, the Next Level MSOs' payments to HCPs were profits shared with HCPs based on the HCPs' referrals to LRH.

190.    In or about November 2015, Next Level created a written presentation about the company based on the information that Marioni and Perkins typically provided to HCPs in their sales pitch. Next Level noted that the MSO would "help[]" HCPs by offering them a "Low risk, high return" opportunity. Next Level stated that it "is focused on advanced lipid testing provided through [BHD]," "[b]illing is processed through [LRH]," and Next Level MSO would receive a share of the monies collected. Next Level explained that the "Buy in amount is $1500 per percent" ownership, and in an "MSO with high participation ~1600 samples per month" (i.e., a high volume of referrals to LRH), a "[p]hysician with 1% ownership receives $11,520/month."

191.    That is, Next Level was offering to pay HCPs $11,520 per month—$138,240 per year—if the HCPs made a nominal $1,500 contribution and had "high participation" in the scheme to refer laboratory testing to LRH.  As its summary indicated, the Next Level MSOs were not a genuine investment opportunity; they were a profit-sharing arrangement to pay HCPs a share of the revenue generated by their referrals.

192.    In describing the HCP sign up process, Next Level highlighted the MSO's profit-sharing motive. First, "[p]hysician signs paperwork to begin 30-45 day period of evaluation period (monies accrue in MSO account)." During the evaluation period, "[LRH] will place a phlebotomist [in the physician's office] or hire physician's current phlebotomist." "At the end of evaluation period shares are offered to physician." Only after the month-plus evaluation period, once Next Level had evidence of the volume of a HCP's referrals to LRH, would Next Level place a referring HCP in a Next Level MSO with other HCPs of similar referring volume. Finally, to disguise the kickbacks, "[c]ontracts are signed and checks are collected" by Next Level.

193.    Given the volume of LRH referrals that the Next Level MSOs generated, LRH assured Marioni and Perkins, in an email copying Madison and Borgfeld, that "YOU ARE THE 'A TEAM,'" claiming that another "recruiter group" for LRH (S&G and Jacobs Marketing) had "less than a handful of friends that they added into their MSO that practice outside Tomball."

194.    For example, in or about September 2015, Next Level recruited Annie Varughese, M.D. (Physician B), of The Woodlands, Texas, to refer laboratory testing to LRH. To induce Physician B's referrals to LRH, Perkins and Marioni offered to pay her MSO kickbacks through SYNRG MSO. Physician B agreed to participate in the kickback scheme and began referring laboratory tests for federal healthcare beneficiaries to LRH on or about October 9, 2015.

195.    Before Next Level offered to pay Physician B MSO kickbacks through SYNRG MSO, Physician B had never previously ordered laboratory tests from LRH. Physician B did not have admitting privileges at LRH. Physician B had never practiced at LRH. And Physician B had never referred any patient to LRH before agreeing to participate in the MSO kickback scheme. Indeed, Physician B's medical practice in The Woodlands, Texas was over 100 miles away from LRH's Rockdale, Texas facility.

196.    During the period of in or about September 2015 to at least July 2016, SYNRG MSO paid Physician B over $70,000 in MSO kickbacks, a return of over 1,455% based on her purported investment of $4,500.

197.    From in or about October 2015 to September 2016, during Physician B's participation in the SYNRG MSO kickback scheme, Physician B referred to LRH hundreds of tests payable by federal healthcare programs. LRH submitted those claims as purported outpatient services to federal programs, including Medicare, which paid over $600,000 to LRH. Examples of those claims are included in Exhibit A hereto.

198.    As another example, in or about April 2015, Next Level recruited Trang Trinh, M.D. (Physician C), of Katy, Texas, to refer laboratory testing to LRH. To induce Physician C's referrals to LRH, Perkins and Marioni offered to pay MSO kickbacks to Physician C through SYNRG MSO. Physician C agreed to participate in the kickback scheme and began referring laboratory tests for federal healthcare beneficiaries to LRH on or about April 27, 2015.

199.    Before Next Level offered to pay MSO kickbacks to Physician C through SYNRG MSO, Physician C had never previously ordered laboratory tests from LRH. Physician C did not have admitting privileges at LRH. Physician C had never practiced at LRH. And Physician C had never referred any patient to LRH before agreeing to participate in the MSO kickback scheme. Indeed, Physician C's medical practice in Katy, Texas was over 100 miles away from LRH's Rockdale, Texas facility.

200.    During the period of in or about April 2015 to June 2016, SYNRG MSO paid Physician C over $117,000 in MSO kickbacks, a return of over 1,460% based on her purported investment of $7,500.

201.    From in or about April 2015 to June 2016, during Physician C's participation in the SYNRG MSO kickback scheme, Physician C referred to LRH hundreds of tests payable by federal healthcare programs. LRH submitted those claims as purported outpatient services to federal programs, including Medicare, which paid over $200,000 to LRH. Examples of those claims are included in Exhibit A hereto.

O'Neal and Hickman

202.    In early 2015, Madison described to O'Neal the MSO model that LRH and its recruiters were using to provide financial incentives to HCPs to order testing from LRH. In or about April 2015, Madison and Borgfeld offered O'Neal the opportunity to be paid by LRH for recruiting HCPs to order diagnostic services from LRH.

203.    In or about May 2015, O'Neal agreed to be paid through Exit Therapy to arrange for and recommend HCP referrals to LRH.  Like LRH's other recruiters, Madison and Borgfeld understood that O'Neal would kickback a portion of the Exit Therapy payments to referring HCPs, in the form of MSO payments, to induce the HCPs' referrals to LRH.

204.    As part of the arrangement, Exit Therapy transferred funds to O'Neal's company, Quick Diagnostics, Inc. (Quick MSO), and Quick MSO paid HCPs who referred to LRH.

205.    O'Neal partnered with Kash, Howard, and Gonzales to recruit HCPs to refer to LRH in return for payments from Quick MSO. Kash, Howard, and Gonzales each had worked as sales representatives in Texas and knew numerous HCPs in Texas. Kash, Howard, and Gonzales spoke with HCPs to offer MSO payments to induce the HCPs' referrals to LRH. Kash, Howard, and Gonzales provided Quick MSO documents to prospective HCP participants, arranged for and recommended that the HCPs order laboratory tests through LRH, and distributed payment checks to referring HCPs.

206.    In or about August 2015, Hickman joined the MSO kickback scheme. To further that scheme, Hickman founded, owned, and operated numerous corporate entities. He created APC to receive payments from LRH and make payments to an MSO, to Kash, to Hickman, and to another company Hickman created, APM.

207.    Hickman created APM to receive payments from APC to pay himself and others.

208.    Hickman created Ascend MSO of TX LLC (Ascend MSO) to receive payments from APC, to pay recruiters like Gonzales, and to pay HCPs who referred to LRH.

209.    In light of its agreement with APC, LRH asked O'Neal to "mov[e] the Exit Therapy doctors under the Ascend contract as of December 1, 2015." LRH then terminated its agreement with Exit Therapy, while maintaining its contract with APC.

210.    In or about August 2015, Ascend MSO recruiters Kash, Gonzales, and Howard began implementing the Ascend MSO kickback scheme, targeting HCPs, offering kickbacks, and coordinating with BHD, THD, and their personnel.

211.    To disguise the kickbacks, Hickman and O'Neal used purported "investment" documentation for the Ascend MSO. Only HCPs who referred to LRH were allowed to participate and remain in the Ascend MSO, and the only source of revenue for the Ascend MSO came from the referrals or other business generated by the HCPs in the MSO. While HCPs purported to invest in the Ascend MSO, the MSO's payments to HCPs were not based on the returns from any genuine investment. Instead, the Ascend MSO's payments to HCPs were simply profits shared with HCPs based on the HCPs' referrals to LRH.

212.    Ascend MSO's marketing director summarized the financial inducements in a "pro forma" sent to Kash, Howard, and Gonzales. The pro forma showed how much money HCPs could make based on their referrals of diagnostic services, including laboratory testing. In the Ascend

MSO pro forma for a "[g]roup of 10 doctors," HCP owners were told they would have "multiple revenue streams," and would receive a share of the revenue generated by their referrals for toxicology testing, blood testing, EEG tests, sleep studies, and other diagnostic services.

213. In their sales pitch to HCPs, the Ascend MSO recruiters focused on the amount of money that HCPs would receive.

214. For example, on or about October 24, 2015, Kash offered the MSO kickbacks to Charles Evans, M.D., of Lufkin, Texas. The following day, the HCP told Kash that he was "80% sold on this" proposal, but had a few questions. In describing Kash's sales pitch, the HCP said that it "sound[ed] like a get rich quick scam"—and a "risky one at that"—in which he "could make an extra million dollars in one year only to go bust 2 years down the road by doing so." The HCP said he was "struggling with how I label this income from the MSO" as it "clearly is not for medical services" provided to the MSO. The HCP warned Kash that "[t]he doctors that sign on what you presented yesterday are going to be skeamers [sic] for get rich quick, and I fear they will be ordering unnecessary tests that will get us investigated."

215. In response, Kash promised the HCP to "alleviate all your concerns" about "any unknown surprises" and said "we want a 10 year working relationship vs a 6 month fiasco."

216. Later that day, the HCP told Kash he was "pretty sure you can count on our [THD] business." The HCP told Kash "this is all pending the hard sale [sic] with [my wife]," explaining that "[w]e will need it presented in a way to her that makes it look like the patient will be in better hands financially and quality and types of care than we have presently." The HCP noted that for the laboratory tests billed by the hospital, "[t]he size of these bills are outrageous," the patients will not want to pay the bills, and the hospital will not want to take a loss, so "[t]his only works if the insurance companies take the brunt of things."

217.    As another example, in or about October 2015, Howard and Gonzales offered Ascend MSO kickbacks to another doctor in this District, Hong Davis, M.D. (Physician D), of Plano, Texas, to induce Physician D to order BHD tests through LRH. Before being offered the kickbacks, Physician D had never referred to LRH, a hospital nearly 200 miles away in Rockdale, Texas. After agreeing on or about October 20, 2015 to receive the Ascend MSO kickbacks, Physician D began referring patients, including Medicare beneficiaries, to LRH for laboratory testing.

218.    Physician D provided Gonzales with a purported "investment" check of $1,000, dated January 14, 2016, from her practice, Hong Davis, M.D. P.A., to Ascend MSO. In the "For" line of the check, Physician D confirmed it was for the "Boston Heart Partnership."

219.    Physician D ordered BHD tests through LRH because of the money Howard and Gonzales had offered her. After referring testing to LRH, Physician D repeatedly asked Gonzales when she would be paid for her referrals. In February 2016, Physician D asked Gonzales, "Expecting time to receive the payment check?" In April 2016, Physician D asked Gonzales, "I trust you will have my check ready tomorrow?" The following day, Physician D complained to Gonzales, "it sound [sic] very fishy and not right, look like we send you all the samples, not only just to get nothing, but also lost $1,000." Physician D pleaded, "I really wish you and Laura [Howard] can tell me the truth, now, if you guys know it." Physician D said, "I am not satisfied, I have not see [sic] a dime and I have already lost $1,000!" Physician D noted that "for 5 months no distribution, never heard of." Physician D indicated she did not need O'Neal "to be how are you, fine, and you person. I just need him to show me the number!"

220.    On or about May 6, 2016, Physician D received a $5,000 check that Hickman authorized and signed on behalf of Ascend MSO. About two weeks later, Physician D received a

$6,438 check that Hickman authorized and signed on behalf of Ascend MSO. In 2016, as authorized by Hickman, Ascend MSO paid $54,871 to Physician D for her referrals to LRH, a 5,387% return on investment.

221.    From in or about November 2015 to July 2016, during her participation in the Ascend MSO kickback scheme, Physician D referred to LRH dozens of tests payable by federal healthcare programs. LRH submitted those claims as purported outpatient services to federal programs, including Medicare, which paid thousands of dollars to LRH. Example of those claims are included in Exhibit A hereto.

222.    As another example, in or about April 2016, APC recruited Elizabeth Seymour, M.D. (Physician E), of Denton, Texas, to refer to LRH for laboratory testing. To induce Physician E's referrals to LRH, Gonzales offered to pay MSO kickbacks to Physician E through Ascend MSO. Physician E agreed to participate in the kickback scheme, gave Gonzales a purported investment check of $1,000, and began referring laboratory tests, including for federal healthcare beneficiaries, to LRH on or about April 14, 2016.

223.    Before Gonzales offered to pay MSO kickbacks to Physician E through Ascend MSO, Physician E had never previously ordered laboratory tests from LRH. Physician E did not have admitting privileges at LRH. Physician E had never practiced at LRH. And Physician E had never referred any patient to LRH before agreeing to participate in the MSO kickback scheme. Indeed, Physician E's medical practice in Denton, Texas was over 180 miles away from LRH's Rockdale, Texas facility.

224.    To eliminate any financial risk for Physician E, Hickman held Physician E's purported investment $1,000 check without depositing it until he and Gonzales had already provided her with a much larger MSO payment check. Hickman did not deposit Physician E's

check until on or about July 11, 2016. By that date, Physician E had made dozens of referrals to LRH for laboratory testing, and Gonzales already had given Physician E a check dated July 6, 2016 for $5,000—five times the amount of Physician E's purported investment.

225.    Ascend MSO paid Physician E $49,000 in MSO kickbacks, a return of 4,800% based on Physician E's purported investment of $1,000.

226.    From in or about April to August 2016, during her participation in the Ascend MSO kickback scheme, Physician E referred to LRH hundreds of tests payable by federal healthcare programs. LRH submitted those claims to federal healthcare programs as purported outpatient services, and Medicare paid over $350,000 to LRH. Examples of those claims are included in the chart in paragraph 149 above.

227.    The HCPs who joined the Ascend MSO kickback scheme and referred laboratory tests and other diagnostic services to LRH profited handsomely.

228.    The below chart summarizes over $1.2 million in Ascend MSO payments from in or about February 2016 to November 2017 to referring HCPs to induce their referrals to LRH:

| HCP | MSO Payments |
|---|---|
| Azim Karim | $17,000.00 |
| Bao Vinh Nguyen Phuc | $55,870.84 |
| Baxter Montgomery | $78,070.84 |
| Bruce Maniet | $50,870.84 |
| Doyce Cartrett | $36,000.00 |
| Dung Hoy Nguyen and Dung Chi Nguyen | $55,870.84 |
| Elizabeth Seymour | $49,000.00 |
| Frederick Brown | $101,741.68 |
| Heriberto Salinas | $55,870.84 |
| Hong Davis | $55,870.84 |
| Huy Chi Nguyen | $55,920.84 |
| James Froelich III | $50,870.84 |
| Jill Taylor | $78,070.84 |

| HCP | MSO Payments |
|---|---|
| Joseph Bolin | $55,870.84 |
| Muhammad Akram Khan | $55,870.84 |
| Nicholas Aguilar | $10,438.84 |
| O. Michael Sprintig | $10,000.00 |
| Paul Gerstenberg | $101,741.68 |
| Paul Worrell | $54,000.00 |
| Robert Hernandez | $27,044.84 |
| Robert Megna | $34,000.00 |
| Thuy Nguyen and Linh Ba Nguyen | $111,741.68 |

229.    Ascend MSO owner Hickman and Ascend MSO recruiters Kash, Gonzales, and Howard received hundreds of thousands of dollars for their actions in furtherance of the kickback scheme.

230.    At Hickman's direction, APM paid Hickman's company, Hickman Tax and Retirement Advisors, $389,221.57 in 2016.

231.    In an attempt to hide his role in the kickback scheme, Kash had his payments funneled through a shell company named Tigerlily LLC, of which he was the beneficial owner. In 2016, APC paid Kash, through Tigerlily, a total of $191,334.

232.    Howard also sought to conceal her role in the kickback scheme. Rather than receive payments directly from an Ascend entity, Howard and Gonzales agreed that Gonzales' company, Zalegon Sales Associates LLC (Zalegon), would receive the payments, and that Gonzales would share the proceeds with Howard. In 2016, Ascend MSO paid Zalegon $506,823.87.

233.    As agreed with Howard, Gonzales deposited the checks Zalegon received from Ascend MSO and withdrew cash to share with Howard. Approximately monthly, from May to December 2016, Gonzales delivered to Howard the cash in a bag. Gonzales paid Howard about $10,000 in cash per month, except for December 2016, when Gonzales paid Howard about $70,000

in cash. Each month, after Howard received the bag of cash from Gonzales, she placed it in the safe in her home, with the cash still in the bag. In total, Gonzales paid Howard about $140,000 in cash from Ascend MSO.

Jones, Parnell, and Hardaway

234. In 2015 and through at least June 2016, Parnell and Hardaway were BHD sales representatives. With Jones, they owned and operated LGRB. LRH paid LGRB to recruit HCPs to refer to LRH and to fund the MSO kickbacks to HCPs. Jones, Parnell, and Hardaway owned numerous MSOs, including Alpha Rise Health LLC (Alpha Rise), Beta Rise Health LLC (Beta Rise), and Omega Rise Health LLC (Omega Rise) (collectively, "Rise MSOs"). Jones, Parnell, and Hardaway used the Rise MSOs to kickback thousands of dollars to HCPs who referred laboratory testing and other diagnostic services to LRH.

235. The below chart summarizes over $1 million in Rise MSO payments to referring HCPs to induce their referrals to LRH:

| HCP | MSO | MSO Payments |
|---|---|---|
| Aria Dayani and Divya Muthappa | Alpha Rise; Beta Rise | $96,634.72 |
| Aria Dayani and Saleh Jaafar | Alpha Rise | $46,396.48 |
| Dagberto Balderas | Alpha Rise | $27,649.00 |
| Dan Freeland | Alpha Rise | $36,096.48 |
| David Sneed | Alpha Rise | $161,185.92 |
| Edward Miwa | Alpha Rise | $46,396.48 |
| Gary Goff | Alpha Rise | $46,396.48 |
| John Hierholzer | Alpha Rise | $12,425.00 |
| Jose Ortiz | Alpha Rise | $40,296.48 |
| Ken Locke | Alpha Rise | $30,638.48 |
| Kevin Lewis | Alpha Rise | $28,662.00 |
| Marc Krock | Omega Rise | $8,115.86 |
| Marco Munoz | Alpha Rise | $46,396.48 |
| Maricela Mazuca | Omega Rise | $9,700.00 |

| HCP | MSO | MSO Payments |
|---|---|---|
| Matthew Thompson | Alpha Rise | $44,496.48 |
| Melissa Miskell | Alpha Rise | $50,196.48 |
| Mitch Finnie | Alpha Rise | $66,959.96 |
| Patricia Allen | Omega Rise | $12,815.86 |
| Rae Benson | Omega Rise | $11,815.86 |
| Raymon Garcia | Alpha Rise | $46,396.48 |
| Saleh Jaafar | Beta Rise | $81,123.00 |
| Stephanie Berg and Andrew Minigutti | Alpha Rise | $46,396.48 |
| Tad Titlow | Omega Rise | $44,926.88 |

236.    To disguise the kickbacks, Jones, Parnell, and Hardaway used purported "investment" documentation for the Rise MSOs. Only HCPs who referred to LRH were allowed to participate and remain in the Rise MSOs, and the only source of revenue for the Rise MSOs came from the referrals or other business generated by the HCPs in the MSOs. While HCPs purported to invest in the Rise MSOs, the MSOs' payments to HCPs were not based on the returns from any genuine investment. Instead, the Rise MSOs' payments to HCPs were simply profits shared with HCPs based on the HCPs' referrals to LRH.

237.    In or about June 2015, Jones provided Madison with "the MSO handout we will be providing physicians," which included a detailed explanation of Rise MSOs' sales pitch to HCPs. The Rise MSO sales pitch was explicitly offered to only "Health Care Provider[s]" and offered them "investment opportunities" at "$1000.00 per share with a limit of two shares." In the Rise MSO sales pitch, Jones indicated that HCPs could order laboratory services contracted through LRH, including BHD blood tests, Asperio Labs genetic and toxicology testing, and Essential Labs toxicology testing. Jones provided Madison with Rise MSOs' "sales forecast," projecting that, based on referrals from HCPs in the MSO, LRH would receive by August 2015 reimbursements of $102,000 from BHD testing, $25,500 from genetic testing, and $6,800 from toxicology testing,

with LRH's reimbursements rising as more HCPs joined Rise MSO, and totaling an estimated $11.3 million in the first year. Jones also provided Madison with Rise MSOs' "pro forma cash flow," projecting that the "physician divident [sic] payment – 1 share" would be $997 in the first month, $3,472 in the second month, and a total of $88,483 in the first year.

238. According to the Rise MSO pro forma, an HCP who "invested" $1,000 for one share in a Rise MSO would recover almost her entire investment amount in the first month and receive an 8,748% return on investment in the first year. Rise MSOs' purported dividend payments to HCPs were not based on any genuine investment, but were a share of the profits generated by the HCPs' referrals to LRH.

239. Madison understood and agreed to Rise MSOs' plan to pay HCPs to induce them to order laboratory testing and other diagnostic services from LRH.

240. Jones, Parnell, and Hardaway provided to HCPs the same Rise MSO documentation that Jones had provided to Madison. In communications with HCPs, they explained and elaborated on the MSO kickback scheme. As Jones noted in his pitch to an HCP in or about June 2015, "[w]e are an MSO that has contracted with [LRH]" and the "advanced testing we represent are [BHD] advanced lipid testing" as well as "cutting edge Genetic Testing and toxicology." The Rise MSO pitch emphasized how much money HCPs could earn from their referrals, offering HCPs "the opportunity to become owners in the MSO and receive profit sharing based on the performance of the MSO and the amount of share ownership."

241. At the direction of Madison and Borgfeld, from in or about September 2015 through at least May 2016, LRH paid at least $3,197,054 to LGRB for arranging for and recommending referrals to LRH and to fund the MSO kickbacks to referring HCPs. LGRB, in turn, transferred the funds during that period to the Rise MSOs, with Alpha Rise receiving at least $2,663,690, Beta

Rise receiving at least $318,125, and Omega Rise receiving at least $215,240. During that period, the Rise MSOs kicked back over $1 million of those funds to the referring HCPs.

242.    For example, in or about July 2015, LGRB recruited Gary Goff, M.D. (Physician F), of Dallas, Texas, to refer to LRH for laboratory testing. To induce Physician F's referrals to LRH, LGRB offered to pay MSO kickbacks to Physician F through Alpha Rise. Physician F agreed to participate in the kickback scheme and began referring laboratory tests, including for federal healthcare beneficiaries, to LRH in or about August 2015.

243.    Before LGRB offered to pay MSO kickbacks to Physician F through Alpha Rise, Physician F had never previously ordered laboratory tests from LRH. Physician F did not have admitting privileges at LRH. Physician F had never practiced at LRH. And Physician F had never referred any patient to LRH before agreeing to participate in the MSO kickback scheme. Indeed, Physician F's medical practice in Dallas, Texas was over 160 miles away from LRH's Rockdale, Texas facility.

244.    Alpha Rise paid Physician F over $46,000 in MSO kickbacks, a return of 2,200% based on Physician F's purported investment of $2,000. In addition to paying Physician F the MSO distributions, Alpha Rise returned to Physician F his full purported investment amount in 2017.

245.    From in or about August to December 2015, during his participation in LGRB's kickback scheme, Physician F referred to LRH hundreds of tests payable by federal healthcare programs. LRH submitted those claims to federal healthcare programs as purported outpatient services, and Medicare paid over $100,000 to LRH. Examples of those claims are included in Exhibit A hereto.

246.    For their role in the LRH kickback scheme, Jones, Parnell, and Hardaway received over $1 million, including management fees and MSO payments.

### E.    LRH and the Recruiters Partnered with Two Laboratory Co-Conspirators

247.    For their laboratory fraud scheme to succeed, Madison and Borgfeld knew they would need to partner with a clinical laboratory to run the tests ordered by the HCPs. LRH did not have the capability in 2015 to perform specialized laboratory testing, lacking the needed personnel and laboratory equipment, among other things. LRH first partnered with BHD, and later with BHD's competitor, THD.

248.    For a fee, both BHD and THD allowed LRH to bill their blood tests to insurers, including federal healthcare insurers, as purported hospital outpatient services. By billing for purported outpatient services, LRH charged insurers a much higher rate than BHD or THD could receive as clinical laboratories or that LRH could receive for laboratory tests for hospital non-patients.

249.    When Theiler discussed the LRH arrangement with Hertzberg in December 2015, he noted that LRH "[q]ualifies as a 'Critical Access Hospital' which is a hospital certified under a set of Medicare conditions," including "[b]eing located in a rural area, at least 35 miles drive away from any other hospital." Theiler noted to Hertzberg that LRH's CAH status allowed it to "receive cost-based reimbursement from Medicare, instead of standard fixed reimbursement rates."

250.    That month, Hertzberg highlighted to colleagues the significant reimbursement increase when LRH submitted the claims, stating that hospitals like LRH "are paid a premium (3x standard rate) by government and private payors." As Theiler understood, "[w]ith the favorable reimbursement, [LRH] will assume responsibility of billing insurance" for the laboratory tests.

251.    Likewise, in internal documents approved by Grottenthaler in 2016, THD described its "unique hospital strategy" and "hospital partnership model" in which "[THD's] tests are white-labeled and marketed as the hospital's tests." THD's documents highlighted the "increased economic opportunity accessed via unique operating partnerships," noting that typical

reimbursement when THD bills the laboratory tests is about "$300 – $315," whereas the reimbursement when a hospital bills the laboratory tests is much higher, such that THD's share of the hospital's reimbursement is "$500+" and even "$600 – $650 per sample for existing hospital partnerships," including LRH.

252.    At Grottenthaler's direction, THD focused heavily on the hospital strategy, aiming for "rapid growth (2016 and beyond)" based on an "accelerated roll out" of "highly accretive hospital partnership agreements." By having LRH and other hospitals bill its tests, THD sought to "increas[e] revenue from hospitals," which "will more than offset projected decline in reimbursement rates from Medicare and commercial insurers" under the CLFS.

253.    Hertzberg, Theiler, and Howard knew that the individuals receiving BHD testing through LRH were neither inpatients nor outpatients of LRH because BHD personnel participated with MSO recruiters in sales visits to the referring HCPs and understood that the individuals were patients of the HCPs, not hospital patients. For the same reason, Grottenthaler, Kash, and Love knew that the individuals receiving THD testing through LRH were not LRH patients.

254.    BHD and THD executives and sales personnel knew that LRH billing their laboratory tests as purported services to hospital patients would result in false, inflated claims to insurers, including federal healthcare insurers, and higher reimbursements for their labs.

255.    To further the false claims conspiracy, both BHD and THD identified HCP targets for the LRH-affiliated MSOs, referred HCPs interested in kickback payments to the MSOs to secure their blood testing referrals, and participated with the MSOs in sales pitches to offer HCPs money to induce their referrals.

### 1.    BHD Executives and Sales Personnel Joined the Conspiracy

256.    On or about December 5, 2014, Hertzberg signed a merger agreement to transfer 100% of the shareholding in BHD to Eurofins Clinical Testing US Holdings, Inc. (Eurofins). The

merger closed on or about January 30, 2015. Pursuant to the merger agreement, the purchase price consisted of a closing payment plus a contingent "earnout" payment. The earnout payment was to be calculated based on BHD's profitability during 2016 and 2017 (earnout period). As part of the earnout provisions, Hertzberg, Theiler, and other BHD executives would remain in place with significant managerial independence from Eurofins during the earnout period. Hertzberg and Theiler stood to receive about 7.9 percent and 1.3 percent, respectively, of the earnout payment, depending on BHD's profitability during the earnout period.

257.    Shortly after the merger closed, a physician who had a financial relationship with LRH alerted Hertzberg that LRH's CEO, Madison, was reaching out to a competitor laboratory to discuss a potential "lucrative deal." The physician told Hertzberg that LRH "want[s] to bill for labs themselves" because they have "great" contracts with payors. Hertzberg replied, "I'm on it! Stay tuned!" The physician then gave Madison's contact information to Hertzberg.

258.    On or about April 1, 2015, Hertzberg approved LRH's proposed arrangement with BHD, and Madison signed the agreement. Described as a "buy and bill contract," Hertzberg allowed LRH to bill BHD tests to insurers, including federal healthcare programs, in return for a fee paid to BHD.

259.    In or about April 2015, LRH performed a "test pilot" of submitting one physician's BHD tests to insurers as purported hospital outpatient laboratory testing. Once they saw that the billing scheme generated significantly more reimbursement, based on a CAH submitting the claims rather than a clinical laboratory, Madison and Borgfeld began paying MSO recruiters to arrange for or recommend that HCPs order BHD testing through LRH.

260.    BHD's sales force, with Hertzberg and Theiler's knowledge and approval, worked closely with LRH and the recruiters who paid MSO kickbacks to induce referrals to LRH for BHD

testing. Hertzberg spoke with Madison about the LRH arrangement on numerous occasions. Parnell, Hardaway, Howard, and other BHD personnel identified HCP targets for the LRH-affiliated MSOs, referred HCPs interested in kickback payments to the MSOs to secure their blood testing referrals, and participated with the MSOs in sales pitches to offer HCPs money to induce their referrals.

261. For example, in or about May 2015, a BHD Regional Sales Director who reported to Theiler confirmed to Parnell and Hardaway that he had joined MSO recruiters at a dinner to recruit six physicians to order BHD tests through LRH; after the MSO pitch, "4 [physicians] have moved forward with joining the MSO." He highlighted the impact of the MSO pitch on a physician who had referred a large volume of tests to another laboratory and had planned to meet with a competitor: "After [the MSO recruiters] discussed the MSO, he is probably going to use us."

262. Fueled by the MSO kickbacks, referrals to LRH for BHD testing increased rapidly. One LRH-affiliated physician told Hertzberg in or about June 2015, "We've been smoking it! Hundreds and hundreds of labs. Gray [Hardaway] is beside himself!"

263. As the LRH arrangement progressed, Hertzberg and Theiler closely tracked the revenue that BHD received from the arrangement. In or about July 2015, Hertzberg and Theiler reviewed data showing that "[LRH] growth continues to be very strong," with a BHD employee advising Hertzberg that if they "annualize the [LRH] volume," BHD would be "up a net of $4.4M." Hertzberg replied, "Have we gotten paid???" A BHD employee confirmed to Hertzberg, "YES!! $300k came in at the end of last week – they are going to be wiring us weekly."

264. Hertzberg and Theiler continued to track the financial success of the LRH arrangement. In or about September 2015, Hertzberg and Theiler reviewed data showing that BHD had received over $1 million to date from LRH. Based on the average LRH orders for BHD testing

over the past four weeks, BHD's annualized revenue related to LRH would be $20,866,560—an increase of $19,166,560 from BHD's "base business" without LRH. Upon reviewing those revenue numbers and a graph of the steeply rising rate of LRH referrals, Hertzberg contacted Theiler and other BHD executives, exclaiming "WOWIE!!!!! HOW DO WE GET SOME MORE OF THAT???!!!!!!!"

265.    The next month, a BHD sales director informed Hertzberg that Grottenthaler—the CEO of THD, a competitor laboratory to BHD—had spoken with Madison, and that "[THD] is in negotiations with [LRH] for a similar model/arrangement as BHD." Hertzberg replied that "I would expect everyone is talking to them [LRH]." To preserve BHD's revenue from the LRH arrangement, Hertzberg told a BHD sales director: "[W]e need to keep our touch high and service levels even higher!"

266.    The sales director agreed but noted to Hertzberg that BHD had "problems" in "filtering clients with pure intent" who were referred by an MSO working with LRH. The sales director also warned Hertzberg about BHD's experience working with an LRH-affiliated "MSO called Benchmark," which was "misleading and dirty." The sales director told Hertzberg that THD was "associat[ed] with unethical/underhanded practices and people" and "Benchmark is going to [THD] with some of its referrals."

267.    Despite the problems, Hertzberg and Theiler continued the lucrative LRH fraud scheme, without disclosing the problems or the MSO kickbacks to BHD's parent company.

268.    Given the substantial revenue the LRH arrangement was generating for BHD, Hertzberg worked with Theiler on plans to expand the arrangement into a formal joint venture, to prevent LRH from working with BHD's competitor, THD. Under Hertzberg and Theiler's proposed joint venture, BHD would have helped LRH develop and operate an on-site laboratory.

269.     Hertzberg and Theiler knew why the existing LRH arrangement was lucrative. As a BHD sales director highlighted to Theiler in or about October 2015, the MSOs "work with [LRH]," "practitioners partner[] with MSO" for their testing and "share in profits of MSO," and BHD receives leads from the MSOs for new HCP clients. The sales director noted to Theiler that MSOs offer the "testing, both [BHD] and toxicology, through [LRH]." Despite calling themselves MSOs, the BHD sales director noted to Theiler that "the MSOs working with [LRH] are not providing any management/administrative service for the office."

270.     The joint venture contemplated by Hertzberg and Theiler to develop LRH's on-site lab would have required approval by BHD's parent company in Europe. At Theiler's request, a BHD sales director, with assistance from Parnell and Hardaway, prepared an executive summary in or about December 2015 of the existing LRH arrangement for Hertzberg to use when discussing her proposed LRH joint venture with BHD's parent company. The summary explained that LRH's "unique" status as a CAH gave it "very favorable reimbursement," allowing it to "receive cost-based reimbursement from Medicare, instead of standard fixed reimbursement rates." BHD's summary acknowledged that cost-based reimbursement was designed "to enhance the financial performance of small rural hospitals" like LRH. The summary noted that LRH had "10 patient beds" and "originally served the Central Texas area, but over the last year, has increased [its] relationships with medical providers in Houston, Dallas and other cities in Texas and Oklahoma."

271.     The executive summary prepared at Theiler's request also described the kickbacks that LRH used to induce HCPs to refer laboratory testing to LRH, explaining that a "driver for growth for [LRH] and other hospitals is the [MSO] model." The summary noted that "[LRH] will employ Marketers. These Marketers represent [MSOs]. The practitioners to [sic] become investors

by purchasing shares in the MSOs. [LRH] will remunerate the Marketers/MSO, which in turn disperse their profits among the investors."

272.     Hertzberg and Theiler knew of the broad reach of LRH's MSOs in recruiting HCPs to order BHD tests through LRH. In or about October 2015, Theiler noted to Hertzberg that "the MSO [for LRH was] recruiting physicians outside of Austin and into other markets." BHD's VP for Hospital Strategy confirmed this point to Hertzberg and Theiler a few days later, noting that LRH's marketers were recruiting "way outside of the [LRH] access area for patients," even though a "[CAH] exists to provide access and does not typically have a marketing arm." The VP gave Hertzberg and Theiler her "strong recommendation and request" to "reel this in" and "stand down on all hospitals, particularly in [Texas]."

273.     Hertzberg and Theiler chose not to end BHD's participation in the MSO kickback scheme, aware of the lucrative nature of their LRH arrangement. Instead, Hertzberg and Theiler tracked the "LR[H] accounts, with volumes, how they were put under LR[H], and how they were in-serviced [by BHD]." In or about November 2015, Theiler sent Hertzberg a detailed spreadsheet listing, among other things, the names, referral volumes, and referral start dates for 128 HCPs for whom an MSO relationship was the "source of referral to [BHD]," who were listed as responsible for 2,185 referrals in just the past month. Theiler even forwarded to Hertzberg the name and phone number of "MSO/Marketer Marty Flores," who was a recruiter for the Next Level MSOs.

274.     Despite discussing the proposed LRH joint venture with BHD's parent company, Hertzberg and Theiler did not tell that company about the MSO kickbacks.

275.     BHD's parent company did not approve Hertzberg's proposed joint venture to develop LRH's on-site lab, but that decision did not dissuade Hertzberg and Theiler. They

continued BHD's preexisting arrangement with LRH, in which BHD performed the laboratory testing, the recruiters paid the MSO kickbacks, and LRH submitted claims to insurers for the tests.

276. As intended by Hertzberg and Theiler, BHD's participation with LRH and others in the hospital billing and MSO scheme was highly lucrative, with LRH paying BHD over $30 million from in or about July 2015 to February 2018.

### 2. THD Executives and Sales Personnel Joined the Conspiracy

277. By about August 2015, Grottenthaler, Cornwell, and Love realized that THD was losing business in Texas because certain HCPs were ordering BHD tests to receive money from MSOs.

278. Initially, Grottenthaler tried to launch "a pilot-project" for what Cornwell described (in an email copying Grottenthaler) as "our MSO," referring to an MSO based in Dallas, Texas.

279. Given the importance of the MSO strategy to THD, it was Grottenthaler who "helped us [THD] set this up" with the MSO. As Grottenthaler, Cornwell, and Love understood, the MSO would pay HCPs for laboratory referrals, THD would perform the laboratory testing for the MSO for a fee, and the MSO would bill the claims to commercial and federal insurers.

280. Grottenthaler helped set up and approved the plan, and Cornwell helped to implement it. However, when the MSO tried to bill insurers for THD's laboratory tests, it faced difficulties, unlike established hospitals, in being paid by insurers.

281. Aware that he needed hospitals for the scheme to work, Grottenthaler hired defendant Kash in October 2015. Kash had a close relationship with O'Neal, who operated the Ascend MSO with Hickman, and O'Neal had a close relationship with a Texas hospital executive, LRH's CEO Madison.

282. Grottenthaler knew that THD's competitor, BHD, already had partnered with LRH, using MSOs to gain business at THD's expense. Kash advised Grottenthaler that partnering with

LRH would "allow us to get another competitive response, to address what is going on here in Texas."

283.    Grottenthaler, Kash, O'Neal, and Madison had numerous meetings in person and by phone and ultimately agreed that THD would join the LRH scheme.

284.    On or about November 2, 2015, LRH entered into a laboratory processing agreement with THD. Pursuant to the agreement, LRH agreed to pay THD for performing laboratory tests on specimens that LRH sent to THD, and THD allowed LRH to bill the tests to any public or private insurer. Borgfeld signed the agreement for LRH, and Grottenthaler signed for THD.

285.    Grottenthaler sought to encourage the hospital referrals by, among other things, paying commissions to THD's sales force for tests ordered from a hospital if the tests had been performed by THD.

286.    Cornwell, Kash, and Love welcomed Grottenthaler's decision to join the LRH kickback scheme. They believed that the MSO payments would increase THD's business, including business lost to BHD. As Cornwell told Grottenthaler, having Kash and Love coordinate with Ascend MSO, for example, would be "an opportunity to get [a high-volume HCP account's] business back" after the HCP had switched to "sending over 100 BH[D] tests per week to LR[H] through Ascend's MSO[.]" Numerous high-volume HCP accounts had been "lost to [BHD's] MSO (presumably Dr. O'Neill's [sic])," Love told Cornwell. After learning of THD's arrangement with LRH, Love said "it is good to have a competitive response to [BHD's] strategy," even though she had "a big concern [about] what happens to these accounts once they move over to a MSO," in light of all of "the MSO's marching around town."

287.    Kash, Cornwell, and THD's employed sales representatives, including Love, spoke to HCPs about the MSO kickbacks, referred HCPs to MSO recruiters, and referred MSO recruiters to HCPs. The MSO scheme became a key part of THD's business, with Love telling Cornwell that "[o]ur business hinges on how well the hospitals and MSOs work together."

288.    Given the lucrative nature of the LRH arrangement, Grottenthaler sought to deepen THD's relationship with LRH. On or about May 1, 2016 and December 19, 2016, THD-Outreach agreed with LRH to develop and manage a laboratory onsite at LRH and to prohibit LRH from receiving such services from any competitors to THD (such as BHD). Pursuant to both agreements, LRH agreed to pay THD per laboratory test that was performed, and THD allowed LRH to bill the tests to any public or private insurer. Grottenthaler signed both agreements, and Borgfeld signed the December 2016 agreement.

289.    LRH and THD-Outreach also entered into an equipment lease agreement on or about December 21, 2016, signed by Grottenthaler and Borgfeld, and a consulting agreement on or about February 15, 2017, also signed by Grottenthaler.

290.    On or about April 1, 2017, THD affiliate THD-Financial agreed to submit laboratory claims in LRH's name and under LRH's National Provider Identifier (NPI) to insurers, including federal healthcare programs, in return for LRH paying 7% of net collections to THD-Financial.

291.    As intended by Grottenthaler, THD and its affiliates' participation with LRH and others in the hospital billing and MSO scheme was highly lucrative, with LRH paying THD, THD-Outreach, and THD-Financial over $15.9 million.

**F.      LRH Submitted False Claims to Medicare, Medicaid, and TRICARE**

292.      During the period of January 1, 2015 to December 31, 2017, LRH submitted false claims for laboratory testing to federal healthcare programs. Example claims are identified in Exhibit A hereto.

293.      As LRH's final claims for payment for Medicare services, including toxicology and blood testing, for the below time periods, LRH submitted to CMS its annual cost report on Form CMS-2552 on the below dates.

| Cost Report Period | Date Submitted | LRH Signatory | Date Signed |
|---|---|---|---|
| 1/1/2014 – 12/31/2014 | 6/1/2015 | Borgfeld | 5/28/2015 |
| 1/1/2015 – 12/31/2015 | 6/1/2016 | LRH's CFO | 5/31/2016 |
| 1/1/2016 – 12/31/2016 | 6/1/2017 | Madison | 5/31/2017 |
| 1/1/2017 – 12/31/2017 | 6/1/2018 | Borgfeld | 5/31/2018 |

294.      Each of LRH's cost reports for years 2014 through 2017 included the certifications in paragraphs 42–46 above, signed by the above LRH signatories.

**II.      OTHER TEXAS HOSPITALS**

295.      In light of the success of the LRH kickback scheme, a number of its co-conspirators agreed to implement the MSO kickback scheme with other Texas hospitals. To induce HCPs' referrals for diagnostic services reimbursed by federal healthcare programs, including laboratory tests, the co-conspirators agreed to a scheme to pay thousands of dollars to referring HCPs, while disguising the payments as purported MSO investment distributions.

**A.      Integrity Transitional Hospital Fraud Scheme**

296.      In late 2015, BHD and THD joined another MSO kickback scheme involving a Texas hospital. The hospital was a long term care hospital (LTCH) in Denton, Texas named Denton Transitional LTCH, L.P. d/b/a Integrity Transitional Hospital (ITH).

297. An LTCH is a hospital that, among other things, "is primarily engaged in providing inpatient services, by or under the supervision of a physician, to Medicare beneficiaries whose medically complex conditions require a long hospital stay and programs of care provided by a long-term care hospital." 42 U.S.C. § 1395x(ccc). With limited exceptions, an LTCH "has an average inpatient length of stay . . . of greater than 25 days." *Id.*

298. Rather than focusing on performing laboratory tests for ITH's long-term inpatients, BHD and THD sought to partner with ITH as part of an MSO kickback scheme to induce HCPs to refer laboratory testing for non-patients of ITH.

299. In or about July 2015, Hardaway introduced the ITH arrangement to BHD, noting that his contact at ITH "know[s] the [LRH] folks." Hardaway's contact at ITH was Benchmark Medical LLC (Benchmark), one of ITH's MSO recruiters, which had worked with BHD in the LRH scheme.

300. Aware of the lucrative nature of the LRH arrangement, Hertzberg and Theiler approved entering into a similar arrangement with ITH.

301. Effective on or about August 10, 2015, BHD entered into a laboratory services agreement with ITH. Pursuant to the agreement, ITH agreed to pay BHD for performing laboratory tests on specimens that ITH sent to BHD.

302. For patients covered by commercial insurance, ITH billed commercial insurers and agreed to pay a per-test fee to the laboratory that performed the testing. For patients covered by Medicare, Medicaid, and TRICARE, BHD billed the federal healthcare programs.

303. Hertzberg and Theiler sought to use ITH to implement the LRH fraud schemes at a new hospital. Hertzberg and Theiler knew that the MSO kickbacks that LRH's recruiters had paid to induce referrals would be replicated at ITH. A BHD sales director informed Hertzberg and

Theiler that "[ITH] as a lead was derived from a group of marketers called Benchmark. Benchmark was originally with [LRH] but [LRH] cut ties with them." The sales director had previously told Hertzberg that LRH cut ties with an "MSO called Benchmark" because Benchmark was "misleading and dirty."

304. To implement the ITH arrangement, as Theiler and Hertzberg knew, "Gray [Hardaway] and Jeff [Parnell] work completely through the CEO of Benchmark (Eric) in their dealings with [ITH]." BHD's sales force, including Hardaway and Parnell, identified HCP targets for the ITH-affiliated MSOs, including Benchmark, referred HCPs interested in kickback payments to the MSOs to secure their blood testing referrals, and participated with the MSOs in sales pitches to offer HCPs money to induce their referrals.

305. As LRH had done, ITH invited THD to join the ITH arrangement in or about September 2015. Love spoke with an ITH executive about the proposed arrangement, and she, Grottenthaler, and Cornwell then met with two ITH executives, including its CEO, in or about October 2015.

306. After the ITH meeting, Grottenthaler and Love met with Paul Worrell, D.O. (Physician G), of Dallas, Texas, to try to gain his business.

307. Shortly after the Physician G meeting, Love, Grottenthaler, Cornwell, and an ITH executive communicated in or about October 2015 about the financial inducements needed to gain laboratory referrals from HCPs, including Physician G. Love explained to Grottenthaler and Cornwell that Physician G "has a large volume clinic that averages around 80 specimens per week that is predominantly 3rd party."

308. In or about October 2015, Love gave ITH the Rise MSO handout referenced above in paragraphs 237–238, which Rise had provided to Physician G, telling him that he could "buy

additional shares based on his volume[.]" ITH responded to Love, in an email shared with Grottenthaler and Cornwell, indicating that "the best option for the physician will be a direct investment into a lab clia" to allow the physician to "own a clean 40%." ITH indicated that the physician-owned laboratory structure is "less scrutinized than MSOs and there is no payment that has to be made up to the management company of the MSO for them getting involved in the practice." ITH requested "the list of CPT codes that [THD] processes in their panel because the only way I can figure out what we will charge/make from the blood tests is if I have those codes. That way I can get a pro forma made." The pro forma would show HCPs, including Physician G, how much money they would receive from their referrals as part of the kickback scheme.

309.    To assist ITH in preparing a pro forma, Love asked Grottenthaler whether THD's CFO was "the best resource for CPT codes." THD's CFO provided the CPT codes for THD's tests, and Love provided those codes to ITH in or about October 2015.

310.    After receiving the Rise MSO handout from Love, ITH forwarded it to Darious Shafie on or about October 19, 2015.

311.    About a week later, on or about October 26, 2015, Shafie formed BDS Healthcare, LLC, d/b/a Vybrem Labs (Vybrem), a Texas company he owned and operated. Shafie formed Vybrem to pay kickbacks to HCPs for laboratory referrals. Shafie created a Vybrem MSO handout nearly identical to the Rise MSO handout that he had received from Love.

312.    On or about October 26, 2015, Love, Cornwell, Shafie, and an ITH executive met with Physician G and offered MSO kickbacks to Physician G to induce him to order THD laboratory tests as part of the ITH scheme. Physician G agreed to participate in the kickback scheme with THD and ITH.

313.     Effective on or about November 1, 2015, THD entered into a laboratory services agreement with ITH, signed by Grottenthaler and ITH's CEO. Pursuant to the agreement, ITH agreed to pay THD for performing laboratory tests on specimens that ITH sent to THD.

314.     Although Grottenthaler had offered to pay THD's sales force a "$50k bonus for any hospital that implements and pays for its first 500 samples," Grottenthaler refused to pay such bonus for ITH because he previously had been "introduced to [ITH]" through another source.

315.     For patients covered by commercial insurance, ITH billed commercial insurers and agreed to pay a per-test fee to the laboratory that performed the testing. For patients covered by Medicare, Medicaid, and TRICARE, THD billed the federal healthcare programs.

316.     To recruit HCPs to order the laboratory testing, ITH paid commissions to MSO recruiters. ITH's MSO recruiters then kicked back a portion of the commissions to referring HCPs, disguising the remuneration as MSO distribution payments when in fact it was paid to induce the HCPs' commercial and Medicare, Medicaid, and TRICARE referrals to ITH, THD, and BHD for laboratory testing.

317.     For example, from in or about November 2015 to June 2016, during his participation in the Vybrem MSO kickback scheme, Physician G referred to THD hundreds of tests payable by federal healthcare programs. THD submitted those claims to federal programs, including Medicare, and examples of those claims are included in Exhibit A hereto.

318.     As agreed with THD and BHD, ITH paid the phlebotomists and other medical staff in HCPs' offices to draw the blood for patients with federal healthcare insurance and patients with commercial insurance. ITH, ITH's recruiters, THD, and BHD instructed the phlebotomists to collect insurance information for federal healthcare beneficiaries and provide that information to THD or BHD, so that THD or BHD could bill for the claims.

319.     To fund the MSO kickbacks, ITH paid commissions to numerous MSO recruiters, including Vybrem. During the period of in or about October 2015 to June 2016, ITH paid Vybrem over $450,000.

320.     The below chart summarizes over $200,000 in Vybrem MSO payments from in or about October 2015 to June 2016 to referring HCPs for their laboratory referrals:

| HCP | MSO Payments |
|---|---|
| Paul Worrell | $67,044 |
| Jason Finkelstein | $29,322 |
| Charles Evans | $58,653 |
| Joseph Scott and Brent Gorman | $46,121 |

321.     To disguise the kickbacks, Shafie used purported "investment" documentation for the Vybrem MSO. Only HCPs who referred diagnostic services, including laboratory testing, as part of the ITH scheme were allowed to participate and remain in the Vybrem MSO, and the only source of revenue for the Vybrem MSO came from the referrals or other business generated by the HCPs in the MSO. While HCPs purported to invest in the Vybrem MSO, the MSO's payments to HCPs were not based on the returns from any genuine investment. Instead, the Vybrem MSO's payments to HCPs were simply profits shared with HCPs based on the HCPs' referrals as part of the ITH scheme.

322.     Aware that he was being paid for referrals, Charles Evans, M.D., of Lufkin, Texas, asked Shafie in or about January 2016 about "other tests that I might run through Vybrid [sic]" because "[t]he more we add to the list the more we make[.]" Evans told Shafie that when Cornwell visits Evans' office, Cornwell should "please make sure he presents this as an arrangement between [THD] and [ITH]. My name and Vybrid [sic] labs (our association) should never come into the conversation." Evans noted, "[m]y entire staff know him [Cornwell] well and some are aware that he has presented me with a business proposition with Vybrid [sic] labs." Evans

acknowledged that he had told his staff the admittedly "misleading" answer that "I am not interested in participating with any MSO scams, and our focus has to remain on our patients, not our bank books!"

323. As intended by Grottenthaler and Hertzberg, THD's and BHD's participation with ITH and others in the MSO scheme was lucrative, with ITH paying THD over $1 million in 2016 and BHD over $5.1 million that year.

**B.    Stamford Memorial Hospital Fraud Scheme**

324. From late 2015 to early 2016, Grottenthaler, Kash, and O'Neal solicited another rural hospital in Texas to participate in their laboratory fraud scheme. They targeted a small hospital with 25 or fewer beds named Jones County Regional Healthcare d/b/a Stamford Memorial Hospital (Stamford) in Stamford, Texas (population under 4,000).

325. Kash and O'Neal met with Stamford's CEO on or about December 29, 2015 to discuss a laboratory billing arrangement based on the LRH model. O'Neal's partner subsequently provided Stamford's CEO with "actual figures" from LRH, pointing to the "remarkable" and "explosive growth" generated by the hospital billing for blood tests, noting that the associated revenue to the hospital was over $94 million and "entirely incremental for the Hospital."

326. Grottenthaler and Kash met with O'Neal on multiple occasions, including on or about March 7, 2016 in Frisco, Texas, and discussed the potential laboratory arrangement with Stamford. To secure Stamford's participation, Grottenthaler and O'Neal met with Stamford's CEO and had numerous communications with him, including an in-person meeting on or about March 22, 2016.

327. Effective on or about May 6, 2016, THD entered into a laboratory processing agreement with Stamford. Pursuant to the agreement, signed by Grottenthaler and Stamford's

CEO, Stamford agreed to pay THD for performing laboratory tests on specimens that Stamford sent to THD.

328. Shortly thereafter, effective on or about May 23, 2016, THD-Financial entered into a laboratory billing and collection agreement with Stamford, signed by Grottenthaler and Stamford's CEO. Pursuant to the agreement, THD agreed to provide billing and collection services to Stamford "in connection with [Stamford] Hospital's expanded laboratory program," including "to submit, in the name of [Stamford] Hospital and any and all laboratory related Professional Services for the benefit of [Stamford] Hospital under [Stamford] Hospital's provider number(s), and on [Stamford] Hospital's behalf, all claims for reimbursement to all patients and third party payors, including, without limitation, state or federal health care programs, for all Professional Services provided by [Stamford] Hospital to patients"; and "to collect and receive, in the name of [Stamford] Hospital, and on behalf of [Stamford] Hospital, all accounts receivable generated by claims for reimbursement." Stamford agreed to pay THD-Financial 5 percent of net collections for billing and collecting the laboratory claims.

329. During the same time period, on or about January 12, 2016, O'Neal met with BHD representatives Theiler and Howard in Dallas, Texas.

330. On or about February 11, 2016, O'Neal had a conference call with Theiler and a BHD representative. Theiler took notes and emailed the notes to a BHD representative.

331. On or about March 4, 2016, Theiler met with O'Neal in Beaumont, Texas.

332. In or about April 2016, Theiler decided to join the Stamford arrangement. Between April and June 2016, Theiler had multiple communications with O'Neal and Stamford's CEO and discussed the arrangement and negotiated contract pricing with them.

333.     Effective on or about May 31, 2016, BHD entered into a laboratory services agreement with Stamford. Pursuant to the agreement, which Theiler negotiated and sought approval for within BHD, Stamford agreed to pay BHD for performing laboratory tests on specimens that Stamford sent to BHD. Stamford's CEO emailed the signed agreement to Theiler.

334.     Under their arrangements with Stamford, THD and BHD agreed to perform laboratory testing for Stamford for a per-test fee.

335.     As part of the Stamford arrangement, for laboratory tests THD performed from on or about May 2016 to December 2016, THD-Financial billed commercial insurers using Stamford's name and NPI, and THD billed federal insurers using THD's and NPI. Thereafter, once Stamford and THD-Financial terminated their billing and collection agreement effective on or about December 13, 2016, Stamford billed commercial insurers using Stamford's name and NPI, and THD billed federal insurers using THD's name and NPI.

336.     As part of the Stamford arrangement, for laboratory tests BHD performed, Stamford and/or its contractor billed commercial insurers in Stamford's name using Stamford's NPI, and BHD billed federal insurers in BHD's name using BHD's NPI.

337.     In coordination with the laboratories and recruiters, Stamford paid for personnel to draw the blood for both commercial and federal patients, fill out applicable paperwork, and ship the blood specimens to the laboratories to perform the testing.

338.     To recruit HCPs to order the laboratory testing, Stamford paid commissions to BenefitPro. BenefitPro and its recruiters then kicked back a portion of the commissions to referring HCPs, disguising the remuneration as MSO distribution payments but was actually paid to induce the HCPs' commercial and Medicare, Medicaid, and TRICARE referrals to Stamford, THD, and BHD for laboratory testing.

### 1. Stamford Funded the Kickbacks Paid by BenefitPro and Regal MSOs

339. To fund the MSO kickbacks to HCPs, Stamford paid BenefitPro 25% of its net collections for diagnostic services, including toxicology and laboratory testing, pursuant to an agreement that Hickman and Stamford's CEO signed on or about June 2, 2016.

340. From in or about November 2016 to November 2017, Stamford paid BenefitPro over $7.1 million.

341. To further the Stamford kickback scheme, Hickman founded, owned, and operated numerous corporate entities. He created BenefitPro to receive payments from Stamford and make payments to himself, the MSOs, Gonzales, and Kash. In addition, Hickman transferred funds from BenefitPro to APM to pay himself and others.

342. Hickman created multiple MSOs to receive payments from BenefitPro, to pay MSO recruiters like Gonzales and Kash, and to pay referring HCPs. Those MSOs were named Cygnus MG LLC, Eridanus MG LLC, Geminorium MG LLC, Herculis MG LLC, Indus MG LLC, Juka MG LLC, and Korvus MG LLC (collectively, BenefitPro MSOs).

343. In or about August 2016, BenefitPro recruiters, including Gonzales, Howard, and Kash, began implementing the BenefitPro MSO kickback scheme, targeting HCPs, offering kickbacks, and coordinating with Stamford and its personnel.

344. In addition, Hickman agreed on behalf of BenefitPro to pay other MSO recruiters, including Regal Health Solutions LLC (Regal), to recruit HCPs to order laboratory testing from Stamford, THD, and BHD. BenefitPro kicked back to those MSO recruiters, including Regal, a portion of the money that Stamford paid to BenefitPro. The MSO recruiters, in turn, kicked back to the referring HCPs a portion of the money that the recruiters had received from BenefitPro.

345. During the period of about November 2016 to October 2017, BenefitPro paid over $750,000 to Regal, a Texas company that Marioni and Perkins owned and operated. Through

numerous MSOs, Regal kicked back a portion of those payments to referring HCPs. Those MSOs included Buena Vista Partners (Buena Vista), CHP Catalyst Health Partners LP (CHP), Transparity Association LP (Transparity), and Transcend Partners LP (Transcend) (collectively, Regal MSOs).

346.    In or about November 2016, Regal recruiters, including Marioni and Perkins, began implementing the Regal MSO kickback scheme, targeting HCPs, offering kickbacks, and coordinating with Stamford and its personnel.

347.    In their sales pitches to HCPs, the BenefitPro and Regal MSO recruiters focused on the amount of money that HCPs would receive.

348.    At least 25 HCPs who participated in the Stamford fraud scheme knew about MSO kickbacks from prior experience.

349.    Of those, at least nineteen HCPs who had received kickbacks from Ascend MSO in the LRH kickback scheme also received kickbacks from the BenefitPro MSOs in the Stamford kickback scheme. Those HCPs included Azim Karim, Thuy Nguyen, Linh Ba Nguyen, Baxter Montgomery, Bruce Maniet, Doyce Cartrett, Elizabeth Seymour, Frederick Brown, Paul Gerstenberg, Heriberto Salinas, Hong Davis, Huy Chi Nguyen, James Froelich, III, Muhammad Akram Khan, Dung Hoy Nguyen, Dung Chi Nguyen, Paul Worrell, Robert Megna, and Jill Taylor.

350.    In addition, at least four HCPs who had received kickbacks from Next Level MSOs in the LRH kickback scheme also received kickbacks from the Regal MSOs in the Stamford kickback scheme. Those HCPs included Annie Varughese, Ashley Chin, Kozhaya Sokhon, and Tommy Pham.

351.    The purpose of the Stamford MSO scheme was to pay HCPs for their referrals, as those involved knew. For example, Stamford's COO, who reported to the CEO and regularly

interacted with participating HCPs, BenefitPro, Regal, THD, and BHD, described the arrangement in May 2016 as a "joint venture" involving "blood draws, toxicology screens (urine) and sleep studies and EEGs," where the "doctors get paid through a Managed Service Organization (MSO)."

352. The COO later acknowledged to colleagues that "the doctors like us and appreciate the level of customer service we provide, but they are all about the money and who can give them the most." The COO noted that "the longer we participate in this program I realize it is all about who can give them the most as many of them can't make ends meet with their current practice models. They are independent of their local hospitals and many of them struggle financially. So they look for programs like this to give them additional income." The COO noted that "unfortunately the doctors follow the money."

353. By following the money, the HCPs who agreed to participate in the Stamford fraud scheme received significant sums.

BenefitPro MSOs

354. The below chart summarizes over $2 million in BenefitPro MSO payments from in or about November 2016 to February 2018 to referring HCPs for their laboratory referrals:

| HCP | BenefitPro MSO | MSO Payments |
|---|---|---|
| Amitabh Skukla | Cygnus | $69,169.00 |
| Azim Karim | Cygnus; Indus | $18,364.00 |
| Baxter Montgomery | Indus | $90,913.97 |
| Bruce E. Maniet | Herculis | $38,847.34 |
| Camilo Paredes | Korvus | $1,475.91 |
| David Palombo | Cygnus | $4,744.00 |
| Doyce Cartrett | Eridanus | $234,314.95 |
| Dung Hoy Nguyen and Dung Chi Nguyen | Geminorium | $49,989.87 |
| Earl Martin | Korvus | $4,245.91 |
| Elias Ntsoane | Indus | $1,000.00 |
| Elizabeth Seymour | Eridanus | $232,314.95 |

| | | |
|---|---|---|
| Emen Udonta | Indus | $1,000.00 |
| Emile Kettle | Cygnus | $1,435.00 |
| Forbes Barnwell | Herculis | $4,164.83 |
| Frederick Brown | Indus | $92,263.97 |
| Graceland Investments | Geminorium | $9,314.88 |
| Heriberto Salinas | Herculis | $19,322.32 |
| Hong Davis | Herculis | $16,900.00 |
| Huy Chi Nguyen | Geminorium | $49,989.87 |
| Jacinto Medical Group | Juka | $124,145.39 |
| James Froelich III | Herculis | $38,847.34 |
| Jeffrey Guillory | Indus | $66,485.10 |
| Jill Taylor | Indus | $152,369.90 |
| Joseph Bolin | Herculis | $38,847.34 |
| Joy Touchstone | Korvus | $5,312.06 |
| Louis Coates | Herculis | $43,847.34 |
| Louis Zegarelli | Herculis | $42,847.34 |
| Lyndon Forbes Barnwell | Eridanus | $17,860.95 |
| Michelle Legall | Cygnus | $5,144.00 |
| Muhammad Akram Khan | Herculis | $38,847.34 |
| Paul Gerstenberg | Indus | $196,501.78 |
| Paul Worrell | Eridanus | $132,217.90 |
| Raja Abusharr | Cygnus; Korvus | $26,199.91 |
| Robert Megna | Geminorium | $112,423.71 |
| Rosemary Bates | Cygnus; Korvus | $9,445.53 |
| Thuy Nguyen and Linh Ba Nguyen | Geminorium | $90,664.85 |
| Willie Villarreal | Korvus | $5,745.91 |

355.    To disguise the kickbacks, Hickman and O'Neal used purported "investment" documentation for the BenefitPro MSOs. Only HCPs who referred diagnostic services, including laboratory testing, as part of the Stamford scheme were allowed to participate and remain in the BenefitPro MSOs, and the only source of revenue for the BenefitPro MSOs came from the referrals or other business generated by the HCPs in the MSOs. While HCPs purported to invest in the BenefitPro MSOs, the MSOs' payments to HCPs were not based on the returns from any genuine

investment. Instead, the BenefitPro MSOs' payments to HCPs were simply profits shared with HCPs based on the HCPs' referrals as part of the Stamford scheme.

356.    As an example, in or about August 2016, BenefitPro recruited Physician E, of Denton, Texas, to refer laboratory testing to BHD as part of the Stamford scheme. To induce Physician E's referrals to BHD, Gonzales and Howard offered to pay MSO kickbacks to Physician E through Eradinus MSO. Physician E agreed to participate in the kickback scheme, provided Gonzales with a purported investment check of $6,000 dated August 1, 2016, and began referring laboratory tests for federal healthcare beneficiaries to BHD on or about August 5, 2016.

357.    To eliminate any financial risk for Physician E, Hickman held Physician E's $6,000 check without depositing it until he and Gonzales had already given her a much larger MSO payment check. Hickman did not deposit Physician E's check until on or about December 21, 2016. By that date, Physician E had made dozens of referrals to BHD for laboratory testing, and Hickman had signed and Gonzales had provided to Physician E a check dated November 23, 2016 for $15,000—two and a half times the amount of Physician E's purported investment. Moreover, within days of Hickman depositing Physician E's check, Hickman signed and Gonzales provided to Physician E another MSO payment check, dated December 22, 2016, for $18,000.

358.    During the period of August 2016 to January 2018, Eridanus MSO paid Physician E over $232,000 in MSO kickbacks, a return of over 3,766% based on Physician E's purported investment of $6,000.

359.    From in or about August 2016 to January 2018, during her participation in the Eradinus MSO kickback scheme, Physician E referred to BHD hundreds of tests payable by federal healthcare programs. BHD submitted those claims to federal programs, including Medicare, which paid over $345,000 to BHD. Examples of those claims are included in Exhibit A hereto.

360.     As another example, in or about July 2016, BenefitPro recruited Doyce Cartrett, M.D. (Physician H), of Silsbee, Texas, to refer laboratory testing to THD as part of the Stamford scheme. To induce Physician H's referrals to THD, Kash offered to pay MSO kickbacks to Physician H through Eradinus MSO. Physician H agreed to participate in the kickback scheme, provided Kash with a purported investment check of $6,000, and began referring laboratory tests for federal healthcare beneficiaries to THD on or about September 27, 2016.

361.     To eliminate any financial risk for Physician H, Hickman held Physician H's $6,000 check without depositing it until he and Kash had already provided Physician H with a much larger MSO payment check. Hickman did not deposit Physician H's check until on or about November 28, 2016. By that date, Physician H had made dozens of referrals to THD for laboratory testing, and Hickman had signed and Kash had provided to Physician H a check dated November 23, 2016 for $15,000—two and a half times the amount of Physician H's purported investment.

362.     During the period of September 2016 to December 2017, Eridanus MSO paid Physician H over $234,000 in MSO kickbacks, a return of over 3,800% based on Physician H's purported investment of $6,000.

363.     From in or about September 2016 to December 2017, during his participation in the Eradinus MSO kickback scheme, Physician H referred to THD hundreds of tests payable by federal healthcare programs. THD submitted those claims to federal programs, including Medicare, which paid over $199,000 to THD. Examples of those claims are included in Exhibit A hereto.

364.     In addition to paying the referring HCPs, BenefitPro paid a significant portion of the money to Hickman, Kash, and Gonzales.

365.     At Hickman's direction, BenefitPro transferred over $1.5 million to APM, which paid Hickman's company, Hickman Tax and Retirement Advisors, $356,699.92 in 2017.

366. To hide his role in the Stamford kickback scheme, Kash directed BenefitPro to pay him through Tigerlily. From December 2016 to December 2017, BenefitPro paid Kash, through Tigerlily, a total of $671,039.66.

367. To pay Gonzales, and in turn Howard, BenefitPro paid Zalegon $702,784.61. Gonzales deposited the checks and paid Howard about $10,000 in cash per month, except for December 2016, when Gonzales paid Howard about $70,000 in cash.

368. As agreed with Howard, Gonzales deposited the checks he received from BenefitPro and withdrew cash to share with Howard. Approximately monthly, from in or about January to November 2017, Gonzales delivered to Howard a bag of about $10,000 in cash per month. Each month, after Howard received the bag of cash from Gonzales, she placed it in the safe in her home, with the cash still in the bag. In total, Gonzales paid Howard about $110,000 in cash from BenefitPro.

Regal MSOs

369. Through the Regal MSOs, Marioni and Perkins paid referring HCPs to induce their referrals to Stamford, THD, and BHD. The below chart summarizes Regal MSOs' payments of over $300,000 to the following referring HCPs to induce their referrals:

| HCP | MSO | MSO Payments |
|---|---|---|
| Andres Mesa | Transparity | $25,742 |
| Annie Varughese | Transparity | $28,280 |
| Ashley Chin | CHP | $17,390 |
| Asif Ali | Transparity | $16,586 |
| Chhay Tay | CHP | $8,195 |
| Harish Thakkar | CHP | $8,592 |
| Joy Touchstone | Transparity | $2,400 |
| Karan Bhalla | CHP | $43,475 |
| Kozhaya Sokhon | Transparity | $33,172 |
| Mike Rodriguez | Transparity | $33,172 |

| HCP | MSO | MSO Payments |
|---|---|---|
| Orlando Kypuros | Transparity | $5,039 |
| Raja Abusharr | Transcend | $2,900 |
| Rishi Hingorani | Transparity | $6,506 |
| Russel Vanbiber | Transparity | $13,362 |
| Syed Yusoof | Buena Vista | $3,715 |
| Tanya Grun | Transcend | $2,800 |
| Tommy Pham | CHP | $58,009 |

370. To disguise the kickbacks, Marioni and Perkins used purported "investment" documentation for the Regal MSOs. Only HCPs who referred diagnostic services, including laboratory testing, as part of the Stamford scheme were allowed to participate and remain in the Regal MSOs, and the only source of revenue for the Regal MSOs came from the referrals or other business generated by the HCPs in the MSOs. While HCPs purported to invest in the Regal MSOs, the MSOs' payments to HCPs were not based on the returns from any genuine investment. Instead, the Regal MSOs' payments to HCPs were simply profits shared with HCPs based on the HCPs' referrals as part of the Stamford scheme.

371. As an example, in or about December 2016, Regal recruited Kozhaya Sokhon, M.D. (Physician I), of Houston, Texas, to refer laboratory testing to BHD as part of the Stamford scheme. To induce Physician I's referrals, Perkins and Marioni offered to pay MSO kickbacks to Physician I through Transparity MSO. Physician I agreed to participate in the kickback scheme and began referring laboratory tests for federal healthcare beneficiaries to BHD on or about December 6, 2016.

372. During the period of about December 2016 to at least October 2017, Transparity MSO paid Physician I over $33,000 in MSO kickbacks, a return of over 450% based on his purported investment of $6,000.

373. From in or about December 2016 to September 2017, during Physician I's participation in the Transparity MSO kickback scheme, Physician I referred to BHD hundreds of tests payable by federal healthcare programs. BHD submitted those claims to federal programs, including Medicare, which paid over $22,000 to BHD. Examples of those claims are included in Exhibit A hereto.

### 2. Stamford, BenefitPro, and Regal Partnered with THD and BHD

374. As part of the Stamford fraud scheme, THD and BHD agreed with Stamford, BenefitPro, and Regal that the laboratories would bill federal healthcare programs for the resulting referrals of laboratory testing for federal healthcare program beneficiaries. Grottenthaler and Kash agreed to this approach on behalf of THD, and Theiler agreed on behalf of BHD.

375. Grottenthaler, Kash, and Theiler understood that Stamford was concerned about the legality of billing federal healthcare programs for claims referred by MSO participants. The laboratory executives agreed to bill those claims to capture the lucrative revenue from federal healthcare program referrals.

376. As agreed among the parties, Stamford paid for phlebotomists or other medical staff located in the offices of HCPs who were receiving MSO kickbacks. Often, those phlebotomists had previously worked in the particular HCPs' offices.

377. For example, Stamford paid Lacrimioara Hurgoiu, who was already working in Dr. Annie Varughese's office as a registered nurse, $18 per hour for 30-40 hours a week to draw blood for laboratory tests that Varughese referred to Stamford, THD, and BHD. Stamford paid Tracy Tompkins, who was already working in Dr. Elizabeth Seymour's office as a phlebotomist, $19 per hour for 30-40 hours a week to draw blood for laboratory tests that Seymour referred to Stamford, THD, and BHD.

378. Stamford paid the phlebotomists to draw the blood for patients with federal healthcare insurance and patients with commercial insurance. Stamford, BenefitPro, Regal, THD, and BHD instructed the phlebotomists to collect insurance information for federal healthcare beneficiaries and provide that information to THD or BHD, so that THD or BHD could bill for the claims.

379. To ensure that they would receive the federal referrals from the Stamford kickback scheme, THD and BHD provided the phlebotomists with supplies for the blood specimens, laboratory-specific requisition forms, and laboratory-specific shipping materials.

380. Stamford, BenefitPro, Regal, THD, and BHD instructed the phlebotomists to use the THD or BHD requisition forms and shipping materials for federal healthcare program beneficiaries. Following those instructions was important to THD and BHD so that they could bill the resulting federal claims.

381. To ensure the success of the Stamford kickback scheme, and at the direction of Grottenthaler, Kash, and Theiler, THD and BHD identified HCP targets for the BenefitPro and Regal MSOs, referred HCPs interested in kickback payments to the BenefitPro and Regal MSOs to secure their blood testing referrals, participated with the MSOs in sales pitches to offer HCPs money to induce their referrals, and sought to ensure that they would receive the federal referrals resulting from the kickbacks.

382. In or about November 2016, Grottenthaler and Kash learned that some HCPs referring to Stamford had not sent the federal payer information to THD. Kash reminded Stamford that the federal payer information needed to be sent to THD with the blood specimens.

383. After Kash's reminder, Stamford's COO contacted BenefitPro and multiple Stamford employees responsible for interacting with the phlebotomists and HCPs, advising them

that "we are receiving feedback [from Kash] that some of the clinics are listing the 'Federal Payers' on their requisition logs but not providing the payer (insurance info) so [THD] can bill for it." Stamford's COO stated: "We need to ensure that all of our clinics are listing the federal payors on the requisition forms and providing insurance cards etc." Stamford's COO instructed the Stamford employees to contact "all clinics reminding them that if there is a federal payor, i.e. Medicare, Medicaid, Blue Cross Blue Shield Federal; Champus, Tricare etc. that they must include the payer information for billing purposes for [THD]." Stamford's COO clarified that this policy to collect "all federal payor info" applied for each "lab who is billing for the service."

384.    In addition, Stamford's COO asked BenefitPro to "alert[] your reps that all payer info must be provided" and to "remind the phelbs [phlebotomists] we draw for the federal payers, in their clinics, but the lab is responsible for billing the federal payors and they will need that info."

385.    In or about February 2017, after THD had billed the federal claims resulting from the Stamford arrangement for about nine months, THD considered, for compliance reasons, ceasing its role in billing the resulting federal claims. That month, Grottenthaler told Stamford's CEO that THD eventually wanted to stop billing the resulting federal claims. Stamford's CEO told Grottenthaler and O'Neal that while previously "these [federal] payors were billed by [THD]," "our position on this has not changed and Stamford will not bill these federal payors." As Stamford and THD knew from experience and HHS-OIG's June 2014 Special Fraud Alert, HCPs typically wish to minimize the number of laboratories to which they refer for reasons of convenience and administrative efficiency. Stamford's CEO told Grottenthaler that Stamford would "find another lab partner for this aspect of our service" "[i]f THD chooses not to bill for these patients going forward."

386. Grottenthaler and THD delayed making the change for months. On or about May 25, 2017, THD purported to stop billing the federal claims resulting from the Stamford arrangement. Stamford informed its employees of the change to "no more federal" referrals for THD, noting that "this is a [THD] move – not ours." Stamford's COO asked Stamford employees and phlebotomists to alert HCPs who ordered THD tests that "effective immediately we will not be able to continue drawing specimens, for Federal Payers, and then sent [sic] to [THD] Laboratory in Richmond VA or receive them in the Stamford Memorial Hospital on site lab."

387. THD's decision to stop submitting the federal claims resulting from the Stamford scheme did not last long. Less than two months later, Grottenthaler decided to reinstate THD's prior policy of billing the resulting federal claims. Grottenthaler was aware of how much money THD could lose by not billing those federal claims.

388. On or about July 14, 2017, as a result of Grottenthaler's decision, THD told Stamford phlebotomists to draw blood specimens for federal healthcare beneficiaries. To ensure THD would receive the federal referrals resulting from the Stamford kickback scheme, THD provided the phlebotomists with THD requisition forms and labels to ship the specimens to THD.

389. On or about the same day, Kash confirmed THD's change in position to Stamford's CEO and COO and O'Neal. Kash noted that THD had learned that Stamford was sending blood specimens for federal patients in the Dallas, Houston, and El Paso areas to BHD (THD's competitor). Kash also referenced THD's awareness that not billing the resulting federal claims could lead to a broader loss of business, noting that at least one HCP had "left the [Stamford] hospital relationship because of not being able to draw blood on all her patients."

390. As intended by Grottenthaler and Kash, THD's participation with Stamford and others in the MSO scheme was lucrative, with Stamford paying THD over $9.5 million.

391.     As intended by Theiler, BHD's participation with Stamford and others in the MSO scheme was lucrative, with Stamford paying BHD over $7.5 million.

## III.     ADDITIONAL THD KICKBACK SCHEMES

392.     Aware of the financial success and astronomical growth of a prior laboratory known as HDL, Grottenthaler sought to adopt the illegal practices used by HDL.

### A.     At THD, Grottenthaler Sought to Replicate HDL's Kickback-Fueled Growth

#### 1.     HDL Used Kickbacks to Gain Business

393.     HDL was a clinical laboratory that offered blood tests for cardiovascular disease and diabetes, and it sought to persuade doctors to order HDL's tests for their patients.

394.     In 2010, HDL agreed to pay volume-based commissions to BlueWave Healthcare Consultants, Inc. (BlueWave) to arrange for and recommend that HCPs order laboratory testing from HDL. In turn, BlueWave paid volume-based commissions to its independent-contractor marketers (collectively, BlueWave marketers).

395.     To generate laboratory testing referrals, HDL and BlueWave agreed to a kickback scheme in which HDL would pay, and BlueWave marketers would offer, to HCPs a $3 "draw fee" (ostensibly as compensation for drawing patients' blood), plus a $17 "processing and handling" (P&H) fee (ostensibly as compensation for handling blood samples), for a total of $20 per patient that the HCPs referred for HDL laboratory testing. HDL and BlueWave believed this financial inducement was "a critical door opener" with HCPs.

396.     In mid-2010, while engaged in the P&H fee kickback scheme with HDL, BlueWave agreed to participate in a kickback scheme with another laboratory, Singulex, Inc., in which Singulex would pay HCPs a $10 P&H fee per patient that the HCP referred for Singulex laboratory testing.

397. In selling HDL and Singulex laboratory tests, BlueWave marketers emphasized to doctors the money to be made from P&H fees. BlueWave marketers targeted "money hungry" doctors and used P&H fees as an inducement. BlueWave marketers even showed HCPs "pro formas" with calculations of how much money the HCPs could receive by ordering HDL and Singulex laboratory tests.

398. Using kickbacks to drive business, BlueWave grew HDL's business from fewer than 100 Medicare patient referrals in 2009, to over 40,000 in 2009, over 120,000 in 2011, and over 200,000 per year from 2012 to 2014.

399. On June 25, 2014, as noted above, HHS-OIG issued a Special Fraud Alert warning that P&H fee payments to physicians or physician practices "present a substantial risk of fraud and abuse" and "are suspect under the [AKS]." 79 Fed. Reg. 40,114, 40,116 (2014).

400. Referrals to HDL dropped significantly after it stopped paying P&H fees to HCPs, and HDL declared bankruptcy less than a year later.

401. On January 9, 2015, HDL ended its sales agreement with BlueWave, citing compliance concerns. HDL sued the BlueWave founders on January 13, 2015 in the U.S. District Court for the Eastern District of Virginia, alleging that the BlueWave founders had "put their economic interests ahead of compliance."

402. On January 29, 2015, Singulex settled FCA allegations that, among other things, it had paid P&H fee kickbacks to induce referrals for laboratory testing reimbursed by federal healthcare programs in violation of the AKS, and had submitted claims for medically unnecessary laboratory tests, from January 1, 2010 to October 31, 2014.

403. On March 31, 2015, HDL agreed to pay $47 million plus additional contingent payments up to $100 million to settle FCA allegations that, among other things, it had paid P&H

fee kickbacks to induce referrals for laboratory testing reimbursed by federal healthcare programs in violation of the AKS, and had submitted claims for medically unnecessary laboratory tests, from November 25, 2008 to January 31, 2015.

404.    On April 9, 2015, the U.S. District Court for the District of South Carolina granted the United States' motion to intervene in a *qui tam* suit against BlueWave and its founders and HDL's former CEO alleging that defendants had offered or paid "kickbacks to referring physicians disguised as 'process and handling' fees," had submitted or caused to be submitted claims for medically unnecessary laboratory tests, and had conspired to violate the FCA.

405.    On August 7, 2015, the United States filed its complaint in intervention against BlueWave and its founders and HDL's former CEO. After a twelve-day trial, the jury returned a unanimous verdict on January 31, 2018, finding that the BlueWave founders and former HDL CEO had violated the FCA. Judgment was entered against the BlueWave founders in the amount of $114,148,661.86 and against the former HDL CEO in the amount of $111,109,655.30. The United States Court of Appeals for the Fourth Circuit affirmed the judgment in all respects, and the Supreme Court denied defendant's petition for a writ of certiorari. *United States v. Mallory*, 988 F.3d 730 (4th Cir. 2021), *cert. denied*, 2021 WL 5284633 (Nov. 15, 2021).

### 2.    As Grottenthaler Intended, THD Used Kickbacks to Gain Business

406.    Grottenthaler founded THD and registered the company with the Texas Secretary of State in July 2014. He was THD's CEO from its founding in 2014 until its bankruptcy in 2019.

407.    In building THD's business, Grottenthaler chose to seek and rely on payments from federal healthcare programs, including Medicare, Medicaid, and TRICARE.

408.    THD received its National Provider Identifier (NPI) from CMS in August 2014.

409.    In 2014, THD had fewer than ten physician clients, little business, and received less than $25,000 in Medicare payments.

410.    Grottenthaler knew of HDL's astronomical growth and sought to replicate its business model. Immediately after HDL terminated its sales agreement with BlueWave on January 9, 2015, citing compliance concerns, Grottenthaler contacted BlueWave marketers to offer them jobs as THD sales managers and employees. Grottenthaler hired over a dozen BlueWave marketers in January 2015 and hired at least six more BlueWave marketers the following month.

411.    When he offered sales jobs to BlueWave marketers in early 2015, Grottenthaler knew that the BlueWave marketers were alleged to have offered kickbacks to HCPs to induce their referrals. During the P&H fee kickback scheme, the BlueWave marketers were well-known in the laboratory industry for using financial inducements to get business. For example, on September 8, 2014, the Wall Street Journal published a Page One article by John Carreyrou and Tom McGinty titled, "Medicare Unmasked:  A Fast-Growing Medical Lab Tests Anti-Kickback Law." The article described the P&H fee kickback scheme in which HDL "paid doctors who sent it patients' blood for testing," identified BlueWave as the "independent sales-and-marketing contractor," and highlighted BlueWave's position that "'this is an ph fee not a draw fee. One word makes it legal the other illegal.'"

412.    Grottenthaler chose to hire BlueWave marketers to leverage their relationships with the same HCPs who had received kickbacks from HDL and Singulex.

413.    Grottenthaler did not rethink his business strategy after the Department of Justice announced millions of dollars in settlements due to BlueWave's kickbacks. Nor did he change his strategy after the Department of Justice intervened and filed a complaint in the FCA case against the BlueWave founders and HDL CEO.

414.    Instead, Grottenthaler doubled down on his plan to replicate HDL's business model, and THD purchased HDL's assets for $37 million in a bankruptcy auction in September 2015.

415.    Shortly after the acquisition became public, Grottenthaler wrote letters to HDL's referring HCPs—many of whom he knew had received P&H fee kickbacks from HDL—promising that it was "business as usual" and that "[THD] and [HDL] have shared values with regard to the importance of compliance with federal and state regulatory requirements in connection with oversight and management of its business operations."

416.    In addition, throughout 2015, Grottenthaler employed BlueWave marketers as THD's sales management and employees, and even hired additional BlueWave marketers, ultimately hiring more than 35 for sales roles at THD.

417.    Because of Grottenthaler's focus on hiring BlueWave marketers, at least 36 of THD's 45 sales employees (80%) in 2015 were BlueWave marketers.

418.    Grottenthaler also placed BlueWave marketers in sales leadership positions. Each of the three VPs of Sales he hired in 2015 were BlueWave marketers. Grottenthaler hired Cornwell as the VP of Sales for the Southwestern Region, with responsibility for sales in Texas. Cornwell reported directly to Grottenthaler. Love was hired as a THD Account Executive in January 2015, and she reported to Cornwell.

419.    Once Grottenthaler hired the BlueWave marketers, he expected them to conduct "business as usual." One of THD's VP of Sales emphasized that approach to THD's sales personnel in October 2015, copying Grottenthaler and stating "All [HDL] accounts will notice nothing different. HDL business as usual. All [HDL] tests available as normal."

420.    Following Grottenthaler, THD's sales personnel pitched THD to HDL's referring HCPs as the new HDL, HDL 2.0, or "True HDL." THD's Senior VP of Sales and Marketing echoed this theme in a THD sales call script sent to Grottenthaler in October 2015. THD advised its sales personnel to tell HDL's referring HCPs that "I would like to assure your office that things

will continue business as usual. Everything from the requisition you utilize, the way the patient specimen is sent, received and processed, to the color-coded patient report and billing policies will remain the same."

421. Aware of the importance of Medicare payments to THD's business, THD advised its sales personnel to tell HDL's referring HCPs that "[THD] does have a Medicare and CLIA # which can and should be utilized."

422. As planned by Grottenthaler, the BlueWave marketers at THD marketed many of the same laboratory tests as HDL to many of the same HCPs who had previously received P&H fee kickbacks. Burt Lively, a former BlueWave marketer that Grottenthaler hired as a THD VP of Sales, testified that HDL's and THD's tests were "almost identical" and that "almost all" of THD's clients were "former HDL clients." Tony Carnaggio, a BlueWave marketer turned THD sales representative, testified that a lot of the doctors that ordered HDL tests later ordered the same tests from THD. Erika Guest, another BlueWave marketer turned THD sales representative, testified that THD was "marketing all of the tests that HDL had."

423. Grottenthaler developed and negotiated the compensation packages for the BlueWave marketers. At Grottenthaler's direction, THD offered them significant financial incentives to secure HCP referrals to THD. Those incentives included commissions based on net collected reimbursements and various bonuses, including for new physician or hospital business.

424. Grottenthaler also was highly motivated to quickly grow THD's business. Grottenthaler sought to, and ultimately did, pay himself large salaries, bonuses, and shareholder distributions.

425. To quickly increase HCP referrals to THD, Grottenthaler agreed that THD would implement at least four kickback schemes, involving: (1) P&H fees; (2) waivers of patient

copayments and deductibles; (3) consulting fees; and (4) MSO payments. THD and its co-conspirators then submitted claims to federal healthcare programs for the tests resulting from the kickbacks and improper financial relationships.

426. To capitalize on the financial success that THD experienced due to the fraud schemes, Grottenthaler sought to cash in before THD faced punishment for those schemes. In or about early 2016, Grottenthaler launched efforts to recapitalize or sell THD, which concluded with a recapitalization transaction on or about January 26, 2017 in which Grottenthaler received $36.95 million.

**B. THD's P&H Fee Kickback Scheme**

427. After the June 2014 Special Fraud Alert, HDL stopped paying P&H fees directly to HCPs. Instead, HDL paid P&H fees to draw site companies that were purportedly independent of referring HCPs. In fact, numerous companies were simply conduits to pay P&H fees to HCPs to induce referrals for laboratory testing.

428. Grottenthaler, Cornwell, and Love knew that the P&H fees would induce HCP referrals for laboratory testing.

429. After acquiring HDL, Grottenthaler continued HDL's practice of paying P&H fees to purported draw site companies. In a letter he sent in or about October 2015 to the draw site companies that HDL had paid, Grottenthaler said that THD "remain[s] fully committed to our draw site partner relationships." Grottenthaler promised the draw site companies that THD would send them an updated agreement to pay them P&H fees, and "[t]he agreement will have no substantive changes to the contract originally in place with [HDL], however it will reflect the new company name."

### 1. Oakmont Wellness Kickback Scheme

430. Oakmont Wellness Center, PA (Oakmont), located in Fort Worth, Texas, was a family medicine clinic formed in or about January 2011. Bibi Tasleyma Sattar, D.O. (Physician J) was Oakmont's sole owner and physician.

431. Physician J and Oakmont were enrolled as HCPs with Medicare, Medicaid, and TRICARE. Oakmont's patients included beneficiaries of those federal programs.

432. Physician J's father, Sultan Satar Sattar (Sultan), was Oakmont's office manager. Physician J's mother, Bibi Zabeda Sattar (Zabeda), was Oakmont's receptionist and referral coordinator. Sultan and Physician J controlled Oakmont's bank account.

433. In or about July 2013, Cornwell, as a BlueWave marketer, offered P&H fee kickbacks to Physician J and Oakmont to induce their laboratory referrals to HDL and Singulex.

434. From July 2013 to July 2014, HDL and Singulex paid over $45,000 in P&H fee kickbacks to Physician J and Oakmont.

### 2. Total Health Kickback Scheme

435. About a month after the June 2014 Special Fraud Alert on P&H fee payments, Zabeda formed Total Health Diagnostics, Inc. (Total Health), a Texas corporation.

436. Zabeda formed Total Health to receive P&H fee kickbacks from HDL.

437. Zabeda served as a director of Total Health. The company's address was a residence in Mesquite, Texas, belonging to Sultan and Zabeda's son (Physician J's brother).

438. Shortly after forming Total Health, HDL and Total Health finalized an agreement for HDL to pay P&H fees to Total Health to induce Physician J's and Oakmont's referrals to HDL for laboratory testing. Zabeda signed the agreement on behalf of Total Health.

439. Cornwell and Love knew that Sultan and Zabeda were Physician J's parents, worked for Oakmont, and had a financial interest in Total Health.

440.     In October 2014, Zabeda emailed Cornwell and Love demanding that HDL pay P&H fees to Total Health, threatening that "if payment to Total Health Diagnostics is not received by October 6, 2014, we will be forced to discontinue all blood draw that is sent to your lab."

441.     The same day, Cornwell forwarded Total Health's demand for P&H fees to HDL. In response, HDL's chief compliance officer told Cornwell that HDL "cannot pay P&H" to Total Health and directed Cornwell to read an email from her compliance employee, who noted that "the agreements and W-9's for Total Health Diagnostics are signed by a Bibi Zabeda Sattar." In response, one of BlueWave's founders told Cornwell that day that "I wouldn't touch [the Total Health arrangement] with a ten foot pole because it's an immediate family member and the perception/argument would be Money could flow back to referring provider."

442.     Cornwell then corresponded with Love and others about the Total Health arrangement. Referring to the Total Health P&H fee agreement, Cornwell told Love that "[a]ccording to [HDL's chief compliance officer], 'all' attorneys agree that it shouldn't be honored." A colleague asked, "Why can't she [Physician J] just draw in office herself?" Cornwell responded to the group, including Love, "Because Sultan wants to get paid for it."

### 3.     ODS Kickback Scheme at Oakmont

443.     Grottenthaler hired Cornwell and Love to join THD's sales force in or about January 2015. At Grottenthaler's direction, THD paid Cornwell and Love to arrange for and recommend referrals to THD for federal healthcare business, including referrals from Oakmont.

444.     In or about April 2015, Cornwell contacted Sultan to ensure that Physician J and Oakmont would order THD laboratory tests for patients, including federal beneficiaries. As Cornwell and Love knew, Sultan wanted to get paid for the referrals to THD.

445.    In or about April 2015, Zabeda formed Onsite Draw Station, Inc. (ODS), a Texas corporation. Zabeda served as ODS's director and controlled ODS's bank account. The company's address was Physician J's residence in Fort Worth, Texas, where Sultan and Zabeda also resided.

446.    In or about April 2015, Love went to Oakmont's office to pick up taxpayer identification forms for THD to set up a compensation arrangement with ODS. Love then asked Zabeda to provide agreements with other laboratories so that Love could "really help expedite" approval of the THD compensation arrangement.

447.    In or about May 2015, THD and ODS entered into an agreement for THD to pay ODS P&H fees of "$25.00 per specimen collected and sent by [ODS] to [THD] for testing."

448.    In the THD P&H fee agreement, ODS listed its address as Physician J's residence in Fort Worth, Texas, where Sultan and Zabeda also resided.

449.    Grottenthaler signed the agreement to pay P&H fees to ODS on or about May 26, 2015.

450.    During the arrangement, ODS collected blood specimens from Physician J's and Oakmont's patients; Physician J and Oakmont referred blood testing to THD; ODS sent the blood specimens to THD for testing; Physician J's parents, acting through ODS, invoiced THD for P&H fees for each referral; and THD paid the P&H fee kickbacks to ODS.

451.    Cornwell and Love knew that Sultan and Zabeda were Physician J's parents, worked for Oakmont, and had a financial interest in ODS.

452.    Love advised Zabeda in June 2015 to provide a referral log to THD to be paid P&H fees. Later that month, Zabeda submitted the referral log to THD, with an invoice to THD for $25 in P&H fees per referred specimen.

453. In or about July 2015, Zabeda informed Cornwell and Love that her "business email" for ODS was zabeda@onsitedrawstation.com. About a week later, Zabeda asked Cornwell and Love "if there is a problem" because "we have not got payment." Love responded the same day, informing Zabeda that "[a] check was sent on the 15th so you should be receiving it soon." Love asked Zabeda to "let me know if you don't" receive the P&H fee check from THD.

454. From in or about July to December 2015, THD paid over $35,000 in P&H fee kickbacks to ODS to induce laboratory referrals to THD. In or about 2016, THD paid over $110,000 in P&H fee kickbacks to ODS to induce laboratory referrals to THD. In or about 2017, THD paid over $115,000 in P&H fee kickbacks to ODS to induce laboratory referrals to THD.

455. THD paid Physician J's parents, through ODS, for the referral of and arranging for healthcare business for which payment may be made in whole or in part under the Medicare, Medicaid, and TRICARE programs.

456. Of the P&H fee kickbacks THD paid to ODS, Physician J's parents retained thousands of dollars of those payments for themselves. In addition, ODS kicked back to Oakmont thousands of dollars of those payments under the guise of renting office space from Oakmont.

457. From 2015 to 2017, during the ODS kickback scheme, THD submitted claims to Medicare, Medicaid, and TRICARE for clinical laboratory services for beneficiaries referred by ODS and Oakmont. Those federal healthcare programs paid THD over $800,000 on those claims.

458. On January 5, 2022, Cornwell entered a guilty plea to Count 1 of the indictment in *United States v. Cornwell*, No. 4:19-CR-319 (E.D. Tex.), admitting that he knowingly and willfully conspired with one or more persons to violate the AKS in connection with THD's payments of P&H fees to ODS to induce Oakmont's laboratory referrals to THD.

### C. THD's Copayment and Deductible Waiver Kickback Scheme

459.     Despite knowing that waiving patient copayments and deductibles could violate the AKS, and aware of FCA claims against HDL for such conduct, Grottenthaler chose to mimic HDL's practice of routinely waiving patient cost-sharing obligations.

460.     Grottenthaler knew that THD's HCP referral targets may be "concerned their patients will be billed too much" for THD tests, causing the patients to "complain or leav[e] [the] physicians." Grottenthaler also knew that THD could gain business from competitors based on their "billing model."

461.     For patients insured by TRICARE or private insurers, Grottenthaler decided that THD would routinely waive copayments and deductibles, in full or in part, to induce HCPs to refer to THD their blood testing business, including the lucrative Medicare business. Grottenthaler envisioned THD's billing policy as a benefit to HCPs, who received an opportunity to market free laboratory testing to their existing and prospective patients, to make their offices more attractive to patients and increase their revenue.

462.     By waiving copayments and deductibles for TRICARE- and privately-insured patients, Grottenthaler also sought to induce patients to agree to THD testing and to buy silence from patients who otherwise would object to their HCPs and insurers if they had to pay large bills for unnecessary tests.

463.     Grottenthaler approved internal documents to train THD's sales force on its "billing message": "Most patients will not receive a bill." For those who do, "No co-pays. 3 invoice reminders. Patients will not be harassed by phone calls or sent to collections."

464.     In THD's written policy, THD stated that it would make "reasonable attempts to collect" from patients; specifically, "up to 3 statements will be sent," with "no harassing phone

calls," and patients who cannot afford the payments "due to financial hardship may qualify for an adjustment on their bill if they call the [THD billing] number below."

465.    As Grottenthaler intended, THD's written billing policy made it appear as if THD was seeking to collect copayments and deductibles, while in fact reassuring HCPs that THD would take no action besides requesting voluntary payments.

466.    THD's sales force communicated THD's copayment and deductible waiver policy to HCPs in their sales pitch. For example, in a pitch to a prospective HCP's office, a THD sales representative explained that THD would "just send[] the 3 statements," that "patients can initiate contact with the billing department and discuss what they can pay," that THD would accept what patients believe they can pay "whatever it is, even if it's only a dollar, or nothing," and that if the patient did not pay, THD would "not send[] any patient to collections" but would "write it off."

467.    The THD sales representative confirmed that "[p]atients will have a bill, in the amount that they will discuss with [THD]. If they choose to pay, they can. If they choose not to pay, [THD] is not going to pursue it. They can pay all of it, some of it, or none of it, based on their own assessment of their ability to pay/financial hardship. There will be no difference if they are a federal payer, or TRICARE, or Medicare."

468.    After THD declared bankruptcy in 2019, THD's Liquidating Trustee publicly released additional information, previously withheld as privileged, about Grottenthaler's role in the copayment and deductible waiver kickback scheme. The Trustee detailed how counsel at the law firm Stewart Dugger & Dean PLLC warned Grottenthaler in 2014 that waiving patient copayments and deductibles could violate "both federal and state law," and explicitly warned "against waiving deductibles or copayments in an effort to induce patients to use the [HCP's]

services." The Trustee also described how counsel at the law firm Perkins Coie LLP warned THD that the systematic waiver of copayments in various states was "insurance fraud" and "illegal."

469.    Grottenthaler and THD sought to mask THD's true billing policy. THD's Trustee detailed how THD removed a statement from its written billing policy that "no patient will be sent to collections" but in fact continued to follow that policy. As THD's CFO noted internally, "we shouldn't put in writing whether or not we'll send patients to collections."

470.    The Trustree detailed how THD's accounting personnel, aware of THD's true policy, continued to create financial models based on THD's "policy not to hold the patient responsible."

### D.    THD's Consulting Fee Kickback Scheme

471.    As a BlueWave marketer, Cornwell had offered P&H fee kickbacks to Jaspaul Bhangoo, M.D. (Physician K), of Denton, Texas, in connection with the physician ordering from HDL and Singulex. Physician K accepted Cornwell's offers, and from 2012 to 2014, Physician K received between $18,700 and $44,200 per year in P&H fees from HDL and additional P&H fees from Singulex.

472.    When he was receiving P&H fee kickbacks, Physician K referred a high volume of laboratory tests to HDL and Singulex—more than 2,200 patient specimens to HDL in 2013 alone.

473.    Grottenthaler hired Cornwell to recruit HDL's referring HCPs like Physician K to order THD laboratory tests.

474.    In or about January 2015, Cornwell offered to pay Physician K purported consulting fees of $5,000 per month to induce Physician K to order THD laboratory tests.

475.    On or about January 20, 2015, Physician K cashed Cornwell's first check. Within a week, Physician K had signed a new account form with THD, and Cornwell told Grottenthaler that Physician K will order THD tests for "60-70 [patients] per week beginning next week."

Induced by the consulting fee kickbacks, Physician K began ordering THD tests on or about February 2, 2015, when he referred to THD eight laboratory tests for a Medicare beneficiary. THD submitted the claims to Medicare, which paid THD over $75. On or about February 4, 2015, Physician K referred to THD over 20 tests for at least four patients. THD submitted the claims to federal healthcare programs, including Medicare, which paid THD over $415.

476. For another three months, Cornwell continued paying the consulting fee kickbacks to Physician K to induce his laboratory testing referrals to THD, Physician K continued referring laboratory testing to THD, and THD continued submitting the claims to federal healthcare programs.

477. On or about February 10, 2015, Cornwell paid Physician K another $5,000. That month, Physician K referred over 345 laboratory tests to THD. THD submitted the claims to federal healthcare programs, including Medicare, which paid THD over $14,900.

478. In or about March and April 2015, Cornwell paid Physician K another $5,000 each month. During that period, Physician K referred over 3,500 laboratory tests to THD. THD submitted the claims to federal healthcare programs, including Medicare, which paid THD over $44,500.

479. Exhibit A hereto includes example claims resulting from the consulting fee kickbacks to Physician K.

480. In or about June 2015, Cornwell recommended to Grottenthaler that Physician K be paid as a member of a "THD Advisory Board."

481. Grottenthaler knew that Cornwell's HCP accounts generally, and Physician K and other high-referring HCPs in particular, were "critical" to THD's success.

482. To induce Physician K's referrals to THD, Grottenthaler arranged for THD to pay Physician K as a purported consultant on THD's advisory board.

483. Effective on or about August 1, 2015, THD entered into a purported consulting agreement with Physician K for "Advisory Board Services." The agreement purported to "engage Consultant [Physician K] to serve on the Advisory Board," paying him $250 per hour.

484. In fact, THD had no advisory board or advisory board members. Instead, the purported advisory board was a cover story for Grottenthaler and Cornwell to justify paying kickbacks to Physician K.

485. To secure Physician K's continued referrals to THD, Grottenthaler authorized thousands of dollars of purported advisory board consulting payments to Physician K.

486. As Grottenthaler and Cornwell knew, THD had no advisory board meetings, agendas, or notes of any advisory board discussions. Nor did Physician K provide any other consulting services to THD.

487. Yet, as authorized by Grottenthaler, THD paid Physician K tens of thousands of dollars as if he were an actual advisory board consultant.

488. To disguise the kickbacks, THD documented that it paid $8,750 to Physician K in October 2015 for his "Advisory Board hours for August and September [2015]" in which he performed "case review" (19 hours), "new report design" (10 hours), and "review of Medicare medical necessity" (6 hours). As Grottenthaler and Cornwell knew, Physician K did not perform these services, much less work those hours, for THD.

489. THD further documented that it paid $4,500 to Physician K in December 2015 for his October 2015 consulting hours spent on "case review" (9 hours), "peer to peer" discussions (6

hours), and "review Medicare medical necessity" (3 hours). As Grottenthaler and Cornwell knew, Physician K did not perform these services, much less work those hours, for THD.

490.    THD also documented that it paid $8,500 to Physician K in February 2016 for his November and December 2015 "Medical/Advisory Board" consulting hours spent on "case review" (22 hours) and four "speaker presentations" (12 hours). As Grottenthaler and Cornwell knew, Physician K did not perform these services, much less work those hours, for THD.

491.    THD's "advisory board" consulting payments to Physician K had the effect that Grottenthaler and Cornwell intended. From in or about August to December 2015, Physician K referred over 12,000 laboratory tests to THD, for which Medicare paid over $189,000. From in or about January to February 2016, Physician K referred over 5,000 laboratory tests to THD, for which Medicare paid over $90,000. Examples of those claims are included in Exhibit A hereto.

## IV.    MEDICALLY UNNECESSARY TESTING

492.    In each of the above kickback schemes, the kickbacks were paid to induce the HCP recipients to routinely order large numbers of laboratory tests for screening purposes, regardless of whether any or all of the tests were reasonable and necessary for the patient. The kickbacks had their desired effect. HCPs ordered laboratory testing even when not reasonable and necessary, and THD, BHD, and LRH billed federal healthcare programs for the medically unnecessary testing.

493.    In addition to using kickbacks to generate more referrals, defendants arranged for and recommended that HCPs order (a) panels of many individual tests; and (b) specific, unusual tests with limited or no clinical utility.

494.    THD and LRH offered a "Little River Assessment Panel" that consisted of many of the same tests that THD arranged for and recommended that HCPs order from THD. The Little River Assessment Panel included a standard lipid panel plus over 25 specialty tests, including Apolipoprotein A1, LDL-P/HDL-P (NMR), sdLDL-C, Apolipoprotein B, HDL-2 Subclass, Lp(a)-

P, Myeloperoxidase (MPO), Lp-PLA2, hs-CRP, Fibrinogen, Galectin-3, NT-proBNP, ApoE Genotype, CYP2C19, Factor V Leiden, Prothrombin Mutation, MTHFR, Insulin, FFA (NEFA), Uric Acid, Glucose, Hemoglobin A1C, Homocysteine, Thyroid Panel, Vitamin D, Cystatin-C, Omega-3 & Omega-6 fatty acid profile, and Sterols. THD and LRH offered a "Little River Follow-Up Panel" with the same tests. Grottenthaler, Madison, and Borgfeld approved the panels, and Kash, Love, and LRH's MSO recruiters arranged for and recommended that HCPs order the panels or variations thereof.

495.    THD and Stamford offered a "Stamford Assessment Panel" and "Stamford Follow-Up Panel" that included the same tests as the Little River Assessment Panel. Grottenthaler approved the panels, and Kash, Love, and Stamford's MSO recruiters arranged for and recommended that in routine clinical practice HCPs order the panels or variations thereof.

496.    The default panel offered by BHD and LRH included over 30 specialty tests, including HDL Map, Cholesterol Balance, Fatty Acid Balance Test, Apolipoprotein A1, Apolipoprotein B, Total Cholesterol, Direct LDL-Cholesterol, HDL-Cholesterol, Lipoprotein a, sdLDL-Cholesterol, Triglycerides, Albumin, Alkaline Phosphatase, ALT (SGPT), AST (SGOT), BUN, Creatine Kinase, Creatinine, Homocysteine, NT-proBNP, Uric Acid, Vitamin D, Thyroid Stimulating Hormone, hs-CRP, LpPLA2, Myeloperoxidase (MPO), Adiponectin, Glucose, Hemoglobin A1c, Insulin, HOMA-IR, and CYP2C19 Genotype (Plavix). BHD and LRH described the panel as "Panel M" for Medicare and other federal referrals. Hertzberg and Theiler approved the panel, and Howard, Gonzales, Hardaway, Parnell, and LRH's MSO recruiters arranged for and recommended that in routine clinical practice HCPs order this panel or variations thereof.

497.    The default panel offered by BHD and Stamford included all, or nearly all, of the tests in LRH Panel M. Theiler approved the panel, and Howard, Gonzales, Hardaway, Parnell, and

LRH's MSO recruiters arranged for and recommended that in routine clinical practice HCPs order this panel or variations thereof.

498. Many of the individual tests within the panels marketed by defendants are reasonable and necessary, if at all, only for specific patient populations with particular clinical conditions. These tests are not reasonable and necessary in routine clinical practice for screening an unselected or heterogenous population of patients in a PCP's office. For example:

    a. The Factor V Leiden test (CPT 81241) and Prothrombin Mutation test (CPT 81240) each can detect a genetic defect that predisposes individuals to developing blood clots. These tests are meant for patients who suffer blood clots within the veins without any other predisposing cause for having one of these conditions.

    b. Myeloperoxidase (MPO) is an enzyme found in white blood cells that is associated with inflammation, and the MPO test (CPT 83876) is meant for patients presenting with chest pain, the overwhelming majority of whom do not present to a PCP's office.

    c. The CYP2C19 test (CPT 81225) is meant for those patients receiving Plavix (clopidogrel) following coronary artery stenting.

    d. The NT-proBNP test (CPT 83880) is meant for patients with dyspnea (shortness of breath) to help make the diagnosis of congestive heart failure or to assess cardiovascular risk in patients with acute coronary syndrome or stable coronary artery disease.

    e. The Galectin-3 test (CPT 82777) is meant to be used in conjunction with clinical evaluation as an aid in assessing the prognosis of patients diagnosed with chronic heart failure.

499.    Defendants arranged for and recommended that HCPs routinely order their laboratory testing, without regard to specific patient needs.

500.    By marketing and encouraging HCPs to order entire panels, which contained individual laboratory tests that were inapplicable to many, if not most, patients, defendants promoted the ordering of medically unnecessary laboratory testing.

501.    Aware that routine ordering of the tests in their panels was unnecessary, defendants advised HCPs on the diagnosis codes to use for certain tests, in order for the tests to be reimbursed by insurers, including federal insurers. THD, BHD, and LRH even included sample diagnosis codes in their laboratory test referral forms.

## COUNT I
### (Against All Defendants Except BenefitPro)
### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### Presenting or Causing False Claims to Be Presented for Payment

502.    The United States incorporates the preceding paragraphs here.

503.    During the period of January 1, 2015 to December 31, 2017, all defendants except BenefitPro knowingly submitted and/or caused LRH to submit the following four categories of claims for payment to Medicare, Medicaid, and TRICARE for laboratory testing that were false or fraudulent, and not payable.

504.    First, all defendants except BenefitPro knowingly submitted and/or caused LRH to submit to Medicare, Medicaid, and TRICARE claims for laboratory testing that were false or fraudulent, and not payable, because of kickbacks that MSOs, including North Houston MSO, Tomball MSO, Next Level MSOs, Quick MSO, Ascend MSO, and Rise MSOs, knowingly and willfully paid to HCPs to induce their referrals to LRH, in violation of the AKS.

505.    Second, all defendants except BenefitPro knowingly submitted and/or caused LRH to submit to Medicare claims for laboratory testing that were improperly referred by physicians

whose financial relationships with LRH did not satisfy any applicable exception to the Stark Law. LRH had an indirect compensation arrangement with the referring physicians who were receiving MSO payments because there was an unbroken chain of persons with financial relationships between them: LRH paid the recruiters, including S&G, Jacobs Marketing, Next Level, Exit Therapy, APC, and LGRB; the recruiters paid the associated MSOs, including North Houston MSO, Tomball MSO, Next Level MSOs, Quick MSO, Ascend MSO, and Rise MSOs; and the MSOs paid the referring physicians.

506.     The referring physicians received aggregate payments from the MSOs that varied with or took into account the volume or value of referring physicians' referrals to LRH for clinical laboratory testing or other business generated by the referring physicians for LRH. LRH and each defendant except BenefitPro knew that LRH was paying recruiters, who were directly or indirectly providing MSO payments to LRH's referring physicians. LRH and each defendant except BenefitPro knew the referring physicians received aggregate payments from the MSOs that varied with or took into account the volume or value of referring physicians' referrals to LRH for clinical laboratory testing or other business generated by the referring physicians for LRH. The financial relationships between LRH and referring physicians did not satisfy the requirements of any applicable exception to the Stark Law. The referring physicians referred Medicare beneficiaries to LRH for clinical laboratory services, and LRH submitted claims to Medicare for those services. Those physicians' referrals to LRH for laboratory tests were prohibited, and the submission of the claims for the improperly referred DHS to Medicare violated the Stark Law.

507.     Third, all defendants except BenefitPro knowingly submitted and/or caused LRH to submit to Medicare, Medicaid, and TRICARE claims for laboratory testing services for LRH outpatients, despite knowing that the beneficiaries actually were non-patients of LRH.

508. Fourth, all defendants except BenefitPro knowingly submitted and/or caused LRH to submit to Medicare, Medicaid, and TRICARE claims for laboratory testing services that were not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body part.

509. By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

### COUNT II
**(Against All Defendants Except BenefitPro)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Making or Using False Records or Statements**

510. The United States incorporates the preceding paragraphs here.

511. During the period of January 1, 2015 to December 31, 2017, all defendants except BenefitPro knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the United States, and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of those defendants' statements and actions.

512. These false records and statements included false certifications on provider enrollment forms and false and misleading representations on claim forms, cost reports, and/or hospital registration records that (1) LRH's claims to Medicare, Medicaid, and TRICARE for laboratory testing complied with the AKS, when in fact those claims violated the AKS; (2) LRH's claims to Medicare for laboratory testing complied with the Stark Law, when in fact those claims violated the Stark Law; (3) LRH's claims to Medicare, Medicaid, and TRICARE for laboratory testing were for outpatients of LRH, when in fact those claims were for non-patients of LRH; and (4) LRH's claims to Medicare, Medicaid, and TRICARE for laboratory testing were reasonable

and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body part, when in fact those claims were not reasonable and necessary.

513.    All defendants except BenefitPro made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

514.    By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

## COUNT III
**(Against Hertzberg, Theiler, Hickman, Howard, Gonzales, Madison, Borgfeld, Jones, Parnell, Hardaway, Marioni, Perkins, Ginny Jacobs, Scott Jacobs, APM, APC, Next Level, LGRB, S&G, and Jacobs Marketing)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy to Submit False Claims**

515.    The United States incorporates the preceding paragraphs here.

516.    Hertzberg, Theiler, Hickman, Howard, Gonzales, Madison, Borgfeld, Jones, Parnell, Hardaway, Marioni, Perkins, Ginny Jacobs, Scott Jacobs, APM, APC, Next Level, LGRB, S&G, and Jacobs Marketing knowingly entered into an unlawful agreement among themselves and one or more others, including LRH and HCPs, to cause LRH to present false or fraudulent claims to the United States, and performed acts in furtherance of this conspiracy. Specifically, those defendants agreed to a plan by which, among other things, LRH paid recruiters, and funded MSO kickbacks, to generate referrals to LRH for laboratory testing; LRH paid phlebotomists located in HCPs' offices to draw the beneficiaries' blood; the phlebotomists were directed to create false hospital registration records identifying the beneficiaries, who were non-patients of LRH, as outpatients of LRH; the recruiters paid MSO kickbacks to HCPs to induce their referrals to LRH for large panels of laboratory tests, regardless of whether the tests were reasonable and necessary;

BHD directly or indirectly performed the laboratory testing; and LRH submitted the resulting claims for laboratory testing to Medicare, Medicaid, and TRICARE.

517.    Defendants Madison and Borgfeld performed acts in furtherance of this conspiracy by, among other things, entering into agreements with MSO recruiters to arrange for and recommend referrals; entering into an agreement with BHD to perform laboratory testing for LRH; calculating and/or authorizing payments from LRH to MSO recruiters to fund the MSO kickbacks; calculating and/or authorizing payments from LRH to BHD for performing laboratory testing; authorizing agreements with phlebotomists who worked in referring HCPs' offices; reviewing and/or submitting claims to Medicare, Medicaid, and TRICARE; and reviewing and/or signing Medicare cost reports.

518.    Defendants Ginny Jacobs, Scott Jacobs, S&G, and Jacobs Marketing performed acts in furtherance of this conspiracy by, among other things, entering into agreements with LRH to arrange for and recommend referrals; recruiting HCPs to refer to LRH by offering them MSO kickbacks; transferring funds from S&G and Jacobs Marketing by means of direct and indirect transfers to North Houston MSO and Tomball MSO; and paying kickbacks to HCPs through North Houston MSO and Tomball MSO.

519.    Defendants Howard and Gonzales performed acts in furtherance of this conspiracy by, among other things, attending in person meetings with potential HCP referral sources; recruiting HCPs to refer to LRH by offering them kickbacks from Quick MSO and Ascend MSO; providing information and/or documentation to HCPs about the MSO kickbacks; receiving documentation from HCPs; providing and/or coordinating the delivery of MSO checks to HCPs; directing BHD personnel to provide supplies and shipping materials to HCPs; meeting with LRH

personnel about the laboratory referrals; and receiving money, directly or indirectly, as compensation for recruiting HCPs to refer to LRH.

520. Defendant Hickman performed acts in furtherance of this conspiracy by, among other things, creating, owning, and operating APM, APC, and the Ascend MSO; meeting with at least one HCP about kickbacks from Ascend MSO; depositing purported investment checks that HCPs provided to Ascend MSO; authorizing and signing purported distribution checks from Ascend MSO to HCPs; authorizing and signing checks and/or bank transfers to himself and Zalegon for Gonzales' and Howard's benefit.

521. Defendants Stanley Jones, Jeffrey Parnell, Thomas Gray Hardaway, and LGRB performed acts in furtherance of this conspiracy by, among other things, entering into agreements with LRH to arrange for and recommend referrals; providing information and/or documentation to HCPs about the MSO kickbacks; receiving documentation from HCPs; providing and/or coordinating the delivery of MSO checks to HCPs; recruiting HCPs to refer to LRH by offering them MSO kickbacks; transferring funds from LGRB to Rise MSOs; authorizing and signing checks and/or bank transfers to Jones, Parnell, and Hardaway as compensation for recruiting HCPs to refer to LRH; and paying kickbacks to HCPs through Rise MSOs.

522. Defendants Ruben Marioni, Jordan Perkins, and Next Health performed acts in furtherance of this conspiracy by, among other things, entering into agreements with LRH to arrange for and recommend referrals; providing information and/or documentation to HCPs about the MSO kickbacks; receiving documentation from HCPs; providing and/or coordinating the delivery of MSO checks to HCPs; recruiting HCPs to refer to LRH by offering them MSO kickbacks; transferring funds from Next Level to Next Level MSOs; authorizing and signing

checks and/or bank transfers to Marioni and Perkins as compensation for recruiting HCPs to refer to LRH; and paying kickbacks to HCPs through Next Level MSOs.

523.    Defendants Hertzberg and Theiler performed acts in furtherance of this conspiracy by, among other things, entering into an agreement with LRH to provide laboratory testing; meeting in person or by remote means with MSO recruiters, LRH personnel, and HCPs; meeting with BHD personnel about the MSO kickbacks and laboratory referrals to LRH; and authorizing and paying commissions and bonuses to BHD sales personnel based on HCPs' referrals to LRH for BHD testing.

524.    By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

## COUNT IV
**(Against Grottenthaler, Kash, Cornwell, Love, Hickman, Gonzales, Madison, Borgfeld, Jones, Parnell, Hardaway, Marioni, Perkins, Ginny Jacobs, Scott Jacobs, APM, APC, Next Level, LGRB, S&G, and Jacobs Marketing)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy to Submit False Claims**

525.    The United States incorporates the preceding paragraphs here.

526.    Grottenthaler, Kash, Cornwell, Love, Hickman, Gonzales, Madison, Borgfeld, Jones, Parnell, Hardaway, Marioni, Perkins, Ginny Jacobs, Scott Jacobs, APM, APC, Next Level, LGRB, S&G, and Jacobs Marketing knowingly entered into an unlawful agreement among themselves and one or more others, including LRH and HCPs, to cause LRH to present false or fraudulent claims to the United States, and performed acts in furtherance of this conspiracy. Specifically, those defendants agreed to a plan by which, among other things, LRH paid recruiters, and funded MSO kickbacks, to generate referrals to LRH for laboratory testing; LRH paid phlebotomists located in HCPs' offices to draw the beneficiaries' blood; the phlebotomists were

directed to create false hospital registration records identifying the beneficiaries, who were non-patients of LRH, as outpatients of LRH; the recruiters paid MSO kickbacks to HCPs to induce their referrals to LRH for large panels of laboratory tests, regardless of whether the tests were reasonable and necessary; THD directly or indirectly performed the laboratory testing; and LRH submitted the resulting claims for laboratory testing to Medicare, Medicaid, and TRICARE.

527.    Defendants Madison and Borgfeld performed acts in furtherance of this conspiracy by, among other things, entering into agreements with MSO recruiters to arrange for and recommend referrals; entering into an agreement with THD to perform laboratory testing for LRH; calculating and/or authorizing payments from LRH to MSO recruiters to fund the MSO kickbacks; calculating and/or authorizing payments from LRH to THD for performing laboratory testing; authorizing agreements with phlebotomists who worked in referring HCPs' offices; reviewing and/or submitting claims to Medicare, Medicaid, and TRICARE; and reviewing and/or signing Medicare cost reports.

528.    Defendants Ginny Jacobs, Scott Jacobs, S&G, and Jacobs Marketing performed acts in furtherance of this conspiracy by, among other things, entering into agreements with LRH to arrange for and recommend referrals; recruiting HCPs to refer to LRH by offering them MSO kickbacks; transferring funds from S&G and Jacobs Marketing by means of direct and indirect transfers to North Houston MSO and Tomball MSO; and paying kickbacks to HCPs through North Houston MSO and Tomball MSO.

529.    Defendants Kash and Gonzales performed acts in furtherance of this conspiracy by, among other things, attending in person meetings with potential HCP referral sources; recruiting HCPs to refer to LRH by offering them kickbacks from Quick MSO and/or Ascend MSO; providing information and/or documentation to HCPs about the MSO kickbacks; receiving

documentation from HCPs; providing and/or coordinating the delivery of MSO checks to HCPs; directing THD personnel to provide supplies and shipping materials to HCPs; meeting with LRH personnel about the laboratory referrals; and receiving money, directly or indirectly, as compensation for recruiting HCPs to refer to LRH.

530. Defendant Hickman performed acts in furtherance of this conspiracy by, among other things, creating, owning, and operating APM, APC, and the Ascend MSO; meeting with at least one HCP about kickbacks from Ascend MSO; depositing purported investment checks that HCPs provided to Ascend MSO; authorizing and signing purported distribution checks from Ascend MSO to HCPs; authorizing and signing checks and/or bank transfers to himself, Zalegon for Gonzales' benefit, and Tigerlily for Kash's benefit.

531. Defendants Stanley Jones, Jeffrey Parnell, Thomas Gray Hardaway, and LGRB performed acts in furtherance of this conspiracy by, among other things, entering into agreements with LRH to arrange for and recommend referrals; providing information and/or documentation to HCPs about the MSO kickbacks; receiving documentation from HCPs; providing and/or coordinating the delivery of MSO checks to HCPs; recruiting HCPs to refer to LRH by offering them MSO kickbacks; transferring funds from LGRB to Rise MSOs; authorizing and signing checks and/or bank transfers to Jones, Parnell, and Hardaway as compensation for recruiting HCPs to refer to LRH; and paying kickbacks to HCPs through Rise MSOs.

532. Defendants Ruben Marioni, Jordan Perkins, and Next Health performed acts in furtherance of this conspiracy by, among other things, entering into agreements with LRH to arrange for and recommend referrals; providing information and/or documentation to HCPs about the MSO kickbacks; receiving documentation from HCPs; providing and/or coordinating the delivery of MSO checks to HCPs; recruiting HCPs to refer to LRH by offering them MSO

119

kickbacks; transferring funds from Next Level to Next Level MSOs; authorizing and signing checks and/or bank transfers to Marioni and Perkins as compensation for recruiting HCPs to refer to LRH; and paying kickbacks to HCPs through Next Level MSOs.

533.    Defendant Grottenthaler performed acts in furtherance of this conspiracy by, among other things, entering into agreements with LRH to provide laboratory testing, consulting, equipment leases, and billing services; meeting in person with MSO recruiters, LRH personnel, and HCPs; hiring THD personnel to implement the LRH fraud scheme; meeting with THD personnel about the MSO kickbacks and laboratory referrals to LRH; and authorizing and paying commissions and bonuses to THD sales personnel based on HCPs' referrals to LRH for THD testing.

534.    Defendants Cornwell, Kash, and Love performed acts in furtherance of this conspiracy by, among other things, attending in person meetings with potential HCP referral sources; meeting with MSO recruiters; recruiting HCPs to refer to LRH by offering them, and/or referring them to MSO recruiters to receive, MSO kickbacks; providing information and/or documentation to HCPs about LRH and THD testing and the MSO kickbacks; directing THD personnel to provide supplies and shipping materials to HCPs; meeting with LRH personnel about the laboratory referrals; and receiving commissions from THD based on HCPs' referrals to LRH for THD testing.

535.    By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

## COUNT V
**(Against Grottenthaler, Theiler, Kash, Howard, Gonzales, Love, Hickman, Marioni, Perkins, APM, and BenefitPro)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Presenting or Causing False Claims to Be Presented for Payment**

536.    The United States incorporates the preceding paragraphs here.

537.    During the period of May 1, 2017 to May 31, 2018, Defendants Grottenthaler, Theiler, Kash, Howard, Gonzales, Love, Hickman, Marioni, Perkins, APM, and BenefitPro knowingly caused THD and/or BHD to submit claims for payment to Medicare, Medicaid, and TRICARE for laboratory testing that were false or fraudulent, and not payable, because of the kickbacks paid from BenefitPro MSOs and Regal MSOs to HCPs to induce their referrals to THD and/or BHD for laboratory testing.

538.    In addition, defendants Grottenthaler, Theiler, Kash, Howard, Gonzales, Love, Hickman, APM, and BenefitPro knowingly submitted and/or caused THD and/or BHD to submit to Medicare, Medicaid, and TRICARE claims for laboratory testing services that were not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body part.

539.    By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

## COUNT VI
**(Against Grottenthaler, Theiler, Kash, Howard, Gonzales, Love, Hickman, Marioni, Perkins, APM, and BenefitPro)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Making or Using False Records or Statements**

540.    The United States incorporates the preceding paragraphs here.

541.    During the period of May 1, 2017 to May 31, 2018, defendants Grottenthaler, Theiler, Kash, Howard, Gonzales, Love, Hickman, Marioni, Perkins, APM, and BenefitPro

knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the United States, and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of defendants' statements and actions.

542.    The false records and statements included false certifications on provider enrollment forms and false and misleading representations on claim forms that THD and/or BHD's claims to Medicare, Medicaid, and TRICARE for laboratory testing (1) complied with the AKS, when in fact those claims violated the AKS; and/or (2) were reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body part, when in fact those claims were not reasonable and necessary.

543.    Defendants Grottenthaler, Theiler, Kash, Howard, Gonzales, Love, Hickman, Marioni, Perkins, APM, and BenefitPro made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

544.    By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

### COUNT VII
**(Against Grottenthaler, Kash, Gonzales, Love, Hickman, Marioni, Perkins, APM, and BenefitPro)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy to Submit False Claims**

545.    The United States incorporates the preceding paragraphs here.

546.    Defendants Grottenthaler, Kash, Gonzales, Love, Hickman, Marioni, Perkins, APM, and BenefitPro knowingly entered into an unlawful agreement among themselves and with one or more others, including Stamford and HCPs, to submit or cause THD to submit false or

fraudulent claims to the United States, and performed acts in furtherance of this conspiracy. Specifically, those defendants agreed to a plan by which, among other things, MSO recruiters would pay MSO kickbacks to HCPs to induce their referrals to THD for laboratory testing, THD would perform the laboratory testing, and THD would submit the claims to Medicare, Medicaid, and TRICARE.

547.    Defendant Hickman performed acts in furtherance of this conspiracy by, among other things, creating, owning, and operating APM, BenefitPro, and the BenefitPro MSO; depositing purported investment checks that HCPs provided to BenefitPro MSOs; authorizing and signing purported distribution checks from BenefitPro MSOs to HCPs; authorizing and signing checks and/or bank transfers to himself, Regal, Zalegon for Gonzales' benefit, and Tigerlily for Kash's benefit.

548.    Defendants Kash and Gonzales performed acts in furtherance of this conspiracy by, among other things, attending in person meetings with potential HCP referral sources; recruiting HCPs to refer to THD by offering them kickbacks from BenefitPro MSOs; providing information and/or documentation to HCPs about the MSO kickbacks; receiving documentation from HCPs; providing and/or coordinating the delivery of MSO checks to HCPs; directing THD personnel to provide supplies, requisition forms, and shipping materials to HCPs; meeting with THD personnel about the laboratory referrals; and receiving money, directly or indirectly, as compensation for recruiting HCPs to refer to THD.

549.    Defendants Marioni and Perkins performed acts in furtherance of this conspiracy by, among other things, entering into an agreement with BenefitPro on behalf of Regal; recruiting HCPs to refer to THD by offering them kickbacks from Regal MSOs; providing information and/or documentation to HCPs about the MSO kickbacks; receiving documentation from HCPs;

providing and/or coordinating the delivery of MSO checks to HCPs; directing THD personnel to provide supplies, requisition forms, and shipping materials to HCPs; meeting with THD personnel about the laboratory referrals; and receiving money, directly or indirectly, as compensation for recruiting HCPs to refer to THD.

550.     Defendant Grottenthaler performed acts in furtherance of this conspiracy by, among other things, meeting in person with MSO recruiters, Stamford personnel, and HCPs; meeting with THD personnel about the MSO kickbacks and laboratory referrals to THD;  and authorizing and paying commissions and bonuses to THD sales personnel based on HCPs' referrals for THD testing.

551.     Defendants Kash and Love performed acts in furtherance of this conspiracy by, among other things, attending in person meetings with potential HCP referral sources; meeting with MSO recruiters; recruiting HCPs to refer to THD by offering them, and/or referring them to MSO recruiters to receive, MSO kickbacks; providing information and/or documentation to HCPs about Stamford and THD testing and the MSO kickbacks; directing THD personnel to provide supplies, requisition forms, and shipping materials to HCPs; meeting with Stamford personnel about the laboratory referrals; and receiving commissions from THD based on HCPs' referrals to THD for laboratory testing.

552.     By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

**COUNT VIII**
**(Against Theiler, Howard, Gonzales, Hickman, Marioni, Perkins, APM, and BenefitPro)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy to Submit False Claims**

553.     The United States incorporates the preceding paragraphs here.

554. Defendants Theiler, Howard, Gonzales, Hickman, Marioni, Perkins, APM, and BenefitPro knowingly entered into an unlawful agreement among themselves and with one or more others, including Stamford and HCPs, to cause BHD to present false or fraudulent claims to the United States, and performed acts in furtherance of this conspiracy. Specifically, those defendants agreed to a plan by which, among other things, MSO recruiters would pay MSO kickbacks to HCPs to induce their referrals to BHD for laboratory testing, BHD would perform the laboratory testing, and BHD would submit the claims to Medicare, Medicaid, and TRICARE.

555. Defendant Hickman performed acts in furtherance of this conspiracy by, among other things, creating, owning, and operating APM, BenefitPro, and the BenefitPro MSO; depositing purported investment checks that HCPs provided to BenefitPro MSOs; authorizing and signing purported distribution checks from BenefitPro MSOs to HCPs; authorizing and signing checks and/or bank transfers to himself, Regal, and Zalegon for Gonzales' and Howard's benefit.

556. Defendants Howard and Gonzales performed acts in furtherance of this conspiracy by, among other things, attending in person meetings with potential HCP referral sources; recruiting HCPs to refer to BHD by offering them kickbacks from BenefitPro MSOs; providing information and/or documentation to HCPs about the MSO kickbacks; receiving documentation from HCPs; providing and/or coordinating the delivery of MSO checks to HCPs; directing BHD personnel to provide supplies, requisition forms, and shipping materials to HCPs; meeting with BHD personnel about the laboratory referrals; and receiving money, directly or indirectly, as compensation for recruiting HCPs to refer to BHD.

557. Defendants Marioni and Perkins performed acts in furtherance of this conspiracy by, among other things, entering into an agreement with BenefitPro on behalf of Regal; recruiting HCPs to refer to BHD by offering them kickbacks from Regal MSOs; providing information

and/or documentation to HCPs about the MSO kickbacks; receiving documentation from HCPs; providing and/or coordinating the delivery of MSO checks to HCPs; directing BHD personnel to provide supplies, requisition forms, and shipping materials to HCPs; meeting with BHD personnel about the laboratory referrals; and receiving money, directly or indirectly, as compensation for recruiting HCPs to refer to BHD.

558.    Defendant Theiler performed acts in furtherance of this conspiracy by, among other things, meeting with MSO recruiters, Stamford personnel, and HCPs; meeting with BHD personnel about the MSO kickbacks and laboratory referrals to BHD; and receiving commissions and/or bonuses from BHD based on HCPs' referrals to BHD for laboratory testing.

559.    By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

## COUNT IX
### (Against Grottenthaler, Hertzberg, Theiler, Cornwell, and Love)
### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### Presenting or Causing False Claims to Be Presented for Payment

560.    The United States incorporates the preceding paragraphs here.

561.    During the period of July 1, 2015 to December 31, 2016, Defendants Grottenthaler, Hertzberg, Theiler, Cornwell, and Love knowingly caused THD and/or BHD to submit claims for payment to Medicare, Medicaid, and TRICARE for laboratory testing that were false or fraudulent, and not payable, because of the kickbacks paid from ITH MSOs, including Vybrem and Benchmark, to HCPs to induce their referrals to THD and/or BHD for laboratory testing.

562.    In addition, defendants Grottenthaler, Hertzberg, Theiler, Cornwell, and Love knowingly submitted and/or caused THD and/or BHD to submit to Medicare, Medicaid, and TRICARE claims for laboratory testing services that were not reasonable and necessary for the

diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body part.

563.     By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

**COUNT X**
**(Against Grottenthaler, Hertzberg, Theiler, Cornwell, and Love)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Making or Using False Records or Statements**

564.     The United States incorporates the preceding paragraphs here.

565.     During the period of July 1, 2015 to December 31, 2016, Defendants Grottenthaler, Hertzberg, Theiler, Cornwell, and Love knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the United States, and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of defendants' statements and actions.

566.     The false records and statements included false certifications on provider enrollment forms and false and misleading representations on claim forms that THD and/or BHD's claims to Medicare, Medicaid, and TRICARE for laboratory testing (1) complied with the AKS, when in fact those claims violated the AKS because of the kickbacks paid from ITH MSOs, including Vybrem and Benchmark, to HCPs to induce their referrals to THD and/or BHD for laboratory testing; and/or (2) were reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body part, when in fact those claims were not reasonable and necessary.

567. Defendants Grottenthaler, Hertzberg, Theiler, Cornwell, and Love made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

568. By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

### COUNT XI
**(Against Grottenthaler, Cornwell, and Love)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy to Submit False Claims**

569. The United States incorporates the preceding paragraphs here.

570. Defendants Grottenthaler, Cornwell, and Love knowingly entered into an unlawful agreement among themselves and with one or more others, including ITH and HCPs, to submit or cause THD to submit false or fraudulent claims to the United States, and performed acts in furtherance of this conspiracy. Specifically, those defendants agreed to a plan by which, among other things, MSO recruiters would pay MSO kickbacks to HCPs to induce their referrals to THD for laboratory testing, THD would perform the laboratory testing, and THD would submit the claims to Medicare, Medicaid, and TRICARE.

571. Defendant Grottenthaler performed acts in furtherance of this conspiracy by, among other things, meeting in person with MSO recruiters, ITH personnel, and HCPs; meeting with THD personnel about the MSO kickbacks and laboratory referrals to THD; and authorizing and paying commissions and bonuses to THD sales personnel based on HCPs' referrals for THD testing.

572. Defendants Cornwell and Love performed acts in furtherance of this conspiracy by, among other things, attending in person meetings with potential HCP referral sources; meeting

with MSO recruiters; recruiting HCPs to refer to THD by offering them, and/or referring them to MSO recruiters to receive, MSO kickbacks; providing information and/or documentation to HCPs about ITH and THD testing and the MSO kickbacks; directing THD personnel to provide supplies, requisition forms, and shipping materials to HCPs; meeting with ITH personnel about the laboratory referrals; and receiving commissions from THD based on HCPs' referrals to THD for laboratory testing.

573.    By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

### COUNT XII
**(Against Hertzberg and Theiler)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy to Submit False Claims**

574.    The United States incorporates the preceding paragraphs here.

575.    Defendants Hertzberg and Theiler knowingly entered into an unlawful agreement among themselves and with one or more others, including ITH and HCPs, to submit or cause BHD to submit false or fraudulent claims to the United States, and performed acts in furtherance of this conspiracy. Specifically, those defendants agreed to a plan by which, among other things, MSO recruiters would pay MSO kickbacks to HCPs to induce their referrals to BHD for laboratory testing, THD would perform the laboratory testing, and BHD would submit the claims to Medicare, Medicaid, and TRICARE.

576.    Defendant Hertzberg performed acts in furtherance of this conspiracy by, among other things, authorizing BHD's arrangement with ITH; communicating with BHD personnel about ITH and the MSO kickbacks and laboratory referrals to BHD; and authorizing and paying

commissions and/or bonuses to BHD sales personnel based on HCPs' referrals to BHD for laboratory testing.

577.     Defendant Theiler performed acts in furtherance of this conspiracy by, among other things, authorizing BHD's arrangement with ITH; communicating with MSO recruiters, ITH personnel, and HCPs; communicating with BHD personnel about ITH and the MSO kickbacks and laboratory referrals to BHD; and receiving commissions and/or bonuses from BHD based on HCPs' referrals to BHD for laboratory testing.

578.     By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

**COUNT XIII**
**(Against Grottenthaler, Cornwell, and Love)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Presenting or Causing False Claims to Be Presented for Payment**

579.     The United States incorporates the preceding paragraphs here.

580.     During the period of January 1, 2015 to May 31, 2018, Grottenthaler, Cornwell, and Love knowingly submitted and/or caused THD to submit the following five categories of claims for payment to Medicare, Medicaid, and TRICARE for laboratory testing that were false or fraudulent, and not payable.

581.     First, Grottenthaler, Cornwell, and Love knowingly submitted and/or caused THD to submit to Medicare, Medicaid, and TRICARE claims for laboratory testing that were false or fraudulent, and not payable, because of the P&H fee kickbacks that THD paid directly or indirectly to HCPs to induce their referrals to THD, in violation of the AKS.

582.     Second, Grottenthaler, Cornwell, and Love knowingly submitted and/or caused THD to submit to Medicare, Medicaid, and TRICARE claims for laboratory testing that were false

or fraudulent, and not payable, because of the consulting fee kickbacks that THD paid to Physician K to induce his referrals to THD, in violation of the AKS.

583. Third, Grottenthaler, Cornwell, and Love knowingly submitted and/or caused THD to submit to Medicare, Medicaid, and TRICARE claims for laboratory testing that were false or fraudulent, and not payable, because of the kickbacks in the form of waived patient copayments and deductibles, in violation of the AKS.

584. Fourth, Grottenthaler, Cornwell, and Love knowingly submitted and/or caused THD to submit to Medicare claims for laboratory testing that were improperly referred by physicians with whom THD had a financial relationship that did not satisfy the requirements of an applicable exception to the Stark Law. THD had a direct compensation arrangement with Physician K in which THD paid Physician K purported consulting fees. In addition, THD had an indirect compensation arrangement with the referring physicians who received P&H fee payments through purported draw site companies, as THD paid the companies, and the companies paid physicians and the physicians' immediate family members. The referring physicians or their immediate family members received P&H fee payments from THD that varied with or took into account the volume or value of referring physicians' referrals to THD for clinical laboratory testing or other business generated by the referring physicians for THD. THD, Grottenthaler, Cornwell, and Love knew that the physicians received aggregate compensation from THD and the companies THD paid that varied with or otherwise took into account the volume or value of their referrals to THD. The financial relationships between THD and referring physicians or the physicians' immediate family members due to the P&H fee payments did not satisfy any Stark Law exception. The referring physicians referred Medicare beneficiaries to THD for clinical laboratory services, and THD submitted claims to Medicare for those services. Those physicians' referrals to THD for

laboratory tests were prohibited, and the submission of the claims for the improperly referred DHS to Medicare violated the Stark Law.

585.    Fifth, Grottenthaler, Cornwell, and Love knowingly submitted and/or caused THD to submit to Medicare, Medicaid, and TRICARE claims for laboratory testing services that were not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body part.

586.    By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

**COUNT XIV**
**(Against Grottenthaler, Cornwell, and Love)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Making or Using False Records or Statements**

587.    The United States incorporates the preceding paragraphs here.

588.    During the period of January 1, 2015 to May 31, 2018, Grottenthaler, Cornwell, and Love knowingly made or used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the United States, and payment of those false or fraudulent claims by the United States was a reasonable and foreseeable consequence of those defendants' statements and actions.

589.    These false records and statements included false certifications on provider enrollment forms and false and misleading representations on claim forms that (1) THD's claims to Medicare, Medicaid, and TRICARE for laboratory testing complied with the AKS, when in fact those claims violated the AKS; (2) THD's claims to Medicare for laboratory testing complied with the Stark Law, when in fact those claims violated the Stark Law; and (3) THD's claims to Medicare, Medicaid, and TRICARE for laboratory testing were reasonable and necessary for the

diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body part, when in fact those claims were not reasonable and necessary.

590.     In addition, the false records and statements included false and misleading statements and representations, including on THD payment documents, that THD paid consulting fees to Physician K for participating in THD's advisory board, when in fact no such board existed at THD; and that THD paid P&H fees to draw site companies that were independent of referring HCPs, when in fact the draw site companies were conduits to pay P&H fees directly or indirectly to HCPs to induce referrals for laboratory testing.

591.     Grottenthaler, Cornwell, and Love made or used, or caused to be made or used, such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

592.     By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

## COUNT XV
**(Against Grottenthaler, Cornwell, and Love)**
**False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**Conspiracy to Submit False Claims**

593.     The United States incorporates the preceding paragraphs here.

594.     Grottenthaler, Cornwell, and Love knowingly entered into an unlawful agreement among themselves and with one or more others, including Sultan, Zabeda, Physician K, and other HCPs, to cause the presentation of false or fraudulent claims to the United States, and performed acts in furtherance of this conspiracy. Specifically, those defendants agreed to a plan by which THD would submit claims to Medicare, Medicaid, and TRICARE for laboratory testing, where

such claims violated the AKS and Stark Law and were for tests that were not reasonable and necessary.

595.     Grottenthaler performed acts in furtherance of this conspiracy by, among other things, communicating with purported draw site companies, authorizing purported P&H fee and consulting payments, approving and communicating THD's copayment and deductible waiver policy, and approving THD panels and requisition forms.

596.     Cornwell and Love performed acts in furtherance of this conspiracy by, among other things, communicating with purported draw site companies, offering purported P&H fee and consulting payments to HCPs or immediate family members of HCPs, offering copayment and deductible waivers to HCPs, and arranging for and recommending that HCPs order tests on THD's panels and requisition forms.

597.     By virtue of these false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the FCA, to be determined at trial, plus civil penalties for each violation.

**COUNT XVI**
**(Against All Defendants)**
**Unjust Enrichment**

598.     The United States incorporates the preceding paragraphs here.

599.     This is a claim for the recovery of monies by which defendants have been unjustly enriched.

600.     By directly or indirectly obtaining from the United States, through Medicare, Medicaid, and TRICARE, funds to which they were not entitled, defendants were unjustly enriched, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial.

## COUNT XVII
### (Against All Defendants)
### Payment by Mistake

601.    The United States incorporates the preceding paragraphs here.

602.    This is a claim for the recovery of monies the United States paid directly or indirectly to defendants as a result of mistaken understandings of fact.

603.    The United States' mistaken understandings of fact were material to its decision to pay the claims to Medicare, Medicaid, and TRICARE that were submitted or caused to be submitted by defendants for laboratory testing.

604.    The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of associated statements, certifications, and representations, paid monies directly or indirectly to defendants to which they were not entitled. Thus, the United States is entitled to recoup such monies, in an amount to be determined at trial.

## PRAYER FOR RELIEF

The United States requests that judgment be entered in its favor and against the defendants identified above as follows:

(a)    On Counts I–XV (False Claims Act), for treble the United States' damages, together with the maximum civil penalties allowed by law;

(b)    On Count XVI (Unjust Enrichment), in the amount by which defendants were unjustly enriched;

(c)    On Count XVII (Payment by Mistake), in the amount mistakenly paid to defendants; and

(d)    Pre- and post-judgment interest, costs, and such other relief as the Court may deem appropriate.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, the United States requests a trial by jury.

Date: January 31, 2022.                    Respectfully Submitted,

                                           BRIAN M. BOYNTON
                                           Acting Assistant Attorney General
                                           Civil Division

                                           BRIT FEATHERSTON
                                           United States Attorney

                                           */s/ James Gillingham*
                                           JAMES GILLINGHAM
                                           ADRIAN GARCIA
                                           BETTY YOUNG
                                           Assistant U.S. Attorneys
                                           Eastern District of Texas
                                           110 N. College Street; Suite 700
                                           Tyler, Texas 75702
                                           E-mail: James.Gillingham@usdoj.gov
                                           E-mail: AGarcia4@usdoj.gov
                                           E-mail: Betty.Young@usdoj.gov
                                           (903) 590-1400
                                           (903) 590-1436 (fax)
                                           Texas State Bar # 24065295

                                           JAMIE ANN YAVELBERG
                                           SARA MCLEAN
                                           CHRISTOPHER TERRANOVA
                                           Civil Division
                                           U.S. Department of Justice
                                           Post Office Box 261
                                           Ben Franklin Station
                                           Washington, DC 20044
                                           (202) 616-4203
                                           (202) 514-0280 (fax)

                                           *Attorneys for the United States*

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $112.84 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 81225 | Gene analysis (cytochrome P450, family 2, subfamily C, polypeptide 19) common variants | $650.21 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 81240 | Gene analysis (prothrombin, coagulation factor II) A variant | $353.78 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 81241 | Gene analysis (coagulation factor V) Leiden variant | $242.80 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 81401 | Molecular pathology procedure level 2 | $207.80 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 82040 | Albumin (protein) level | $51.02 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 82172 | Apolipoprotein level | $94.59 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 82306 | Vitamin D-3 level | $125.13 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 82550 | Creatine kinase (cardiac enzyme) level, total | $75.22 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 82565 | Blood creatinine level | $47.29 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 82627 | Dehydroepiandrosterone (DHEA-S) hormone level | $67.78 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 82670 | Measurement of total estradiol (hormone) | $94.22 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 82947 | Blood glucose (sugar) level | $59.96 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83036 | Hemoglobin A1C level | $46.92 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83519 | Measurement of substance using immunoassay technique, by radioimmunoassay | $430.12 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83520 | Measurement of substance using immunoassay technique | $92.73 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83525 | Insulin measurement, total | $46.92 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83695 | Lipoprotein (A) level | $39.47 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $103.15 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83701 | Lipoprotein measurement | $75.60 |

---

[2]  For patient privacy, their names have been omitted from this chart and replaced with a numerical identifier.

[3]  Date of the initial claim to a federal healthcare program; for LRH claims, see paragraph 289 above for the date the final claim was submitted as part of LRH's cost report.

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $103.15 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $103.15 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 83921 | Organic acid level | $121.40 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 84075 | Phosphatase (enzyme) level, alkaline | $76.71 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 84270 | Sex hormone binding globulin (protein) level | $65.91 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 84402 | Testosterone (hormone) level, free | $24.95 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 84403 | Testosterone (hormone) level, total | $101.67 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $64.43 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 84450 | Liver enzyme (SGOT), level | $15.64 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 84460 | Liver enzyme (SGPT), level | $51.39 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 84520 | Urea nitrogen level to assess kidney function, quantitative | $40.22 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 84550 | Uric acid level, blood | $54.00 |
| Physician A | LRH | Medicare | Beneficiary 1 | 4/15/2016 | 5/27/2016 | 86141 | Measurement C-reactive protein for detection of infection or inflammation, high sensitivity | $102.41 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $112.84 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 81225 | Gene analysis (cytochrome P450, family 2, subfamily C, polypeptide 19) common variants | $650.21 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 82040 | Albumin (protein) level | $51.02 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 82172 | Apolipoprotein level | $94.59 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 82550 | Creatine kinase (cardiac enzyme) level, total | $75.22 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 82565 | Blood creatinine level | $47.29 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 82725 | Fatty acids measurement | $40.59 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 82947 | Blood glucose (sugar) level | $59.96 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83519 | Measurement of substance using immunoassay technique, by radioimmunoassay | $430.12 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83520 | Measurement of substance using immunoassay technique | $92.73 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83520 | Measurement of substance using immunoassay technique | $92.73 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83525 | Insulin measurement, total | $46.92 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83695 | Lipoprotein (A) level | $39.47 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $103.15 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83704 | Lipoprotein level, quantitation of lipoprotein particle number(s) | $203.33 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $103.15 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $103.15 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 83921 | Organic acid level | $121.40 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 84075 | Phosphatase (enzyme) level, alkaline | $76.71 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $64.43 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 84450 | Liver enzyme (SGOT), level | $15.64 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 84460 | Liver enzyme (SGPT), level | $51.39 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 84520 | Urea nitrogen level to assess kidney function, quantitative | $40.22 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 84550 | Uric acid level, blood | $54.00 |
| Physician A | LRH | Medicare | Beneficiary 2 | 9/13/2016 | 10/26/2016 | 86141 | Measurement C-reactive protein for detection of infection or inflammation, high sensitivity | $102.41 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | G0483 | Drug test(s), definitive; 22 or more drug class(es), including metabolite(s) if performed | $607.52 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | 82610 | Cystatin C (enzyme inhibitor) level | $26.11 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | 83525 | Insulin measurement, total | $29.64 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $65.15 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $65.15 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | 84311 | Chemical analysis using spectrophotometry (light) | $10.23 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | 84311 | Chemical analysis using spectrophotometry (light) | $10.23 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | 84481 | Thyroid hormone, T3 measurement, free | $38.57 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | 84550 | Uric acid level, blood | $34.10 |
| Physician A | LRH | Medicare | Beneficiary 3 | 5/9/2017 | 6/12/2017 | 86376 | Microsomal antibodies (autoantibody) measurement | $39.04 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 81240 | Gene analysis (prothrombin, coagulation factor II) A variant | $125.00 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 81241 | Gene analysis (coagulation factor V) Leiden variant | $155.23 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 81401 | Molecular pathology procedure level 2 | $306.56 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 82306 | Vitamin D-3 level | $125.13 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 82465 | Cholesterol level | $41.71 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 82550 | Creatine kinase (cardiac enzyme) level, total | $75.22 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 82565 | Blood creatinine level | $47.29 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 82725 | Fatty acids measurement | $40.59 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 82947 | Blood glucose (sugar) level | $59.96 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 82985 | Glycated protein level | $53.25 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83036 | Hemoglobin A1C level | $46.92 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83090 | Homocysteine (amino acid) level | $109.11 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83519 | Measurement of substance using immunoassay technique, by radioimmunoassay | $430.12 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83520 | Measurement of substance using immunoassay technique | $92.73 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83525 | Insulin measurement, total | $46.92 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83695 | Lipoprotein (A) level | $39.47 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $103.15 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83701 | Lipoprotein measurement | $75.60 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83718 | HDL cholesterol level | $24.95 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83721 | LDL cholesterol level | $29.05 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $103.15 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $103.15 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 83921 | Organic acid level | $121.40 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 84075 | Phosphatase (enzyme) level, alkaline | $76.71 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $64.43 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 84450 | Liver enzyme (SGOT), level | $15.64 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 84460 | Liver enzyme (SGPT), level | $51.39 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 84478 | Triglycerides level | $46.18 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 84520 | Urea nitrogen level to assess kidney function, quantitative | $40.22 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 84550 | Uric acid level, blood | $54.00 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 85384 | Fibrinogen (factor 1) activity measurement | $41.71 |
| Physician B | LRH | Medicare | Beneficiary 4 | 1/18/2016 | 3/2/2016 | 86141 | Measurement C-reactive protein for detection of infection or inflammation, high sensitivity | $102.41 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 82040 | Albumin (protein) level | $41.62 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 82465 | Cholesterol level | $34.02 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 82550 | Creatine kinase (cardiac enzyme) level, total | $61.36 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 82565 | Blood creatinine level | $38.58 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 82947 | Blood glucose (sugar) level | $48.91 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 83036 | Hemoglobin A1C level | $38.28 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 83090 | Homocysteine (amino acid) level | $89.01 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 83520 | Measurement of substance using immunoassay technique | $75.64 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 83525 | Insulin measurement, total | $38.28 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 83695 | Lipoprotein (A) level | $32.21 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $84.15 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 83701 | Lipoprotein measurement | $61.66 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $84.15 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 84075 | Phosphatase (enzyme) level, alkaline | $62.58 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $52.55 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 84450 | Liver enzyme (SGOT), level | $12.76 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 84460 | Liver enzyme (SGPT), level | $41.92 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 84478 | Triglycerides level | $37.67 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 84520 | Urea nitrogen level to assess kidney function, quantitative | $32.80 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 84550 | Uric acid level, blood | $44.05 |
| Physician C | LRH | TRICARE | Beneficiary 5 | 1/28/2016 | 5/20/2016 | 86141 | Measurement C-reactive protein for detection of infection or inflammation, high sensitivity | $83.54 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 81240 | Gene analysis (prothrombin, coagulation factor II) A variant | $125.00 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 81241 | Gene analysis (coagulation factor V) Leiden variant | $155.23 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 81401 | Molecular pathology procedure level 2 | $306.56 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 82040 | Albumin (protein) level | $51.02 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 82306 | Vitamin D-3 level | $125.13 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 82465 | Cholesterol level | $41.71 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 82550 | Creatine kinase (cardiac enzyme) level, total | $75.22 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 82565 | Blood creatinine level | $47.29 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 82725 | Fatty acids measurement | $40.59 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 82947 | Blood glucose (sugar) level | $59.96 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83036 | Hemoglobin A1C level | $46.92 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83090 | Homocysteine (amino acid) level | $109.11 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83519 | Measurement of substance using immunoassay technique, by radioimmunoassay | $86.02 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83520 | Measurement of substance using immunoassay technique | $92.73 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83525 | Insulin measurement, total | $46.92 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83695 | Lipoprotein (A) level | $39.47 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $103.15 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83701 | Lipoprotein measurement | $75.60 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83718 | HDL cholesterol level | $24.95 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83721 | LDL cholesterol level | $29.05 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $103.15 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $103.15 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 83921 | Organic acid level | $121.40 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 84075 | Phosphatase (enzyme) level, alkaline | $76.71 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $64.43 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 84450 | Liver enzyme (SGOT), level | $15.64 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 84460 | Liver enzyme (SGPT), level | $51.39 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 84478 | Triglycerides level | $46.18 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 84520 | Urea nitrogen level to assess kidney function, quantitative | $40.22 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 84550 | Uric acid level, blood | $54.00 |
| Physician C | LRH | Medicare | Beneficiary 6 | 2/11/2016 | 3/15/2016 | 86141 | Measurement C-reactive protein for detection of infection or inflammation, high  sensitivity | $102.41 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 82040 | Albumin (protein) level | $51.02 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 82465 | Cholesterol level | $41.71 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 82550 | Creatine kinase (cardiac enzyme) level, total | $75.22 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 82565 | Blood creatinine level | $47.29 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 82627 | Dehydroepiandrosterone (DHEA-S) hormone level | $67.78 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 82670 | Measurement of total estradiol (hormone) | $94.22 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 82725 | Fatty acids measurement | $40.59 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 82947 | Blood glucose (sugar) level | $59.96 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 82985 | Glycated protein level | $53.25 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83001 | Gonadotropin, follicle stimulating (reproductive hormone) level | $58.09 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83002 | Gonadotropin, luteinizing (reproductive hormone) level | $66.29 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83036 | Hemoglobin A1C level | $46.92 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83519 | Measurement of substance using immunoassay technique, by radioimmunoassay | $86.02 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83520 | Measurement of substance using immunoassay technique | $92.73 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83525 | Insulin measurement, total | $46.92 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83695 | Lipoprotein (A) level | $39.47 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $103.15 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83704 | Lipoprotein level, quantitation of lipoprotein particle number(s) | $197.37 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $103.15 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $103.15 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 83921 | Organic acid level | $121.40 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84075 | Phosphatase (enzyme) level, alkaline | $76.71 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84144 | Progesterone (reproductive hormone) level | $63.31 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84270 | Sex hormone binding globulin (protein) level | $65.91 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84403 | Testosterone (hormone) level, total | $101.67 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84439 | Thyroxine (thyroid chemical), free | $74.11 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $64.43 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84450 | Liver enzyme (SGOT), level | $15.64 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84460 | Liver enzyme (SGPT), level | $51.39 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84478 | Triglycerides level | $46.18 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84481 | Thyroid hormone, T3 measurement, free | $61.07 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84520 | Urea nitrogen level to assess kidney function, quantitative | $40.22 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 84550 | Uric acid level, blood | $54.00 |
| Physician D | LRH | Medicare | Beneficiary 7 | 6/9/2016 | 9/8/2016 | 85384 | Fibrinogen (factor 1) activity measurement | $41.71 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $11.69 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 82172 | Apolipoprotein level | $41.67 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 82306 | Vitamin D-3 level | $39.80 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 82550 | Creatine kinase (cardiac enzyme) level | $4.13 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 82610 | Cystatin C (enzyme inhibitor) level | $15.27 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 82725 | Fatty acids measurement | $17.89 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 82947 | Blood glucose (sugar) level | $2.79 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 82985 | Glycated protein level | $20.27 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83036 | Hemoglobin A1C level | $13.05 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83090 | Homocysteine (amino acid) level | $22.68 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83519 | Measurement of substance using immunoassay technique | $90.80 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83525 | Insulin measurement | $15.37 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83695 | Lipoprotein (A) level | $17.40 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $45.63 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83704 | Lipoprotein level | $42.41 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $45.63 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $45.63 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 83921 | Organic acid level | $44.24 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 84550 | Uric acid level, blood | $2.92 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 84681 | C-peptide (protein) level | $27.98 |
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 85384 | Fibrinogen (factor 1) activity measurement | $11.42 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician E | BHD | Medicare | Beneficiary 8 | 1/6/2017 | 1/17/2017 | 86141 | Measurement C-reactive protein for detection of infection or inflammation | $17.40 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $22.87 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 82172 | Apolipoprotein level | $52.94 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 82306 | Vitamin D-3 level | $50.56 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 82542 | Chemical analysis using chromatography technique | $24.68 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 82550 | Creatine kinase (cardiac enzyme) level, total | $11.12 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 82610 | Cystatin C (enzyme inhibitor) level | $23.22 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 82725 | Fatty acids measurement | $22.74 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 82947 | Blood glucose (sugar) level | $6.71 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 82985 | Glycated protein level | $25.75 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83036 | Hemoglobin A1C level | $16.58 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83090 | Homocysteine (amino acid) level | $28.81 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83519 | Measurement of substance using immunoassay technique, by radioimmunoassay | $92.32 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83520 | Measurement of substance using immunoassay technique | $44.22 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83525 | Insulin measurement, total | $19.52 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83695 | Lipoprotein (A) level | $22.11 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $57.97 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83704 | Lipoprotein level, quantitation of lipoprotein particle number(s) | $35.00 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $57.97 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $57.97 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83921 | Organic acid level | $56.20 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 83921 | Organic acid level | $56.20 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 84550 | Uric acid level, blood | $7.72 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 84681 | C-peptide (protein) level | $35.55 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 85384 | Fibrinogen (factor 1) activity measurement | $14.51 |
| Physician E | BHD | TRICARE | Beneficiary 9 | 4/24/2017 | 5/5/2017 | 86141 | Measurement C-reactive protein for detection of infection or inflammation, high sensitivity | $22.11 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $112.84 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 81240 | Gene analysis (prothrombin, coagulation factor II) A variant | $353.78 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 81241 | Gene analysis (coagulation factor V) Leiden variant | $242.80 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 82172 | Apolipoprotein level | $94.59 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 82306 | Vitamin D-3 level | $125.13 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 82550 | Creatine kinase (cardiac enzyme) level, total | $75.22 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 82565 | Blood creatinine level | $47.29 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 82947 | Blood glucose (sugar) level | $59.96 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83036 | Hemoglobin A1C level | $46.92 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83090 | Homocysteine (amino acid) level | $109.11 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83519 | Measurement of substance using immunoassay technique, by radioimmunoassay | $430.12 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83520 | Measurement of substance using immunoassay technique | $92.73 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83525 | Insulin measurement, total | $46.92 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83695 | Lipoprotein (A) level | $39.47 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $103.15 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83701 | Lipoprotein measurement | $75.60 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $103.15 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $103.15 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83921 | Organic acid level | $121.40 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 83921 | Organic acid level | $121.40 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 84075 | Phosphatase (enzyme) level, alkaline | $76.71 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $64.43 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 84450 | Liver enzyme (SGOT), level | $15.64 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 84460 | Liver enzyme (SGPT), level | $51.39 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 84520 | Urea nitrogen level to assess kidney function, quantitative | $40.22 |
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 84550 | Uric acid level, blood | $54.00 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician F | LRH | Medicare | Beneficiary 10 | 10/6/2015 | 12/22/2015 | 86141 | Measurement C-reactive protein for detection of infection or inflammation, high sensitivity | $102.41 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $17.88 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 82172 | Apolipoprotein level | $41.38 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 82542 | Chemical analysis using chromatography technique | $96.43 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 82652 | Dihydroxyvitamin D, 1, 25 level | $51.39 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 82664 | Electrophoresis, laboratory testing technique | $34.91 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 82725 | Fatty acids measurement | $17.77 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 82777 | Galectin-3 level | $29.36 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 83525 | Insulin measurement, total | $15.26 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $45.32 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 83704 | Lipoprotein level, quantitation of lipoprotein particle number(s) | $42.12 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $45.32 |
| Physician G | THD | Medicare | Beneficiary 11 | 2/5/2016 | 2/11/2016 | 84311 | Chemical analysis using spectrophotometry (light) | $18.66 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 80053 | Blood test, comprehensive group of blood chemicals | $14.20 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $6.53 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 81401 | Molecular pathology procedure level 2 | $137.20 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 82172 | Apolipoprotein level | $41.67 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 82306 | Vitamin D-3 level | $36.53 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 82542 | Chemical analysis using chromatography technique | $48.55 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 82607 | Cyanocobalamin (vitamin B-12) level | $20.27 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 82610 | Cystatin C (enzyme inhibitor) level | $18.28 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 82664 | Electrophoresis, laboratory testing technique | $35.15 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 82725 | Fatty acids measurement | $17.89 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 82747 | Folic acid level, RBC | $23.24 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 82777 | Galectin-3 level | $29.57 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 83090 | Homocysteine (amino acid) level | $22.68 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 83520 | Measurement of substance using immunoassay technique | $34.81 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 83525 | Insulin measurement, total | $15.37 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 83704 | Lipoprotein level, quantitation of lipoprotein particle number(s) | $42.41 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 83735 | Magnesium level | $9.01 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $45.63 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $45.63 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 83921 | Organic acid level | $22.12 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84100 | Phosphate level | $2.35 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84206 | Proinsulin (pancreatic hormone) level | $23.94 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84311 | Chemical analysis using spectrophotometry (light) | $9.40 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84311 | Chemical analysis using spectrophotometry (light) | $9.40 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84378 | Carbohydrate analysis, single quantitative | $3.87 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84439 | Thyroxine (thyroid chemical), free | $12.12 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $22.59 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84481 | Thyroid hormone, T3 measurement, free | $22.78 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84482 | Thyroid hormone, T3 measurement, reverse | $10.34 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84550 | Uric acid level, blood | $2.24 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 84681 | C-peptide (protein) level | $27.98 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 85025 | Complete blood cell count (red cells, white blood cell, platelets), automated test and automated differential white blood cell count | $10.45 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 86341 | Islet cell (pancreas) antibody measurement | $23.26 |
| Physician H | THD | Medicare | Beneficiary 12 | 1/3/2017 | 1/12/2017 | 86376 | Microsomal antibodies (autoantibody) measurement | $19.56 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $22.71 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 82040 | Albumin (protein) level | $8.39 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 82172 | Apolipoprotein level | $52.56 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 82306 | Vitamin D-3 level | $50.21 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 82550 | Creatine kinase (cardiac enzyme) level | $11.05 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 82565 | Blood creatinine level | $8.69 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 82947 | Blood glucose (sugar) level | $6.66 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 82985 | Glycated protein level | $25.57 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83036 | Hemoglobin A1C level | $16.46 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83090 | Homocysteine (amino acid) level | $28.62 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83519 | Measurement of substance using immunoassay technique | $114.55 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83525 | Insulin measurement | $19.39 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83695 | Lipoprotein (A) level | $21.96 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $57.57 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83704 | Lipoprotein level | $43.45 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $57.57 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $57.57 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83921 | Organic acid level | $55.82 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 83921 | Organic acid level | $55.82 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 84075 | Phosphatase (enzyme) level, alkaline | $8.78 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $28.50 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 84450 | Liver enzyme (SGOT), level | $8.78 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 84460 | Liver enzyme (SGPT), level | $8.99 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 84520 | Urea nitrogen level to assess kidney function, quantitative | $6.70 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 84550 | Uric acid level, blood | $7.68 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 85384 | Fibrinogen (factor 1) activity measurement | $14.41 |
| Physician I | BHD | TRICARE | Beneficiary 13 | 1/24/2017 | 2/4/2017 | 86141 | Measurement C-reactive protein for detection of infection or inflammation | $21.96 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 80053 | Blood test, comprehensive group of blood chemicals | $9.27 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $11.78 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82172 | Apolipoprotein level | $41.34 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82492 | Chemical analysis | $24.09 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82492 | Chemical analysis | $24.09 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82533 | Cortisol (hormone) measurement, total | $21.75 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82544 | Chemical analysis using chromatography technique | $24.09 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82544 | Chemical analysis using chromatography technique | $24.09 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82610 | Cystatin C (enzyme inhibitor) level | $18.13 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82627 | Dehydroepiandrosterone (DHEA-S) hormone level | $29.65 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82664 | Electrophoresis, laboratory testing technique | $34.87 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82670 | Measurement of total estradiol (hormone) | $37.26 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82679 | Estrone (hormone) level | $33.28 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82725 | Fatty acids measurement | $17.76 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82747 | Folic acid level, RBC | $23.06 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 82777 | Galectin-3 level | $29.33 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 83520 | Measurement of substance using immunoassay technique | $34.54 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 83525 | Insulin measurement, total | $15.24 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 83698 | Lipoprotein-associated phospholipase A2 (enzyme) level | $45.27 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 83704 | Lipoprotein level, quantitation of lipoprotein particle number(s) | $42.07 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 83735 | Magnesium level | $8.93 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $45.27 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $45.27 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 83921 | Organic acid level | $21.94 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 83970 | Parathormone (parathyroid hormone) level | $55.05 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84140 | Pregnenolone (reproductive hormone) level | $27.57 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84154 | PSA (prostate specific antigen) measurement, free | $24.53 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84206 | Proinsulin (pancreatic hormone) level | $23.76 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84270 | Sex hormone binding globulin (protein) level | $28.99 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84311 | Chemical analysis using spectrophotometry (light) | $18.66 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84378 | Carbohydrate analysis, single quantitative | $3.84 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84403 | Testosterone (hormone) level, total | $34.43 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84439 | Thyroxine (thyroid chemical), free | $12.02 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $22.41 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84481 | Thyroid hormone, T3 measurement, free | $22.59 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84482 | Thyroid hormone, T3 measurement, reverse | $10.26 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84550 | Uric acid level, blood | $4.06 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 84681 | C-peptide (protein) level | $27.75 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 85025 | Complete blood cell count (red cells, white blood cell, platelets), automated test and automated differential white blood cell count | $10.37 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 86341 | Islet cell (pancreas) antibody measurement | $23.08 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 86376 | Microsomal antibodies (autoantibody) measurement | $19.40 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | 86800 | Thyroglobulin (thyroid protein) antibody measurement | $21.22 |
| Physician J | THD | Medicare | Beneficiary 14 | 10/2/2015 | 10/22/2015 | G6047 | Dihydrotestosterone | $34.43 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 80053 | Blood test, comprehensive group of blood chemicals | $9.28 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $11.81 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82172 | Apolipoprotein level | $41.38 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82533 | Cortisol (hormone) measurement, total | $21.77 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82542 | Chemical analysis using chromatography technique | $120.54 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82607 | Cyanocobalamin (vitamin B-12) level | $20.13 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82610 | Cystatin C (enzyme inhibitor) level | $18.15 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82627 | Dehydroepiandrosterone (DHEA-S) hormone level | $29.68 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82664 | Electrophoresis, laboratory testing technique | $34.91 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82670 | Measurement of total estradiol (hormone) | $37.30 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82679 | Estrone (hormone) level | $33.32 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82725 | Fatty acids measurement | $17.77 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82728 | Ferritin (blood protein) level | $18.20 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82747 | Folic acid level, RBC | $23.08 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82777 | Galectin-3 level | $29.36 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 82985 | Glycated protein level | $20.13 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83036 | Hemoglobin A1C level | $12.96 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83090 | Homocysteine (amino acid) level | $22.52 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83520 | Measurement of substance using immunoassay technique | $34.55 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83525 | Insulin measurement, total | $15.26 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83540 | Iron level | $8.64 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83704 | Lipoprotein level, quantitation of lipoprotein particle number(s) | $42.12 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83735 | Magnesium level | $8.94 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83789 | Mass spectrometry (laboratory testing method) | $24.11 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83876 | Myeloperoxidase (white blood cell enzyme) measurement | $45.32 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $45.32 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83918 | Organic acids level | $43.92 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 83970 | Parathormone (parathyroid hormone) level | $55.11 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84140 | Pregnenolone (reproductive hormone) level | $27.60 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84153 | PSA (prostate specific antigen) measurement, total | $24.56 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84154 | PSA (prostate specific antigen) measurement, free | $24.56 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84206 | Proinsulin (pancreatic hormone) level | $23.77 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84270 | Sex hormone binding globulin (protein) level | $29.02 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84311 | Chemical analysis using spectrophotometry (light) | $18.66 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84378 | Carbohydrate analysis, single quantitative | $3.84 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84403 | Testosterone (hormone) level, total | $34.47 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84439 | Thyroxine (thyroid chemical), free | $12.03 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $22.43 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84481 | Thyroid hormone, T3 measurement, free | $22.61 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84482 | Thyroid hormone, T3 measurement, reverse | $10.27 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84550 | Uric acid level, blood | $4.06 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 84681 | C-peptide (protein) level | $27.78 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 85025 | Complete blood cell count (red cells, white blood cell, platelets), automated test and automated differential white blood cell count | $10.38 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 86341 | Islet cell (pancreas) antibody measurement | $23.10 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 86376 | Microsomal antibodies (autoantibody) measurement | $19.42 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | 86800 | Thyroglobulin (thyroid protein) antibody measurement | $21.24 |
| Physician J | THD | Medicare | Beneficiary 14 | 1/14/2016 | 3/7/2016 | G0480 | Drug test(s), definitive, utilizing (1) drug identification methods able to identify individual drugs and distinguish between structural isomers | $78.34 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | (but not necessarily stereoisomers), including, but not limited to gc/ms (any type, single or tandem | |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $12.33 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 81240 | Gene analysis (prothrombin, coagulation factor II) A variant | $65.62 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 81241 | Gene analysis (coagulation factor V) Leiden variant | $81.50 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 82040 | Albumin (protein) level | $3.33 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 82533 | Cortisol (hormone) measurement, total | $21.75 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 82607 | Cyanocobalamin (vitamin B-12) level | $20.10 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 82610 | Cystatin C (enzyme inhibitor) level | $18.13 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 82725 | Fatty acids measurement | $17.76 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 82746 | Folic acid level, serum | $19.61 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 82947 | Blood glucose (sugar) level | $2.65 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 83090 | Homocysteine (amino acid) level | $22.49 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 83525 | Insulin measurement, total | $15.24 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 83695 | Lipoprotein (A) level | $17.27 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 83701 | Lipoprotein measurement | $33.10 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 83735 | Magnesium level | $8.93 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $45.27 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 84378 | Carbohydrate analysis, single quantitative | $3.84 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 84403 | Testosterone (hormone) level, total | $34.43 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 84550 | Uric acid level, blood | $3.05 |
| Physician K | THD | Medicare | Beneficiary 15 | 2/10/2015 | 4/28/2015 | 84681 | C-peptide (protein) level | $27.75 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 80053 | Blood test, comprehensive group of blood chemicals | $7.06 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 80061 | Blood test, lipids (cholesterol and triglycerides) | $8.97 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 82172 | Apolipoprotein level | $41.38 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 82248 | Bilirubin level, direct | $3.38 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 82533 | Cortisol (hormone) measurement, total | $21.77 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 82610 | Cystatin C (enzyme inhibitor) level | $18.15 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 82652 | Dihydroxyvitamin D, 1, 25 level | $51.39 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 82664 | Electrophoresis, laboratory testing technique | $34.91 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 82725 | Fatty acids measurement | $17.77 |

| Referring HCP | Billing Entity | Payor | Beneficiary[2] | Referral Date | Claim Date[3] | CPT Code | CPT Description | Payment |
|---|---|---|---|---|---|---|---|---|
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 82728 | Ferritin (blood protein) level | $18.20 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 82747 | Folic acid level, RBC | $23.08 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 83036 | Hemoglobin A1C level | $12.96 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 83520 | Measurement of substance using immunoassay technique | $17.28 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 83525 | Insulin measurement, total | $15.26 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 83540 | Iron level | $8.64 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 83735 | Magnesium level | $8.94 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 83880 | Natriuretic peptide (heart and blood vessel protein) level | $45.32 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 84100 | Phosphate level | $3.23 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 84311 | Chemical analysis using spectrophotometry (light) | $9.33 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 84378 | Carbohydrate analysis, single quantitative | $3.84 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 84439 | Thyroxine (thyroid chemical), free | $12.03 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 84443 | Blood test, thyroid stimulating hormone (TSH) | $22.43 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 84481 | Thyroid hormone, T3 measurement, free | $22.61 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 84550 | Uric acid level, blood | $3.08 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 84681 | C-peptide (protein) level | $27.78 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 85025 | Complete blood cell count (red cells, white blood cell, platelets), automated test and automated differential white blood cell count | $10.38 |
| Physician K | THD | Medicare | Beneficiary 16 | 1/8/2016 | 1/15/2016 | 86376 | Microsomal antibodies (autoantibody) measurement | $19.42 |